## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATRICIA A. SHENK,<br>106 Cambridge Dr.,<br>Hershey, PA  17033,<br><br>Individually and On Behalf of All Others<br>Similarly Situated,<br><br>                            Plaintiff,<br><br>      v.<br><br>MALLINCKRODT PLC,<br>675 McDonnell Blvd.<br>Hazelwood, MO 63042<br><br>and MARK TRUDEAU,<br>c/o Mallinckrodt PLC<br>675 McDonnell Blvd.<br>Hazelwood, MO 63042<br><br><br>                            Defendants. | No.   17-145<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

Plaintiff, Patricia A. Shenk ("Plaintiff"), individually and on behalf of all others similarly

situated, by and through Plaintiff's counsel, alleges the following based upon personal

knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other

matters, based upon, *inter alia*, an investigation conducted by and through Plaintiff's attorneys,

which included, among other things, a review of the filings of Mallinckrodt plc ("Mallinckrodt"

or the "Company") with the United States Securities and Exchange Commission ("SEC"),

Company news releases and conference calls, public statements issued by Defendants, securities

analyst reports, and media and industry reports.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after Plaintiff has had a reasonable opportunity to conduct discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of all persons who purchased Mallinckrodt's publicly traded securities on a domestic exchange between November 25, 2014, and January 18, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").   These claims are asserted against Mallinckrodt and its current Chief Executive Officer ("CEO"), Mark Trudeau, who made materially false and misleading statements during the Class Period in press releases, analyst and investor conference calls, and SEC filings.

2.      Mallinckrodt is a public limited company organized in Ireland with its U.S. headquarters in St. Louis, Missouri.   Mallinckrodt trades on the New York Stock Exchange ("NYSE") under the ticker symbol "MNK."   Mallinckrodt develops and produces specialty pharmaceutical products, including generic drugs and imaging agents, and has in excess of $3.3 billion in annual revenue.

3.       On August 14, 2014, Mallinckrodt acquired Questcor Pharmaceuticals, Inc. ("Questcor") in a $5.6 billion transaction.   As a result of the acquisition, Mallinckrodt added HP Acthar Gel ("Acthar"), an injectable medication made from pigs' pituitary glands, to its drug portfolio.

4.      Acthar is the only approved therapeutic preparation of adrenocorticotropic hormone ("ACTH") in the U.S., and is approved by the U.S. Food and Drug Administration

("FDA") as a treatment for 19 different conditions, including infantile spasms, and difficult-to-treat autoimmune and inflammatory conditions.

5.      In June 2013, Questcor had acquired the U.S. rights to market a synthetic ACTH drug, Synacthen Depot ("Synacthen") from Novartis International AG.  Although not stated at the time, Questcor's acquisition of Synacthen was for the purpose of preventing its competitors from obtaining FDA approval for an alternative ACTH treatment, thereby maintaining its U.S. monopoly on ACTH treatments.

6.      Given the monopoly status of Acthar in the U.S. market, Questcor, and later Mallinckrodt, repeatedly increased the price of Acthar 85,000% from $40 per vial in 2001, to over $34,000 per vial in 2017.

7.      Acthar is now one of the most expensive drugs on the market, and is currently the single most expensive drug reimbursed by both Medicare and Medicaid.  As a result of its acquisition of Questcor, Mallinckrodt obtained the exclusive rights to both Acthar and Synacthen, and Acthar became an important revenue source for Mallinckrodt, representing 34% of the Company's overall sales in 2016.

8.      As a result of the exorbitant price increases and the lack of data supporting the efficacy of Acthar for many of its approved uses, Acthar's use has been severely criticized since at least 2012.  Furthermore, since at least August 2014, the substantial overall cost of Acthar prescriptions to Medicare has been a source of significant criticism.

9.      Throughout the Class Period, Defendants made false and misleading statements and failed to disclose material adverse facts about the long-term sustainability of the Company's monopolistic Acthar revenues and the exposure of Acthar to reimbursement rates by Medicare and Medicaid.  Specifically, Defendants made false and/or misleading statements and/or failed to

disclose that Acthar's monopoly status as the only FDA-approved ACTH preparation was the product of unlawful anticompetitive practices and failed to disclose that its increasing reliance on Medicare and Medicaid meant that the Company's monopolistic Acthar revenue would be threatened if the government took action to limit the price paid for this drug by taxpayers.

10.     After Mallinckrodt completed the acquisition of Questcor on August 14, 2014, the Company stated in its 2014 Form 10-K filed on November 25, 2014, that Acthar "has limited direct competition due to the unique nature of the product."  However, the Company failed to disclose that its Acthar revenues were in fact the product of its monopolistic efforts to prevent an alternative ACTH treatment from being introduced in the U.S. market, a practice that it would later be forced to abandon.

11.     The Company's 2014 Form 10-K also stated that "federal and state governments may continue to enact measures in the future aimed at containing or reducing payment levels for prescription pharmaceuticals paid for in whole or in part with government funds. We cannot predict the nature of such measures, which could have material adverse consequences for the pharmaceutical industry as a whole and, consequently, also for us."  However, this statement omitted the fact that the Company's increasing reliance on Medicare and Medicaid for over 60% of Acthar's sales meant that the Company was highly exposed to changes in reimbursement levels for these programs.  As such, this statement created a materially false and misleading impression of the true nature of, and specific risks to, Mallinckrodt due to its exposure to Medicare and Medicaid reimbursement levels.

12.     Beginning in the summer of 2015, the high costs (and very substantial cost increases) for certain drugs became a national issue.  As a result, the portion of total Acthar

revenues being paid by the federal government was of significant concern to Mallinckrodt investors.

13.     Against this background, on an October 6, 2015 conference call with investors, Trudeau was asked about the Company's reliance on Medicare for revenues for Acthar.  Trudeau indicated that Mallinckrodt's combined revenues for Medicare and Medicaid constituted roughly 25% of the Company's total revenues, and that the proportion of Acthar revenues attributable to Medicare and Medicaid was "a little higher than that."

14.     The truth about the Company's dependence on Medicare and Medicaid for Acthar revenue began to surface on November 9, 2015, when Citron Research ("Citron") issued a statement on Twitter comparing Mallinckrodt to Valeant Pharmaceuticals International, Inc. ("Valeant" or "VRX"), whose stock price had plummeted 30% after Citron accused Valeant of fraud.

15.     In the wake of the Citron comment, Mallinckrodt's stock price fell 17% from a close of $69.89 per share on November 6, 2015, to close at $58.01 per share on November 9, 2015.

16.     The truth about the Company's dependence on Medicare and Medicaid for Acthar revenue continued to be revealed on November 16, 2016, when Citron published a report (the "Citron Report") accusing Trudeau and the Company of securities fraud in connection with Trudeau's October 6, 2015 statements downplaying the Company's reliance on Medicare and Medicaid for Acthar revenue.  The Citron Report revealed that, based on information published by the Centers for Medicare and Medicaid Services ("CMS") (a federal agency within the U.S. Department of Health and Human Services that administers various government-sponsored healthcare programs) on November 14, 2016, Medicare paid approximately $504 million and

Medicaid paid $144.6 million for Acthar in 2015, and that these payments collectively amounted to 61.32% of Mallinckrodt's total Acthar revenue in 2015.  Individually, Medicare paid approximately 48% of Mallinckrodt's 2015 revenue from Acthar.  These numbers, Citron alleged, demonstrated that Mr. Trudeau lied when he indicated that Medicare constituted only "a little bit higher" than 25% of Acthar sales.

17.     In the wake of the Citron Report, Mallinckrodt's stock price fell 18.4% from a close of $67.80 per share on November 15, 2016, to close at $55.32 per share on November 17, 2016.

18.     Further information regarding the Company's reliance on Medicare and Medicaid for Acthar revenue was revealed on November 29, 2016.  During a conference call with investors on this date, Trudeau admitted that "Acthar now represents a significantly greater proportion of our operating income than one-third."

19.     On this news, Mallinckrodt's stock price declined 9.1% from a close of $57.67 per share on November 28, 2016, to close at $52.42 per share on November 29, 2016.

20.     The next day, the Company effectively admitted the falsity of Trudeau's October 6, 2015 statements, telling investors at a Piper Jaffray Healthcare conference that its reimbursement level from Medicare alone was in the "mid-40s."

21.     The truth about the Company's anticompetitive and unlawful efforts to prevent an alternative ACTH treatment from reaching the U.S. market was revealed on January 18, 2017, when the FTC announced that Mallinckrodt had agreed to pay $100 million in connection with a joint settlement with the FTC and several states.  As part of the settlement, Mallinckrodt also agreed to license Synacthen to a competitor to pursue FDA approval for two of Acthar's primary indications, infantile spasms and nephrotic syndrome.

22.     The news of the settlement, and the fact that Mallinckrodt would lose its ACTH monopoly in the U.S., caused the Company's stock price to decline 5.85% from a close of $49.42 per share on January 17, 2017, to close at $46.53 per share on January 18, 2017.

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

25.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business throughout this District, and a substantial part of the events giving rise to these claims took place in this District.  Specifically, the settlement between the FTC and Mallinckrodt was filed in this District.  *See* Joint Mot. for Entry of Stipulated Order for Perm. Inj. & Equitable Monetary Relief, *Federal Trade Comm'n, et al. v. Mallinckrodt ARD Inc., et al.*, No. 1:17-cv-00120, ECF No. 2 (D.D.C. Jan. 18, 2017).

26.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

27.     Plaintiff, Patricia A. Shenk, as set forth in the accompanying certification attached as Exhibit A, incorporated by reference herein, purchased Mallinckrodt stock at artificially inflated prices during the Class Period and has been damaged thereby.

28.     Defendant Mallinckrodt is a public limited company organized in Ireland and based in Staines-upon-Thames, England.  Mallinckrodt's U.S. headquarters is located in St. Louis, Missouri.  The Company develops, manufactures, and distributes specialty pharmaceutical products and reported over $3.3 billion in net sales for fiscal year 2016.

29.     Defendant Mark Trudeau is and, throughout the Class Period, was the Company's CEO.

30.     Trudeau, because of his position in the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  Trudeau was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his position and access to material non-public information available to him, Trudeau knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. Trudeau is liable for the false statements pleaded herein because he made, or caused to be made, all the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period.

31.     The Class Period begins on November 25, 2014, shortly after Mallinckrodt completed the acquisition of Questcor in August 2014.  The Company stated in its 2014 Form 10-K filed on this date that Acthar "has limited direct competition due to the unique nature of the product."  The 2014 Form 10-K also stated that, with the exception of Acthar's indication for treatment of infantile spasms, "Acthar is not subject to patent or other exclusivity" and that "Acthar's commercial durability therefore relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws."

32.     With respect to Medicare and Medicaid reimbursement levels, the 2014 Form 10-K stated that "federal and state governments may continue to enact measures in the future aimed at containing or reducing payment levels for prescription pharmaceuticals paid for in whole or in part with government funds. We cannot predict the nature of such measures, which could have material adverse consequences for the pharmaceutical industry as a whole and, consequently, also for us."

33.     The statements referenced in ¶ 31 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Acthar's "limited direct competition" and "commercial durability" was in fact due to Questcor's illegal anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt initially followed, but later would later be forced to abandon.

34.     The risk disclosures referenced in ¶ 32 created a materially false and misleading impression of the true nature of, and specific risks to, Mallinckrodt due its exposure to Medicare and Medicaid reimbursement levels.   As the Citron Report revealed on November 16, 2016, Medicare spending in 2014 on Acthar totaled over $391 million, representing over 45% of Acthar sales.  The Report further revealed that combined 2014 Medicare and Medicaid spending on Acthar was over $518 million, representing over 60% of Acthar sales.   Therefore, the Company faced extreme exposure to reductions in reimbursement levels by these programs.  As a result, the Company's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

35.     On October 6, 2015, Mallinckrodt held a guidance call with investors.  During the call, Trudeau touted growth in Acthar sales, which he described as one of the Company's "key initiatives."   Trudeau stated that one of the "key levers" to Acthar sales growth was "further developing key payer relationships."

36.     Given the growing controversy over prescription drug pricing, investors were concerned about the Company's exposure to potential reductions in reimbursement by federal prescription drug programs like Medicare.   One analyst, Jason Gerberry of Leerink Partners, specifically asked: "What is your Acthar exposure to Medicare?"  In response, Trudeau stated:

> So with regards to your question on Medicare exposure to Acthar,
> a couple of things. One, if we look at our overall business, the
> combined proportion of our business that goes through Medicare
> and Medicaid combined it's about a quarter of our business,
> roughly. ***Acthar is maybe a little higher than that.*** But in general,
> our business is about a quarter.

37.     Shortly after Trudeau's October 6, 2015 comments, on November 9, 2015, Citron issued a statement on Twitter that compared Mallinckrodt to Valeant, and specifically targeted the Company's reimbursement levels, including from Medicare and Medicaid.   The Citron

comment stated that "[a]t these prices $MNK has signif more downside than $VRX-- far worse offender of the reimb sys - more to follow. VRX can't live in a vacuum."

38.     In the wake of the Citron comment, Mallinckrodt's stock price fell 17% from a close of $69.89 per share on November 6, 2015, to close at $58.01 per share on November 9, 2015.

39.     The decline in Mallinckrodt's stock price was contained after the Company falsely reassured investors on November 9, 2015, that "we are fully confident in our business model and remain focused on executing on our long-term growth strategy."

40.     The statements referenced in ¶¶ 35–36, and 39 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants failed to disclose that the Company's "business model" and "long term growth strategy" was actually contingent on illegal, anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt would later be forced to abandon.  Moreover, as the Citron Report revealed on November 16, 2016, the percentage of Acthar sales for 2014 attributable to Medicare alone was over 45%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid was over 60%.  Furthermore, Defendants failed to disclose that the total percentage of Acthar sales attributable to Medicare *increased* in 2015, with sales attributable to Medicare alone totaling 48%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid totaling 61%.  As a result, Trudeau's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

41.     On November 24, 2015, the Company filed its 2015 Form 10-K, in which it again stated that Acthar "has limited direct competition due to the unique nature of the product" and that "Acthar's commercial durability . . .  relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws."   The 2015 Form 10-K also contained similar risk disclosures as the 2014 Form 10-K.

42.      The statements referenced in ¶ 41 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that Acthar's "limited direct competition" and "commercial durability" was in fact due to Questcor's illegal anticompetitive conduct in preventing a synthetic version of ACTH to reach the U.S. market, a practice that Mallinckrodt would later be forced to abandon.

43.     The risk disclosures referenced in ¶ 41 created a materially false and misleading impression of the true nature of, and specific risks to, Mallinckrodt due to its exposure to Medicare and Medicaid reimbursement levels. As the Citron Report revealed on November 16, 2016, the percentage of Acthar sales for 2014 attributable to Medicare alone was over 45%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid was over 60%.  Moreover, the total percentage of Acthar sales attributable to Medicare *increased* in 2015, with sales attributable to Medicare alone totaling 48%, and the total percentage of Acthar revenue attributable to both Medicare and Medicaid totaling 61%. Therefore, the Company faced extreme exposure to reductions in reimbursement levels by these programs.  As a result, the Company's statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Is Revealed.**

44.     On November 14, 2016, CMS released updated drug pricing data for 2015.  The 2015 data revealed that Medicare spending on Acthar had increased from approximately $391 million in 2014, to approximately $503 million in 2014, an increase of over 28%, and that combined Medicare and Medicaid spending on Acthar increased from approximately $518 million in 2014, to approximately $648.5 million in 2015, an increase of over 25%.

45.     On November 16, 2016, Citron published the Citron Report, which analyzed the 2015 CMS drug pricing data and concluded that Trudeau's statements on October 6, 2015, regarding the percentage of Acthar sales attributable to Medicare were false.  The Citron Report revealed to the market that, contrary to Trudeau's statements that the percentage of 2015 Acthar sales attributable to Medicare was "maybe a little bit higher than" 25%, the percentage was actually over 48%, with the percentage of Acthar sales attributable to both Medicare and Medicaid totaling over 61%.  The Citron Report accused Trudeau and the Company of securities fraud for misleading investors about the Company's exposure to government prescription drug programs.

46.      After publication of the Citron Report, Mallinckrodt's stock price fell 18.4% from a close of $67.80 per share on November 15, 2016, to close at $55.32 per share on November 17, 2016.

47.     On November 29, 2016, Mallinckrodt released its fourth quarter 2016 earnings results, and held a conference call with investors.   In his opening remarks, Trudeau acknowledged that "[a]s we expand patient access [to Acthar] in pulmonology and rheumatology, our patient mix has shifted more toward older patients, many of whom are

covered by Medicare."  Trudeau also admitted that "Acthar now represents a significantly greater proportion of our operating income than one-third."

48.     During the call, analysts questioned the Company's dependence on Medicare for Acthar revenue in light of the recently revealed data:

> Analyst [Marc Goodman (UBS)]: For Acthar, just helps [sic] us understand better how much of the [commercial payer] contracting has already kicked in and is impacting the business so far.  I'm just trying to understand, you keep increasing commercial contracting, yet the Medicare piece of the business is going up.  I heard you comment about the older patients with these indications that seem to be growing.   So I understand that part.   But I just don't understand why that piece of the business is increasing so fast and yet the commercial business is increasing so fast.

49.     Analysts also highlighted Trudeau's earlier misleading statements about the Company's Medicare exposure with Acthar.  For example, Gregg Gilbert of Deutsche Bank noted that "on the amount of Acthar business that's paid for by the government," there has "obviously been some controversy in the market . . . about your potential mischaracterization of the channel mix."

50.     Hugh O'Neill ("O'Neill"), an Executive Vice President and President of Autoimmune & Rare Diseases at the Company, noted that "[a]s it relates to the shift in the payer mix," "there's nothing here that's happening I think that we were surprised by."  Mr. O'Neill's statements confirmed that the Company knew about the increase in Medicare payments for Acthar and that Trudeau's October 6, 2015 statements were false when made.

51.     The news of the Company's increasing exposure to Medicare from Acthar, which it now acknowledged represented "a significantly greater proportion of our operating income than one-third," caused Mallinckrodt's stock price to decline an additional 9.1% from a close of $57.67 per share on November 28, 2016, to close at $52.42 per share on November 29, 2016.

52.     The next day, the Company effectively admitted the falsity of Trudeau's October 6, 2015 statements, telling investors at a Piper Jaffray Healthcare conference that its reimbursement level from Medicare alone was in the "mid-40s."  Specifically, O'Neill stated: "Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for the product versus where it was a year and a half, two years ago which was more in that low, mid-30s."

53.     The truth about the Company's anticompetitive and unlawful efforts to maintain its monopoly on Acthar by preventing a synthetic ACTH treatment from reaching the U.S. market was revealed on January 18, 2017, when the FTC announced that Mallinckrodt had agreed to a joint settlement with the FTC and several states. As part of the settlement, Mallinckrodt agreed to pay $100 million, and more importantly, agreed to license Synacthen to a competitor to pursue FDA approval for two of Acthar's primary indications, infantile spasms and nephrotic syndrome.

54.     The news of the settlement, and the fact that Mallinckrodt would lose its ACTH monopoly in the U.S., caused the Company's stock price to decline 5.85% from a close of $49.42 per share on January 17, 2017, to close at $46.53 per share on January 18, 2017.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

55.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Mallinckrodt's publicly traded securities during the Class Period on a domestic exchange (the "Class").  Excluded from the Class are Defendants, directors and officers of Mallinckrodt, and their families and affiliates.

56.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The Company's shares are owned by thousands of persons.

57.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Mallinckrodt securities was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

58.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

59.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

60.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

61.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Mallinckrodt securities was artificially inflated throughout the Class Period by Defendants' false and misleading statements, and significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed through corrective disclosures on November 9, 2015, November 16, 2016, November 29, 2016, and January 18, 2017, causing investors' losses.  As a result of their purchases of Mallinckrodt securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

62.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

63.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded domestically on the NYSE, an efficient
market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor
to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Mallinckrodt securities
between the time Defendants misrepresented or failed to disclose material
facts and the time the true facts were disclosed, without knowledge of the
misrepresented or omitted facts.

64.     At all relevant times, the market for Mallinckrodt securities was efficient for the
following reasons, among others: (1) as a regulated issuer, Mallinckrodt filed periodic public
reports with the SEC; (2) Mallinckrodt regularly communicated with public investors through
established market communication mechanisms, including through regular disseminations of
press releases on major news wire services and through other wide-ranging public disclosures,
such as communications with the financial press, securities analysts, and other similar reporting
services; and (3) Mallinckrodt's securities traded domestically on the NYSE, an efficient market.

**NO SAFE HARBOR**

65.     Defendants' "Safe Harbor" warnings accompanying any forward-looking
statements issued during the Class Period were ineffective to shield those statements from
liability.

66.     Defendants are also liable for any false or misleading forward-looking statements
pleaded because, at the time each forward-looking statement was made, the speaker knew the
forward-looking statement was false or misleading and the forward-looking statement was
authorized and/or approved by an executive officer of Mallinckrodt who knew that the statement

was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### FIRST CLAIM
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants.

67.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.     During the Class Period, Mallinckrodt and Trudeau carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Mallinckrodt securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of these Defendants, took the actions set forth herein.

69.     Mallinckrodt and Trudeau: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Mallinckrodt securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and/or as controlling persons.

70.     Defendants' Class Period statements were issued with actual knowledge of their falsity or were issued with extreme recklessness.

71.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against Defendant Trudeau.**

72.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.     Defendant Trudeau acted as a controlling person of Mallinckrodt within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level position, and his ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements issued by the Company and disseminated to the investing public, Trudeau had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Trudeau was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, Trudeau had direct and supervisory involvement in the day-to-day operations of the Company and therefore is presumed to have had the power to control or

influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.     As set forth above, Mallinckrodt and Trudeau each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person, Trudeau is also liable pursuant to Section 20(a) of the Exchange Act.

76.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding damages and equitable relief in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

77.     Plaintiff hereby demands a trial by jury.

Dated: January 23, 2017           Respectfully submitted,

/s/ Michael Weitzner
Michael Weitzner (D.C. Bar No 472505)
4916 Brandywine Street N.W.
Washington, D.C. 20016
Tel:  (202) 905-1172
Fax:  (202) 265-0403
mweitzner@weitznerlaw.com

Geoffrey C. Jarvis (D.C. Bar No. 392243)
Naumon A. Amjed
(pro hac vice application forthcoming)
Ryan T. Degnan
(pro hac vice application forthcoming)
Nathan Hasiuk
(pro hac vice application forthcoming)

**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
gjarvis@ktmc.com
namjed@ktmc.com
rdegnan@ktmc.com
nhasiuk@ktmc.com

*Attorneys for Plaintiff*