IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
PATRICIA SHENK, et al.,              CA No. 1:17-cv-00145-DLF


              Plaintiffs,            Washington, D.C.
v.                                   Monday, November 19, 2018
                                     2:00 p.m.


MALLINCKRODT PLC, et al.,


              Defendants.
- - - - - - - - - - - - - - - x

_____

          TRANSCRIPT OF INITIAL STATUS CONFERENCE
      HELD BEFORE THE HONORABLE DABNEY L. FRIEDRICH
               UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiffs:      Mark R. Rosen, Esq.
                         Jeffrey W. Golan, Esq.
                         Jeffrey B. Gittleman, Esq.
                         Julie Palley, Esq.
                         BARRACK, RODOS & BACINE
                         3300 Two Commerce Square
                         2001 Market Street
                         Philadelphia, PA 19103
                         (215) 963-0600

                         Brian K. Murphy, Esq.
                         MURRAY MURPHY MOUL + BASIL
                         1114 Dublin Road
                         Columbus, OH 43215
                         (614) 488-0400


For the Defendants:      Rachelle Silverberg, Esq.
                         Jonathan Siegel, Esq.
                         Moxila A. Upadhyaya, Esq.
                         WACHTELL, LIPTON, ROSEN & KATZ
                         51 West 52nd Street
                         New York, NY 10019
                         (212)403-1000

                         John Provost, Esq., Mallinckrodt

**APPEARANCES CONTINUED:**

For the Defendants:       David W. Brown, Esq.
                          Laila Arand, Esq.
                          PAUL, WEISS, RIFKIND, WHARTON &
                          GARRISON LLP
                          1285 Avenue of the Americas
                          New York, NY 10019
                          (212) 373-3000


Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111



Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                        **P R O C E E D I N G**

2              THE DEPUTY CLERK:  Your Honor, this is Civil

3    Action 17-145, Patricia Shenk v. Mallinckrodt PLC, et al.

4              Will counsel please approach the podium and

5    identify yourselves for the record as well as any additional

6    parties at your table.

7              MR. ROSEN:  Good morning, Your Honor.  Mark Rosen,

8    Barrack, Rodos & Bacine.  I'm joined by Jeffrey Golan,

9    Jeffrey Gittleman and Julie Palley, all from our firm, and

10   I'm also joined by Brian Murray of the -- Brian Murphy of

11   the Murray Murphy firm.  One day, I will get that right.

12   Thank you.

13             THE COURT:  Good afternoon.  Thank you.

14             MS. SILVERBERG:  Good afternoon, Your Honor.

15   Rachelle Silverberg from Wachtell, Lipton on behalf of

16   Defendant Mallinckrodt.  With me is Jon Siegel from my law

17   firm as well as Moxi -- I'm going to mispronounce her last

18   name.  Apologies.

19             MS. UPADHYAYA:  Moxila Upadhyaya,

20   U-P-A-D-H-Y-A-Y-A, for the court reporter.

21             THE COURT:  Good afternoon.

22             MS. SILVERBERG:  And with me also is John Provost

23   from Mallinckrodt, representing Mallinckrodt.

24             THE COURT:  Okay.

25             MR. BROWN:  Good afternoon, Your Honor.  David

```
 1    Brown from Paul, Weiss, Rifkind, Wharton & Garrison, and
 2    with me is Laila Arand, who is also at Paul, Weiss.  Thank
 3    you.
 4              THE COURT:  Great.
 5              All right.  Ms. --
 6              MR. BROWN:  Oh, and we're here for the individual
 7    defendants, Mark Trudeau and Matthew Harbaugh.
 8              THE COURT:  Thank you.
 9              All right.  Ms. Silverberg, will you be arguing
10    the motion to dismiss?
11              MS. SILVERBERG:  I will, Your Honor.
12              THE COURT:  Okay.  All right.  I know there was an
13    inquiry ahead of time about how much time you have and I
14    think I said something like 20 minutes, but I'm loose here.
15    So I'll give you enough time on both sides to make your
16    argument.
17              MS. SILVERBERG:  Thank you, Your Honor.
18    Appreciate it.  As noted, Rachelle Silverberg on behalf of
19    Mallinckrodt.  I will be making the lead argument today on
20    behalf of all defendants.  Dave Brown from Paul, Weiss, who
21    represents the individual defendants, may make a few
22    additional points at the conclusion of my argument on
23    matters relating directly to those defendants or to the
24    extent the Court has any questions on matters that were
25    raised in his separate briefing.
```

1          Your Honor, this is a securities fraud case.

2     Plaintiff alleges that the defendants, including the CEO and

3     CFO of a major public pharmaceutical company, intentionally

4     defrauded the market; that they lied to investors.  Those

5     are very serious claims, and they are claims that are very

6     frequently lodged after a company announces bad news and

7     experiences a stock drop.  Because of that, Congress passed

8     the PSLRA.  There is now a heightened pleading requirement

9     for plaintiffs who want to allege fraud.  They have to

10    allege -- number one, allege with particularity a material

11    misstatement, including why that statement is untrue or in a

12    motion; two, they have to allege scienter; and, three, they

13    have to allege loss causation.  In this case, I want to

14    focus on scienter because focusing on scienter, stepping

15    back and looking at the practical effect of what happened,

16    their allegations, both looking at the substance of the

17    statements and the context in which they were made, makes

18    clear that there is no inference of -- there's no inference

19    of scienter here.

20          Scienter, under Supreme Court law, is a mental

21    state embracing an intent to deceive, manipulate or defraud.

22    Under the PSLRA, a plaintiff must allege with particularity

23    facts giving a strong -- rise to a strong inference of

24    scienter.  That's the language in the statute.  A strong

25    inference has to be powerful, cogent, compelling and strong

1    in light of all the other explanations, and the Court must

2    weigh competing inferences rationally drawn from the facts

3    alleged, and plaintiffs can only prevail if a reasonable

4    person would deem the inference of scienter cogent and at

5    least as compelling as any opposing inference one can draw.

6    So this is a very, very different standard than the standard

7    usually applied on a motion to dismiss.  It's not enough to

8    have a plausible inference.  Here, the Court must also

9    consider the inferences against the plaintiff.

10          There are two ways, under the case law, that a

11   plaintiff can establish scienter.  One is by alleging motive

12   and opportunity; and the second is by showing allegations

13   that constitute strong circumstantial evidence of conscious

14   misbehavior or recklessness.  Here, plaintiff has shown

15   neither.

16          Starting with the first, motive, the classic way

17   plaintiff shows motive in a stock-drop case is through stock

18   sales.  The argument is that the plaintiffs -- the -- I'm

19   sorry, that the defendants intentionally inflated the price

20   of the stock by providing false information to the market so

21   that they could sell their shares at an inflated price and

22   profit from it.  Here, the opposite happened.  The

23   defendants increased their holdings of stock during the

24   class period, and that's --

25          THE COURT:  And when -- that's in June of 2017?

1              MS. SILVERBERG:  That is throughout the class

2      period, including in 2017.

3              THE COURT:  But the other dates were what, early

4      2014 before -- is that correct, before the FTC

5      investigation?

6              MS. SILVERBERG:  There were some before the FTC

7      investigation and then there were some after and --

8              (Brief pause.)

9              Sorry.  There were some before in 2014; there were

10     some later in 2017, but regardless, they were not selling

11     any shares during the class period and they were buying

12     shares at a time when the plaintiffs allege that the stock

13     price was inflated.

14             THE COURT:  Okay.  Well, I agree with you they

15     were buying, but I think they were also selling in 2014.

16             MS. SILVERBERG:  If they were selling, it was

17     before the class period.  We will --

18             THE COURT:  The class period began --

19             MS. SILVERBERG:  In November 2014.

20             THE COURT:  Okay.  All right.

21             MR. ROSEN:  Excuse me, Your Honor.  Ms. Silverberg

22     is mistaken.  The class period begins in July.

23             THE COURT:  July?  Okay.  Well, all of these

24     dates, the purchases and sales that I have are early 2014.

25             MS. SILVERBERG:  Yes.  And there may be times

1    where, for example, they went up a little bit and then down

2    a little bit, but the net holdings over the class period

3    were increasing during the course of the class period.

4              THE COURT:  Okay.

5              MS. SILVERBERG:  And thank you for correcting me

6    on the amended -- the original class period began in

7    November; the amended class period begins in July.

8              THE COURT:  And I might not have an accurate list

9    of all the purchases and sales, but the ones that I have

10   reflected in the class period are in June of 2017, a

11   purchase by O'Neill and by Trudeau, and then a sale 7/1/17

12   of Harbaugh.  So these may not be complete, but you can

13   correct those later.

14             MS. SILVERBERG:  We'll correct those later.  Thank

15   you, Your Honor.

16             Okay.  So the court held in Plumbers Local #200

17   that the lack of any tangible benefit to the plaintiffs --

18   and, again, the net numbers were increasing -- weighs

19   against scienter and the increase in the stock holdings

20   during the class period, according to a number of cases,

21   negate any inference of motive.

22             THE COURT:  Okay.  What about the motive to have

23   the merger go through?

24             MS. SILVERBERG:  Right.  So that motive

25   preliminarily only applies to two of the claims, the

1    allegation that you did not disclose the FTC investigation

2    and the merger proxy and the allegation that they did not

3    disclose the fact that the sole plant to develop Synacthen

4    was going to stop developing Synacthen in 2016.  Those are

5    the only two claims to which they allege motive because the

6    merger went through in 2014.  So they have no allegations of

7    motive as to any material -- alleged material misstatements

8    or omissions that happened after the merger --

9          THE COURT:  Was there not a statement in the proxy

10   about Acthar being unique and the plaintiffs have alleged

11   that the way in which it was spun as being unique was not

12   complete because it was unique not just because of the kind

13   of drug it was but because you, essentially, had a monopoly?

14         MS. SILVERBERG:  So I'll -- I will get to that

15   statement, but for -- first of all, just the blanket

16   statement that motive is established by wanting to get a

17   merger to go forward, there's case law that we cite that the

18   mere allegation that somebody wants a merger to go forward

19   on its own is not adequate to allege scienter.  That is what

20   we would call a fact-free allegation.  It's generic.  It

21   could apply to any executive any time.  That's in the Baan

22   case.  So allegations that are not particular to the

23   particular defendants at issue but are generic, Executives

24   want this to happen, are not adequate allegations of motive.

25   Beyond -- and we cite cases in which the court says that

1    generic allegations of wanting a merger to go through are

2    not enough.

3            They cite two cases in which they say courts did

4    allow -- hold that merger was enough.  Those cases are very

5    easily distinguishable.  In one of the cases -- well, in

6    both of the cases, there were significant insider sales of

7    stock.  And, in fact, in one of them -- the race car case --

8    one of the insiders had sold 61 percent of their position

9    during the two-week period.  The other distinguishing -- in

10   the other case, there were numerous red flags, but in both

11   those cases -- and, in particular, the race car case --

12   there was a specific financial motive that was associated

13   with the decision not to make disclosures.  So in the race

14   car case, the defendants were the shareholders of the buying

15   company and if the -- their stock went below a certain

16   price, they were actually going to have to pay more to buy

17   the other company.  So their motive was not, Oh -- the

18   generic, We want the merger to close, but rather, if the

19   stock price went down and was not artificially inflated, as

20   alleged in the complaint, they would have had a direct

21   negative consequence to them.  In addition, in both of those

22   cases that they cite, the alleged misstatements were

23   misstatements made by the buying company about itself.  So

24   they were hiding information about themselves.  Here, what

25   is actually being said is that, No, the defendants did not

1    disclose information, not about their company, but about the

2    company that they were buying.  And, again, the facts in

3    those cases -- the insider trading, the red flags and the

4    fact that there were specific financial motivations separate

5    from just a generic wanting the merger to close --

6    distinguishes those cases.

7              The other thing I would just very briefly say, now

8    that we're talking about those two disclosures, just to

9    sidetrack from scienter, on the disclosure of the FTC

10   investigation, as we note in our briefing, that was

11   disclosed in November 2014 by the very first quarterly

12   filing that Mallinckrodt --

13             THE COURT:  Okay.  I've got a question about that

14   date.

15             MS. SILVERBERG:  Yes.

16             THE COURT:  Is it November 2014 or November 2015

17   that it was disclosed?

18             MS. SILVERBERG:  November 2014.

19             THE COURT:  Okay.

20             MS. SILVERBERG:  So the merger -- Mallinckrodt

21   announced the merger of Questcor in the first half of 2014.

22   In July of 2014, the two parties, Mallinckrodt and Questcor,

23   issued the proxy statement prospectus which was mailed to

24   the shareholders for purposes of voting on the deal.  The

25   deal, then, closed about a month later, and then in November

1   2014, the first quarterly filing 10-Q/10-K that Mallinckrodt

2   made once it now owned Questcor, they disclosed the FTC

3   investigation.

4           THE COURT:  Were there any other filings between

5   the time of the proxy and that report?

6           MS. SILVERBERG:  There were no other quarterly or

7   -- regular quarterly or annual filings during that period.

8   So it was the very next one; they announced the FTC

9   disclosure; and, significantly, there was no stock drop.  So

10  the market seemed to not care.  And we cite in our brief the

11  case law that says that the lack of a stock drop negates --

12  you need a stock drop in order to have loss causation.

13          THE COURT:  Okay.  I don't want to detract from

14  your argument completely, but one question I want you --

15          MS. SILVERBERG:  Yes.

16          THE COURT:  -- to answer either now or you can

17  wait until later, the plaintiffs want me to look at the

18  stock drop from 2014 until much later when -- well, the -- I

19  guess, when the FTC actually did the consent decree, at that

20  point.  That's the price they want to use.  But is the --

21  obviously, from your perspective, the critical date is the

22  time at which the alleged misstatement or omission --

23          MS. SILVERBERG:  Correct.  So --

24          THE COURT:  -- was corrected which would be

25  November 2014.

1          MS. SILVERBERG:  Correct.  They are claiming that

2     it would have been material to the shareholders to know in

3     July 2014 that there was an early-stage FTC investigation.

4     Our response to that is, the shareholders were told a few

5     months later in November 2014 that there was an FTC

6     investigation.  In addition, later in the class period, that

7     disclosure was amended to include, There is this FTC

8     investigation and it could have a material adverse effect on

9     the company's operations and finances.  So there were

10    disclosures during that time.  So to the extent the

11    plaintiff wants to argue that the failure to disclose the

12    fact of the investigation artificially inflated the stock

13    price, the stock price did not go down when the company

14    announced there was an investigation.  They don't allege

15    that the stock price went down when there was an allegation

16    that the investigation could have a material effect.

17         And while we're on the topic, and just to complete

18    the picture on the anticompetitive conduct -- I mean, again,

19    the crux of a securities fraud claim is that the plaintiffs

20    put false or incomplete information into the market with the

21    intent to artificially inflate the stock so that people who

22    bought shares paid too much, because if they knew the full

23    scope of the information, they would have paid less.  So the

24    notion is, what did the market know?  And was that reflected

25    in the stock price?  And when the executives were making

1  their statements, were they acting with an intent to

2  defraud?

3          Here's what the market knew about the

4  anticompetitive conduct.  Let's start with the July 2014

5  proxy.  Here's what the market knew.  The market knew that

6  Questcor, the company Mallinckrodt was buying, had, about a

7  year earlier, acquired Synacthen.  They knew because there

8  were analyst reports and press reports that that was a

9  controversial acquisition.

10          THE COURT:  Okay.  Can I consider all those at

11  this stage in a motion to dismiss?  Those that aren't

12  cited --

13          MS. SILVERBERG:  You can --

14          THE COURT:  -- in the complaint.

15          MS. SILVERBERG:  You can consider them for the

16  purpose of assessing what was included in the total mix of

17  information, and that's the In re XM case here.  So we are

18  not asking you to consider those cases for -- those

19  documents for the truth of the matters therein, but if we're

20  trying to determine whether or not the market was fully

21  informed on the issue, you can look at them to see what the

22  market knew.  And, again, the plaintiffs' theory -- and they

23  allege it in their complaint -- that the -- that

24  Mallinckrodt stock traded in an efficient market.  So

25  they're going to -- if this case proceeds -- I hope it

1    doesn't, but if it does -- they're going to come to you and

2    say that even though this is a fraud case, they need not

3    show reliance because there's an efficient market for the

4    stock and, therefore, everything that is in the market is --

5    every -- the information that's publicly available is

6    reflected in the stock price.  So it's an efficient market.

7    So therefore, for determining whether the information is

8    reflected in the stock price or if there's an artifical

9    inflation, you're allowed to look at what else is in the

10   market.

11           Now, they cite two cases where they say the court

12   said you cannot look at documents outside of the SEC

13   filings.  Those cases are both very different.  One case

14   happened in the context of a 14A proxy solicitation where

15   the shareholders were asked to vote on an issue relating to

16   environmental issues, and the court there said that in that

17   type of case which is different than a 10b-5 case, the court

18   looks -- the court should not take into account what's in

19   the total mix of information because in those cases, you're

20   mailing a document to the shareholders; say, Here's a

21   question we want you to vote on.  Here's the information

22   we're giving you.  How do you vote?  And in that context,

23   the court says it's not reasonable to tell the shareholders

24   they need to do their own research and see what else is out

25   in the market.  If you're posing a question to them, give

1     them the information they need to answer the question.

2            THE COURT:  So in a case involving fraud on the

3     market, the courts, across the board, are looking at all of

4     these analysts' reports and press reports, even if they

5     require subscriptions; even if they're, kind of, in the

6     sophisticated investor --

7            MS. SILVERBERG:  Correct.

8            THE COURT:  -- world?  That's permissible?

9     There's not another case involving fraud on the market where

10    a court has said, "No, you can't do that"?

11           MS. SILVERBERG:  What I would say is, plaintiffs

12    have not cited a single case -- not one -- where a court has

13    not taken judicial notice of what else was in the public

14    marketplace of information in a 10b-5 case.  Not one case.

15    And the other thing I would say is, if you look at -- and I

16    think the parties cited something like 150 cases combined.

17    If you look at all of the cases that we've discussed and

18    even that the plaintiff has discussed, in reviewing what was

19    in the total mix of information, you will see that courts

20    do, in fact, look to see what was in the public domain as

21    part of the total mix of information.  So again, we're not

22    asking that you look at this for the truth of the

23    information, but rather, for what is in the market.

24           And the other thing I would just note is a very

25    key part of plaintiffs' claim is that Mr. Trudeau, on an

1    analyst call that was attended by, you know, a relatively

2    small number of analysts, made a statement about Medicare

3    revenues and that that artificially inflated the price.

4    So there was a --

5              THE COURT:  Can't have it both ways?

6              MS. SILVERBERG:  Right.  And I believe it was the

7    Third Circuit that said that an efficient market for good

8    news is an efficient market for bad news.  So that's --

9              THE COURT:  Okay.

10             MS. SILVERBERG:  -- exactly right.

11             THE COURT:  So you started to distinguish the two

12   cases.  You said one was a 14A proxy solicitation --

13             MS. SILVERBERG:  And the other --

14             THE COURT:  -- and the other --

15             MS. SILVERBERG:  -- was a Section 11 case that had

16   a different standard for what the Court can consider.

17             THE COURT:  Okay.

18             MS. SILVERBERG:  And, again, he does not cite a

19   single 10b-5 case on the subject.

20             But -- so going back to what the market knew about

21   the competitive environment from Acthar, even before July

22   2014, lots of press reports; lots of analyst reports which

23   we all -- which we cite and quoted in our brief that

24   Questcor bought this company and that it was going to

25   basically take away the major potential competitive risk to

 1    Acthar.  The market also knew that Retrophin, the company

 2    who lost out to Questcor, had filed a civil lawsuit alleging

 3    that the acquisition violated the antitrust laws and, in

 4    fact, the allegations in the Retrophin complaint -- which we

 5    included with our exhibits -- are very similar to the

 6    allegations that were ultimately made in the SEC -- in the

 7    FTC complaint.  It --

 8              THE COURT:  Okay.  So that was not in the proxy

 9    statement, but it was incorporated?

10              MS. SILVERBERG:  So the Retrophin complaint -- the

11    disclosure about the Retrophin litigation was incorporated

12    by reference.  That had been disclosed by a Questcor 10-Q

13    and that disclosure was incorporated by reference.  So

14    again, the underlying facts that, you know, people thought

15    there was potential antitrust noise around the acquisition

16    that there was a civil lawsuit was out there and, in

17    addition, Senator Klobuchar had sent a letter to the FTC

18    requesting FTC investigation.  That letter was made public

19    by Citron, of all people, through a tweet.  So the public

20    knew that there was a request for an FTC investigation.  So

21    that is what they knew just before the class period started;

22    then, once you get into the class period, you have the fact

23    that Mallinckrodt disclosed in every quarterly and annual

24    filing that the FTC was investigating whether or not the

25    acquisition of Synacthen by Questcor violated the antitrust

1    laws and, later in the period, they allege that this could

2    have a material adverse effect on the company and its

3    operations.  So clearly, the market understood that there

4    was antitrust noise around Acthar and that people were

5    alleging antitrust violations.  That was well known to the

6    market.

7            Now, the only other thing and -- relating to the

8    anticompetitive piece of it that plaintiffs allege -- and,

9    quite frankly, in their opposition brief, has become, I

10   think, the core of their anticompetitive issue -- is this

11   claim that Mallinckrodt violated the antitrust laws and did

12   not disclose that it did not intend to develop Synacthen for

13   any indication that was going to compete with Acthar, and

14   they claim that that was an omission that should have been

15   disclosed because it misled the market.  Once again,

16   however, that fact was disclosed.  If you look at

17   plaintiffs' own complaint at Paragraph 84, they allege that

18   in 2016, Mallinckrodt publicly filed what is called an

19   investigational new drug application that said it was

20   seeking to license Synacthen solely for a muscular dystrophy

21   condition, and that filing which was a public filing made

22   with the FDA was, then, discussed -- and, again, alleged in

23   the complaint -- by certain Mallinckrodt executives on

24   calls.

25            THE COURT:  Okay.  But what about from July of

1    2014 through 2016?

2         MS. SILVERBERG:  So while there was no direct

3    disclosure, there was no reason for the market to think that

4    they were just -- so --

5         THE COURT:  Well, what about -- so Questcor had

6    previously indicated when it bought Novartis that it would

7    seek to get FDA approval for this drug to be used widely.

8    So can that be held against Mallinckrodt?

9         MS. SILVERBERG:  No, for a multitude of reasons,

10   but, number one, Mallinckrodt never said that.  Mallinckrodt

11   is a different company and Mallinckrodt is very differently

12   situated than Questcor.  Questcor -- again, as alleged in

13   the complaint and not disputed, Questcor was 95 percent

14   about Acthar.  It was largely a one-drug company.  Synacthen

15   was a teeny, teeny, teeny, teeny little piece of Acthar.  I

16   think revenues were, like, $10 million.  It was not a major

17   product.

18        THE COURT:  Wait, wait.  Say that again.  You're

19   talking about for Questcor or --

20        MS. SILVERBERG:  Right.  Questcor.  So Questcor,

21   when Mallinckrodt bought it, 95 percent of Questcor's

22   business was in Acthar.  Synacthen was a very, very, very

23   teeny piece of Questcor's business.  So in a case where you

24   have, you know, a company with one product, in theory, you

25   can imagine a scenario where a company buys a second product

1    and decides, We're going to develop it.  Mallinckrodt, by

2    contrast, is a large pharmaceutical company with a large

3    portfolio of products.  Investors would not ordinarily

4    assume that Questcor -- which has largely one drug -- the

5    decisions it may make as to whether or not to develop a

6    second drug and diversify its portfolio would necessarily

7    apply to Mallinckrodt which has a multiple [sic] of drugs; a

8    robust R&D pipeline.  They would not assume necessarily that

9    Mallinckrodt will allocate R&D, given its --

10              THE COURT:  Well, Questcor was going to develop

11   the synthetic drug to avoid any claim of monopolistic

12   behavior; right?

13              MS. SILVERBERG:  There's nothing in the record.  I

14   wasn't, you know -- Questcor is a separate company.  It had

15   a separate management team.  They made statements.  There's

16   nothing in the record as to what Questcor did or did not

17   intend to do, and I don't think anyone sitting here knows

18   what --

19              THE COURT:  Okay.  But in an efficient market, we

20   can assume, maybe, the market knew about these statements

21   that Questcor had made.

22              MS. SILVERBERG:  Correct.

23              THE COURT:  But you're saying that that can't be

24   held against Mallinckrodt because it's --

25              MS. SILVERBERG:  Correct.

```
1              THE COURT:  -- a new company.  They --
2    Mallinckrodt didn't make any misstatements itself;
3    therefore, its omission is --
4              MS. SILVERBERG:  Mallinckrodt --
5              THE COURT:  -- not actionable?
6              MS. SILVERBERG:  Mallinckrodt made no statement
7    whatsoever about its intent to develop or not Synacthen
8    until, in 2016, it publicly filed this investigational new
9    drug application to develop Synacthen for the multiple
10   dystrophy -- muscular dystrophy condition.  The other thing
11   I would say is they do not allege any stock drop from the
12   disclosure and the discussion that Mallinckrodt was going to
13   be developing this drug for a single purpose only.  And,
14   again, going back to what the market did or did not think,
15   there's no allegation that anyone asked Mallinckrodt what
16   they were intending to do.  There's no allegation that there
17   was any speculation in the market.  What you had is
18   Mallinckrodt acquired Questcor and, as is typical, a new
19   company makes decisions going forward on how it's going to
20   handle R&D.  And, again, no one asked about it.  It was not
21   the subject of discussion.  The only -- the main disclosure
22   came in 2016, at which point there was no market reaction
23   that's alleged.
24             THE COURT:  Okay.
25             MS. SILVERBERG:  Okay.  So going back, on the
```

1   development of Synacthen -- going back a few steps, motive.

2   The only motive that's alleged is to those two

3   nondisclosures in the proxy and, as we discussed, the

4   alleged motive of wanting a merger to go through is not

5   enough and, in any event, there was more than adequate

6   disclosure on the antitrust issues.

7          The -- one other thing, just to add on the

8   anticompetitive conduct.  They claim that the lack of

9   disclosure -- the alleged lack of disclosure that Synacthen

10  was not going to compete -- that Mallinckrodt was not going

11  to develop Synacthen to compete with other conditions, that

12  should have been disclosed because that itself is a

13  violation of the antitrust laws.  That is not a violation of

14  the antitrust laws.  Under Article 2 of the Sherman Act,

15  it's a violation to exclude competitors, but there's no

16  violation of the antitrust laws to simply not develop your

17  own product.  So even if you want to say that there should

18  have been additional requirement, that would not have --

19  there was no need to disclose this fact to provide

20  information about potential antitrust laws because

21  Mallinckrodt's decision not to develop Synacthen for

22  conditions that competed with Acthar treatments did not

23  violate the antitrust laws.  They have no -- and the FTC

24  never even said that it violated the antitrust laws.

25          THE COURT:  Okay.  So I understand the plaintiffs'

1    theory and I am confused by it, but it seems that they're

2    saying, because there were some sort of price limits on the

3    synthetic drug, that it actually would have created

4    competition for Mallinckrodt and Acthar had it been pursued

5    with the FDA, but I'm wondering, if it had, could

6    Mallinckrodt just simply increase the price as high as it

7    wanted and then eliminated any kind of competition for

8    itself.

9              MS. SILVERBERG:  In theory, it --

10             THE COURT:  Were there any limitations on the

11   pricing other than ones that were self-imposed because it

12   was selling for a few dollars in Europe and it would be a

13   bad PR scene for Mallinckrodt to market it at, you know,

14   $24,000 a vial?  But were there any sort of pricing limits?

15             MS. SILVERBERG:  Not that have been alleged and

16   not that I'm aware of.

17             THE COURT:  Okay.

18             MS. SILVERBERG:  But, again, there was no

19   requirement for Mallinckrodt to develop that drug for any

20   purpose and its failure to do so did not violate any

21   antitrust laws, but just -- I think we've covered the

22   anticompetitive piece of it, unless you have any other

23   questions --

24             THE COURT:  No, go ahead.

25             MS. SILVERBERG:  -- on this.

1          But I do want to step back and talk about -- very,

2     very briefly about scienter which is -- again, we've talked

3     through all of the -- stock-drop cases/securities fraud are

4     about, is there an intent to deceive?  Is there an intent to

5     manipulate the market?  And you have to look at what they're

6     doing.  And, again, no stock drops, but look at the

7     disclosures that were made.  It makes no sense; no

8     inference, let alone a strong inference, that the

9     Mallinckrodt executives decided, Let's inflate the price of

10    the stock by not saying more about the competition issues

11    around Questcor, given what they disclosed.  They put in

12    their securities filings that there's an investigation that

13    could have a material adverse effect on the company.

14          THE COURT:  And, again, they said that in November

15    of 2014?

16          MS. SILVERBERG:  They put -- they disclosed the

17    investigation in 2014.  It was not until about a year later

18    that they disclosed, And it could have a material adverse

19    effect.  But, again, there's no alleged stock drop connected

20    with the additional language in the disclosure.  So it would

21    have to have been a rather --

22          THE COURT:  And that date for the second

23    disclosure where it's tied to, It could have an impact on --

24          MS. SILVERBERG:  We'll get it --

25          THE COURT:  -- an adverse impact on Mallinckrodt

1    --

2              MS. SILVERBERG:  We'll get it for you in a second.

3              THE COURT:  Okay.  Well, while they're looking for

4    it, can you tell me, in looking for the stock drop, should I

5    be looking at the initial disclosure in November of 2014 or

6    should I be looking at the later disclosure where

7    Mallinckrodt admits that it could have an adverse impact on

8    it?

9              MS. SILVERBERG:  So again, their theory is that

10   the failure to disclose a piece of information artificially

11   inflated the price of the stock.  So if a piece of

12   information that they say should have been disclosed was

13   disclosed and the stock price did not fall, there was no

14   artifical inflation.  I know they have a theory that you can

15   allege loss causation without having to show that the stock

16   price actually fell.  That's been rejected by a number of

17   courts, and they do not cite any case anywhere that says

18   that.  They rely on Iqbal which was not a PSLRA pleading

19   allegation.  That case basically held that at the class

20   certification stage, the plaintiff does not have to prove,

21   as a final matter, loss causation.  That does not mean that

22   as a pleading matter, you don't have to allege that the

23   stock actually fell.  And in Dura, there was discussion of

24   stock drop.  There's other cases that have specifically held

25   that the stock has to drop.  And in one of -- one or two of

1    the District of -- the District of -- District of Columbia

2    cases that we cite discussing 10b-5 cases, there's actually

3    language suggesting that the court is presuming that you

4    need a stock drop in order to actually assert loss

5    causation.

6                THE COURT:  So no matter what other good news

7    could have happened in the interim period, if --

8                MS. SILVERBERG:  Correct.

9                THE COURT:  -- there's no stock drop, there's no

10   loss --

11               MS. SILVERBERG:  Correct.

12               THE COURT:  -- causation --

13               MS. SILVERBERG:  Correct.

14               THE COURT:  -- period?

15               MS. SILVERBERG:  Period.  Period.

16               THE COURT:  Stop.  No case --

17               MS. SILVERBERG:  Stop.  No case.

18               THE COURT:  -- ever has said --

19               MS. SILVERBERG:  Correct.  So --

20               THE COURT:  -- that good news can negate that?

21               MS. SILVERBERG:  As a pleading matter on

22   securities fraud cases, full stop.  If they announce

23   something that they claim was a material omission and the

24   stock does not go down, they do not have loss causation and

25   case over.

1           THE COURT:  Okay.  All right.

2           MS. SILVERBERG:  The date, by the way, of the

3     enhanced disclosure was November 24th, 2015.

4           But, anyway -- but going back to the scienter

5     aspect here, given everything that, number one, the

6     executives knew was in the market, including the Retrophin

7     lawsuit; the chatter around the original acquisition; the

8     disclosures about the FTC allegation, it's not plausible to

9     believe that these people were planning on artificially

10    propping up the stock by not disclosing more.  And in the In

11    re Bank of America AIG case, the Southern District of New

12    York actually notes that if -- the question is if reasonable

13    minds could differ as to whether or not there is adequate

14    disclosure, that should rebut the inference of scienter,

15    because one reasonable view is the people thought that they

16    had actually disclosed all that they had to disclose.

17          THE COURT:  Okay.  And, in addition to motive, can

18    it be shown -- is it an "or"?  You can also show strong

19    circumstantial evidence of conscious misbehavior or

20    recklessness?

21          MS. SILVERBERG:  Correct.  And I was actually

22    getting to that --

23          THE COURT:  Okay.

24          MS. SILVERBERG:  -- second prong on what I just

25    said.  It -- again, conscious -- you need strong inference

1    of conscious misbehavior or recklessness.  So where is the

2    strong inference that these people wanted to mislead the

3    market on the anticompetitive environment around Acthar,

4    given what they knew the market already knew and given what

5    they themselves had already said on the issue?  The more

6    logical inference -- certainly an inference as strong as

7    defraud -- is that these people thought that the information

8    was, in fact, adequately disclosed to the market.

9         And, finally, just one brief thing, just -- which

10   is in the briefing.  We note that the underlying facts were

11   disclosed and what they're complaining about is that we

12   didn't actually describe it as an illegal anticompetitive

13   scheme.  We cite case law that says you don't have to

14   self-flagellate.  They cite cases saying that they're

15   denying the motion to dismiss where the company did not

16   disclose illegal behavior.  Those cases are all

17   distinguishable on the basis that in those cases, the

18   underlying facts were not disclosed.  Here, the underlying

19   facts of Questcor's, you know, acquisition of Synacthen,

20   it's the FTC -- the investigation -- the Retrophin

21   litigation, all of those underlying facts were disclosed.

22   What we didn't disclose -- in part, because we didn't think

23   it was true -- is that this is an antitrust violation and,

24   to this day, no one has held it's an antitrust violation.

25   The FTC consent decree does not admit or deny liability.

1          If you have no other questions on the

2     anticompetitive scheme, I was going to move on to the

3     insurer restrictions.

4          THE COURT:  Sure.

5          MS. SILVERBERG:  Okay.  And, Your Honor, I'd like

6     to pass up a document very briefly which I provided -- a

7     demonstrative which I provided to plaintiffs' counsel before

8     the hearing.

9          MR. ROSEN:  Your Honor, we do object to that

10    document.  If we could be heard on that?

11         THE COURT:  Okay.  Well --

12         MS. SILVERBERG:  Let me just explain what it is.

13    It has no argument or no information.  There are a lot of

14    quotes throughout the complaint of what was said in the

15    market regarding insurer restrictions and statements that we

16    made relating to them.  There are lots of statements in our

17    brief relating to the same item and in the exhibits.  In

18    order to not have to flip through before a lot of documents,

19    I created a chart that literally has the date of the

20    statement; has, for the Court's convenience, as a

21    confirmation for plaintiff, the exact cite of where it is

22    either in plaintiffs' complaint or in an exhibit that the

23    Court has; and then the last column is literally, with quote

24    marks around the text, a direct quote of the language from

25    the complaint paragraph that's cited or the language from

1   the exhibit that has been previously provided.  It's

2   literally just a compilation of quotes that are already

3   before the Court, but in a single, easier, user-friendly

4   format.

5              THE COURT:  Okay.

6              MR. ROSEN:  May I be heard, Your Honor?

7              THE COURT:  Sure.

8              MR. ROSEN:  We object on three grounds.  Actually,

9   could I --

10              THE COURT:  Yes.

11              MR. ROSEN:  But if I could just be heard very

12   briefly on that and then she can resume argument.

13              We object on three grounds.  First of all, they've

14   had two briefs.  We get one brief.  They had the initial

15   brief -- two sets of briefs, one for the individuals; one

16   for the company; and then they got a reply brief.  We only

17   get one.  They didn't put this in their opening brief; they

18   didn't put this in their reply brief.  We had no other

19   chance to respond.  If they considered this so important in

20   their brief and we had consented to allow them to have extra

21   pages, it should have gone there and then we would have had

22   a chance to respond to it.  We didn't.

23              Second, the statement is inaccurate.  One of the

24   quotations on Page 3 of their chart -- the very last item --

25   is very important.  It says, April 8th, 2007, first quarter

1   earnings press release.  And they say, Notably, we continue

2   to see strengthening in Acthar formulary positions and

3   access for appropriate patients in both the commercial and

4   public environments, including --

5              THE COURT REPORTER:  Could you slow down, please.

6              MR. ROSEN:  I'm sorry.

7              We continue to see strengthening in Acthar

8   formulary positions and access for appropriate patients in

9   both the commercial and public environments, including

10  relating or removal of previous formulary restrictions.  In

11  fact, Paragraph 157 says, Including relaxing or removal.

12  That's a significant difference.

13             Finally, it omits the statement in Paragraph 161

14  which is critical which talks about -- it says -- it's

15  talking about growth and it says at one point, quoting the

16  CEO, Mr. Trudeau, In terms of the growth, we would expect,

17  kind of, similar type growth rates, regardless of the payer

18  mix.  Whether it's federal reimbursed patients -- Medicare

19  primarily -- or commercial patients, we would expect similar

20  growth rates, regardless of the type of reimbursement that

21  occurs.  He further said, quote, We continue to see good,

22  strong formulary positioning, strengthening formulary

23  positioning that we alluded to in the first quarter, closed

24  quote, and that with the new data the company had published

25  on Acthar, quote, We wouldn't expect anything different here

```
1    going forward.

2             That shows -- which they conveniently left out of

3    their chart -- that shows that they were continuing to make

4    representations about relaxing or easing the formulary

5    restrictions throughout 2017 which were disproven by the

6    disclosures in November at the end of the class period where

7    they revealed the opposite --

8             THE COURT:  Okay.

9             MR. ROSEN:  -- that they were under --

10            THE COURT:  Mr. Rosen, I'm sympathetic to your

11   remark that you didn't have a chance to either respond or

12   correct any inaccuracy.  So I will give you that

13   opportunity, but this case is extremely complicated

14   factually --

15            MR. ROSEN:  I understand.

16            THE COURT:  -- and to the extent you want to

17   supplement with any similar sort of paper, I'll grant you

18   leave to do that as well and I'll give you an opportunity to

19   respond to this, but anything that simplifies the lengthy

20   briefing and exhibits, I'm going to welcome.  So I'll give

21   you the opportunity both to respond to theirs and file any

22   similar document that they, then, get the chance to -- but

23   I'm not looking for additional briefing, folks.  I'm just

24   looking for simplifying key statements.  All right?

25            MR. ROSEN:  I understand that, Your Honor, and
```

1    that's what I objected to most which is -- in effect, this

2    is a third set of briefs for the defendant.

3            THE COURT:  Well, here's what I'm going to do.

4    Rather than me take this today, I'm going to ask that you

5    all talk about to the extent there are things that are

6    inaccurate about it.  And if they're not inaccurate, if you

7    can submit one document, that would be great; if not, I'll

8    give you a chance to submit a response to this, but, again,

9    I'm not looking for legal briefing on this.  If this is just

10   pulling statements out of the complaint and you think that

11   they've cherry-picked things unfairly, I get it, and you get

12   a chance to give your version of this, but ideally, folks,

13   we'd have one document here that fairly represents both

14   sides.  So you know, if we can't do it in one document and

15   you want to file your own, you may do so.

16           MR. ROSEN:  Thank you, Your Honor.

17           THE COURT:  All right.  Ms. Silverberg?

18           MS. SILVERBERG:  Thank you.

19           THE COURT:  So remind me where you were.

20           MS. SILVERBERG:  Yes.  And -- sure.  And, for the

21   record, Mr. Rosen is correct.  We had a typo relaxing --

22   relating to --

23           THE COURT:  Okay.  All right.  I don't need to

24   hear about it.  You -- just let's just make sure it's

25   accurate and, to the extent he wants to supplement, he may

```
 1    do so.
 2              MS. SILVERBERG:  Okay.
 3              THE COURT:  So you're talking about insurer --
 4              MS. SILVERBERG:  Insurer --
 5              THE COURT:  -- restrictions?
 6              MS. SILVERBERG:  -- restrictions.
 7              THE COURT:  So was this the third category --
 8    is -- of --
 9              MS. SILVERBERG:  This is the second.  So just to
10    preview, the first --
11              THE COURT:  Oh.  This was the Medicaid/Medicare --
12              MS. SILVERBERG:  So --
13              THE COURT:  -- comment?
14              MS. SILVERBERG:  So to step back, the -- look at
15    the main categories.  The first is anticompetitive conduct
16    which, I think, we've exhausted.
17              THE COURT:  Yep.
18              MS. SILVERBERG:  The second category are comments
19    that the company made about its status with insurers and
20    insurer restrictions and progress on those restrictions, and
21    then we'll touch briefly on future -- forward -- projections
22    about growth which, I think, fall into this category.
23              The third, what I'll call, large category that the
24    parties spent a lot of time briefing on was Mr. Trudeau's
25    statement about Medicare reimbursements during the analyst
```

1    call in 2015, and then what I would call a much smaller

2    category is Acthar's efficacy which will probably be

3    disposed of in about 30 seconds.

4             THE COURT:  Okay.  All right.  Well, I know we're

5    going way over, but this is very helpful to me.  So Mr.

6    Rosen, you'll get an equal amount of time.

7             MR. ROSEN:  Thank you, Your Honor.

8             MS. SILVERBERG:  Okay.

9             Insure -- the status of insurers.  In late 2006 --

10   late 2016 into most of 2017 until the end of the third

11   quarter of 2017 -- and, again, first quarter, January,

12   February, March; second quarter, April, May, June; third

13   quarter, July, August, September.  So late 2016, most of

14   2017 until late third quarter, Acthar sales were growing.

15   Plaintiffs concede that.  They allege it in their complaint.

16   Sales were growing.  During that time period, Mallinckrodt

17   issued a number of -- disclosed the results and issued a

18   number of public statements explaining why, in their view,

19   sales were increasing.  They said that they had increased

20   the net percentage of commercial covered lives under

21   contract.  And a -- commercial covered lives, I think, is

22   pharma-speak for people who have commercial insurance

23   contracts.  So they've increased the number of people with

24   private insurance who have a path to getting Acthar

25   reimbursement.  They said that they were strengthening

1    formulary positions; namely, improving their position with

2    certain insurers; that they were getting stronger formulary

3    positions; and that some payers that had restrictions are

4    starting to relax those restrictions; and they said, in one

5    case, an insurer actually added Acthar to a formulary for

6    the first time.

7         So again, during a time when sales were

8    increasing, Mallinckrodt gave reasons why sales were

9    increasing.  At the end of the third quarter, 2017, sales

10   decreased year over year for the first time and the stock

11   price fell.  Plaintiff now says that in light of the

12   decreased sales that started at the end of the third

13   quarter, Mallinckrodt's prior statements, made at a time

14   when sales were increasing, must have been false and

15   misleading.  And according to the plaintiff -- and this is

16   Paragraph 167 of the complaint -- they say that the reality

17   was that major insurers were continuing to approve Acthar

18   for only a limited range of treatments and others were

19   continuing to place severe restrictions and both of which,

20   plaintiff says, created an undisclosed risk that Acthar

21   sales would decline.  These allegations do not come close to

22   creating a strong inference that the executives intended to

23   defraud the market with respect to the status of insurer

24   reimbursements.

25        First, the market knew -- and, again, this is

1    total mix of information -- that some of the very large

2    insurers had restrictions on Acthar's use.  They knew it,

3    among other reasons, because the insurers posted it on their

4    websites.  In fact, the way that plaintiffs know it is

5    because plaintiffs access the insurer websites and put down

6    the restrictions which, by the way, went back to 2008, 2012;

7    period of time when Acthar sales were increasing.

8              THE COURT:  Okay.  And, again, in an efficient

9    market, we have to assume --

10             MS. SILVERBERG:  Correct.

11             THE COURT:  -- that the market knows this?

12             MS. SILVERBERG:  Correct.  And these restrictions

13   were also discussed in analyst reports for years.  And, for

14   example, that's Exhibit-48 that we've included with our

15   papers.  It has been -- the insurer restrictions have been

16   the subject of Citron reports and prior lawsuits.

17             THE COURT:  Okay.  But wait.  Are you asking me to

18   look at these other sources for the truth as opposed to just

19   --

20             MS. SILVERBERG:  The market --

21             THE COURT:  -- notice --

22             MS. SILVERBERG:  I'm asking you to look at it for

23   the -- well, plaintiff is alleging that there were

24   restrictions.  So if you're going to -- and we are not

25   disputing that some insurers, in fact, had restrictions.

 1    Our point is, the entire market knew that some insurers had

 2    restrictions.

 3              THE COURT:  Okay.

 4              MS. SILVERBERG:  Are you -- you're good?

 5              THE COURT:  Not that that --

 6              MS. SILVERBERG:  But I'm getting to the next

 7    point.

 8              THE COURT:  All right.

 9              MS. SILVERBERG:  Okay.  There's no question that

10    there were restrictions.  The company had disclosures about

11    restrictions.  They disclosed that, Our ability to maintain

12    and increase sales depends on several factors, including our

13    ability to achieve hospital formulary acceptance and

14    maintain reimbursement levels by third parties.  Other risk

15    factors:  Cost-containment efforts of third-party payers and

16    governmental organizations could materially adversely affect

17    our net sales and results of operations.

18              This sheet which I just gave you -- and which

19    you're invited not to look at until we could come up with a

20    consolidated sheet with the plaintiff -- will have a list of

21    the disclosures that go toward the total mix of information

22    out there that there were restrictions on insurers.  That

23    was known.

24              THE COURT:  And this is out of the complaint?

25    This document that you're going to give me.

 1          MS. SILVERBERG:  This is -- this complaint which

 2   I'm going to give you -- and I don't know if you have a copy

 3   now -- where it says --

 4          THE COURT:  I don't.

 5          MS. SILVERBERG:  -- Source --

 6          THE COURT:  Right.

 7          MS. SILVERBERG:  -- for every quoted statement, it

 8   cites to either the paragraph in the complaint that we

 9   quoted the language from --

10          THE COURT:  Okay.

11          MS. SILVERBERG:  -- or the exhibit number and page

12   reference from the exhibit.  And just so you know, we gave

13   the Court excerpts of the documents we cited.  To print out

14   all of the documents is about eight volumes.

15          THE COURT:  Okay.  No, I don't want that.

16          MS. SILVERBERG:  There you go.  Okay.

17          THE COURT:  But I'm not going to look at this

18   until he has a chance to --

19          MS. SILVERBERG:  That's fine.

20          THE COURT:  -- make changes.  All right.

21          MS. SILVERBERG:  So the market knew that

22   Mallinckrodt and Acthar were operating in an environment

23   where insurers -- some insurers had restrictions.  That does

24   not mean that the statements that Mallinckrodt made, for

25   example, in late 2016, early 2017 saying that, We are making

1    good progress with insurers; that we have added a new

2    formulary; that we are increasing the percentage of

3    commercial lives -- commercial covered lives under contract,

4    were false or misleading.  During the time that sales were

5    growing, Mallinckrodt disclosed that they were, in fact,

6    making progress.  Plaintiffs say that, Well, the stock

7    dropped, so those were false, and you should have said that

8    people were actually restricting.  So two answers to that.

9           On the part of, You should have said that there

10   were insurers with restrictions, everyone knew that there

11   were insurers with restrictions, but the fact that there

12   were insurers with restrictions does not mean that the

13   disclosures that we -- that Mallinckrodt made against the

14   backdrop of this other information were not accurate.  And,

15   in fact, going back to the PSLRA standard where you need

16   particularized facts of why a statement is allegedly

17   materially false or misleading, there's not a single

18   particularized fact in their complaint that Mallinckrodt was

19   not increasing the percentage of commercial covered lives

20   under contract.  In fact, the disclosures are that when they

21   acquired -- and, again, out of plaintiffs' complaint -- when

22   they acquired Questcor, there were 0 lives under contract

23   and over time, it went up to 60 percent.  They claim that

24   was misleading.  There's not a single allegation --

25   particularized allegation that that fact, as disclosed by

1    Mallinckrodt, was not accurate; not a single particularized

2    allegation that the statement that they added Acthar to a

3    formulary for the first time, not true; not a single

4    particularized allegation that they were not getting

5    stronger formulary positions across a number of payers.  The

6    positive statements that were made, no particularized

7    allegation that they were false.

8            So number one, there's -- they have not

9    established either falsity or, quite frankly, a strong

10   inference of an intent to defraud with respect to those

11   affirmative statements, nor were those statements misleading

12   because Mallinckrodt did not say in the same breath, And by

13   the way, there are some insurers that continued to have

14   restrictions, because that was in the total mix of

15   information; the market knew about that; and Mallinckrodt

16   had issued, in their public statements, a number of risk

17   warnings that directly relate to the situation with insurer

18   reimbursements.  And, again, there will be a long list of

19   those in the sheet that we will negotiate with Mr. Rosen.

20           THE COURT:  And that's around the same time frame,

21   even if it's not at the --

22           MS. SILVERBERG:  Throughout the class period.

23           THE COURT:  Okay.

24           MS. SILVERBERG:  Yes.

25           THE COURT:  All right.

```
 1              MS. SILVERBERG:  And the insurer websites are

 2      available.

 3              THE COURT:  Okay.

 4              MS. SILVERBERG:  Okay.  So clearly, in the total

 5      mix of information -- so in terms of stepping back, going to

 6      material misstatement, for the reasons just discussed,

 7      there's -- they have not met the standard of a material

 8      misstatement or omission, given the total mix of

 9      information.

10              And just stepping back on scienter, again, to the

11      extent that they need to show a strong inference of a

12      conscious -- of conscious misbehavior, a state of mind, if

13      you look at what the market knew, their risk factors and the

14      fact that, at the time, the sales were growing, they were

15      explaining why, in their view, the sales were growing.  They

16      have not come up with a -- they have not pled a strong

17      inference of scienter, again, going back to the In re Bank

18      of America AIG case.  The better inference is they thought

19      that the market was adequately informed, particularly in a

20      context when their net stock holdings were increasing during

21      the class period.

22              Okay.  Anything else on insurer restrictions?

23              Mr. Trudeau's statement.  Okay.  So during an

24      analyst call in November -- in late 2015, Mr. Trudeau was

25      asked what percentage of Acthar revenue comes from Medicare,
```

1    and he gave a long and winding answer in which, talking out

2    loud, he backed into the number by calculating the

3    percentage of the business that goes through Medicare and

4    Medicaid as about a quarter, roughly, and noting that the

5    Medicare number -- and I know they dispute whether it's

6    Medicare -- Medicare number is, maybe, a little bit higher

7    than that.  They have alleged that that was an intentional

8    statement intended to defraud the investors.  And, again,

9    recognizing we're focusing on scienter here first, they do

10   not have a strong inference of scienter with respect to that

11   statement.  Again, PSLRA; strong inference of conscious

12   misconduct.

13          First, let's look at the content of -- the context

14   of the statement.  This was not a written disclosure.  This

15   was an oral response off the cuff in response to an analyst

16   question.  And, again, the Supreme Court, in Omnicare, noted

17   that you can look at an oral statement -- you do not apply

18   the same rigor or look at the context of an oral statement

19   the same way you do as a written statement where someone had

20   time to prepare, revise, edit, confirm.  It was not planned.

21   It was spontaneous.  And, again, there's case law in

22   Plumbers & Pipefitters in the Seventh Circuit and In re

23   Supreme Industries in the Northern District of Indiana

24   saying that when someone makes a statement on the fly, there

25   is no inference of scienter.  So if you look at just

1    starting with the context of this statement --

2            THE COURT:  Say that again.  When someone makes a

3    statement on the fly --

4            MS. SILVERBERG:  On the fly --

5            THE COURT:  -- there's no evidence of scienter?

6    Surely, there can be cases --

7            MS. SILVERBERG:  Strong inference.

8            THE COURT:  Okay.

9            MS. SILVERBERG:  Okay.  Then you --

10           THE COURT:  No strong inference.

11           MS. SILVERBERG:  Strong inference of scienter.

12           THE COURT:  Okay.

13           MS. SILVERBERG:  I'll -- sometimes when you're

14   talking orally, it's not as clear as when you put it down in

15   words.  I apologize if I fumbled that word.

16           THE COURT:  Okay.

17           MS. SILVERBERG:  That was not planned.

18           All right.  So number one, in assessing scienter,

19   look at the context in which it was made.  Someone asked a

20   question.  He answered on the spot.  Number two, look at the

21   language that he used.  He did not say, Oh, the answer is

22   about 30, 35 percent.  He didn't give a definite answer.  He

23   gave a very general number.  It was a rough number.  It was

24   a little higher than about a quarter, roughly.  Lots of

25   contingent, rough, vague words.  He also does not come out

1    right away with a number.  Rather, if you look at the first

2    part of his answer, it's as if he is thinking out loud

3    trying to derive that number by reference to another number.

4    It's clear that he is giving a rough approximation of what

5    the answer is, and it should have been clear to anybody

6    listening to him that that's what he was doing.  He was not

7    giving a firm, Here is the number.

8              THE COURT:  Okay.  I get these arguments with

9    respect to determining whether there's scienter.  I

10   understand that, but in terms of me deciding whether these

11   are material -- this is a material misstatement --

12             MS. SILVERBERG:  Yes.

13             THE COURT:  I get -- with respect to scienter, it

14   makes sense to look at all this.  But in me deciding whether

15   there was a material misstatement here --

16             MS. SILVERBERG:  Yes.

17             THE COURT:  -- don't I have to give every

18   inference to the plaintiff here?  I mean, there's a lot of

19   ambiguity about whether it related both to Medicare and

20   Medicaid; whether the -- so he said -- I forget the quote,

21   but a little more than 25 percent, if it's Medicare and

22   Medicaid, and even if I put aside the Citron report for the

23   reasons that you --

24             MS. SILVERBERG:  Right.

25             THE COURT:  -- point out, even I put that aside

1      and I look at just the statements by the executives --

2      Mallinckrodt executives later about what it was back then,

3      it would be somewhere from the 30s to, maybe, the low 50s.

4      Don't I have to give the outer limit here and basically be

5      looking at whether or not it's material that this is --

6      instead of 25 percent, it was low 50s?  Don't I have to look

7      at the statement that way in terms of deciding whether it's

8      material?  Now, I get all your points in terms of whether

9      this was an intentional effort to deceive; all makes sense.

10     But in terms of just interpreting the ambiguity and what he

11     said here, it's a lot of qualifications.  I agree with all

12     that.  But don't I have to give them the benefit of the

13     doubt in how I interpret that statement?

14             MS. SILVERBERG:  So in terms of looking at the

15     statement itself, a couple of things on that.  Number one,

16     it's not the difference -- in determining whether it's

17     accurate or not, it's not the difference between 25 and

18     something a little bit above 50 preliminarily.  He said --

19     he clearly indicated it's something higher than 25.  And the

20     outer limit, even when you take into account Medicare, does

21     not necessarily get you above --

22             THE COURT:  Not necessarily, but it could.  So it

23     gets you up to the 30s without either Medicare or Medicaid,

24     whichever one -- which was omitted --

25             MS. SILVERBERG:  Medicare is the one that was in

1     -- that Mr. Trudeau --

2              THE COURT:  It was -- the question --

3              MS. SILVERBERG:  A year later --

4              THE COURT:  -- was about Medicare.

5              MS. SILVERBERG:  The question was about Medicare.

6              THE COURT:  He threw in Medicaid.  So I'm just

7     saying I need to throw in, I think -- if you look at the

8     statement -- just the plain terms of the statement, even

9     though the question was about Medicare, given the way his

10    statement follows the sentence about Medicaid --

11             MS. SILVERBERG:  Correct.

12             THE COURT:  -- I think, on a motion to dismiss,

13    I've got to give them Medicaid, and I think I've got to look

14    at what the outer limit, you know -- assuming I'm not going

15    to look at the Citron report, I've got to look at the outer

16    limit of what the executive said, and I think the outer

17    limit would be somewhere in the 50s.  Now, it -- I think

18    it's ambiguous and I think you've got a good argument that

19    it was closer to the low 30s.  But at a motion-to-dismiss

20    stage, don't I have to draw all those inferences in favor of

21    the plaintiff?

22             MS. SILVERBERG:  The outer -- if you take the

23    outer limit of every number --

24             THE COURT:  Yes.

25             MS. SILVERBERG:  -- given by the executives a year

1    later, I believe that does get you to a little bit over

2    50 --

3                THE COURT:  Exactly.

4                MS. SILVERBERG:  -- but that still does not make

5    it a material misstatement --

6                THE COURT:  Okay.

7                MS. SILVERBERG:  -- for the following reason.

8    What we're arguing about here is the differential between

9    whatever number range -- information Mr. Trudeau gave the

10   market and whatever number you are going to take for

11   purposes of a motion to dismiss.  That differential, what

12   it, you know -- 50 minus whatever -- wherever you want to

13   pen Mr. Trudeau's statement; however, it needs to be

14   material.  They acknowledge that Acthar's revenue was only

15   about a third of Mallinckrodt's revenue.  So the percentage

16   of the company's revenue derived from Acthar is not a

17   significant percentage of the company's revenue.  It's

18   whatever that differential is between what Mr. Trudeau told

19   the market and what -- for purposes of a motion to dismiss,

20   what number you're using.  It's that differential applied to

21   only about a third of the company's revenue.  So right away

22   --

23               THE COURT:  Okay.  But what if he said -- let's

24   just hypothesize here that it only applied to -- instead of

25   a third, it only applied to a tenth, all right, or 5 percent

1    and, yet, he made a statement that was 100 percent wrong.

2    So instead of 25, he said 100.  All right?  And, yet, it's

3    still -- in terms of Mallinckrodt's overall percentage, it's

4    still less than 5 percent.  Does it -- does that just mean

5    you can make blind, false statements wildly wrong and you're

6    insulated because it's just a small percentage of

7    Mallinckrodt's business?

8              MS. SILVERBERG:  Yes.  I mean, so the Court -- the

9    standard under the PSLRA is, you have to make a material

10   misstatement.  So for example, let's say, hypothetically,

11   somebody -- they have a product that brings in $100 million

12   of revenue a year and they said, Actually, it -- they were

13   asked, How much revenue does it bring in?  And they say,

14   $101 million.  It is not a material misstatement, because $1

15   million either way in a multi-billion dollar company is not

16   material, so it's not actionable.  The question is, is it

17   actionable under the securities laws?  I don't -- they do

18   not dispute that they need a material misstatement.  So in

19   looking at material -- materiality, there's a couple of

20   questions.  And there's case law that says, if you are off

21   -- off -- by 5 percent, not material.

22             THE COURT:  Five percent of what?  Those cases --

23             MS. SILVERBERG:  Revenue --

24             THE COURT:  -- dealt with assets, didn't it, or is

25   it --

1              MS. SILVERBERG:  I don't --

2              THE COURT:  Was it revenue?

3              MS. SILVERBERG:  -- believe -- well --

4              THE COURT:  Okay.

5              MS. SILVERBERG:  -- we'll double-check that,

6      but --

7              MR. SIEGEL:  Generally, 5 percent.

8              MS. SILVERBERG:  -- generally, 5 percent.

9              THE COURT:  Of revenue?

10             MR. SIEGEL:  Revenue, earnings --

11             MS. SILVERBERG:  Yeah, the range is 5 percent, but

12     here, we didn't misstate 5 percent of the revenue.  We

13     didn't misstate 5 percent of any money coming in.  All that

14     was misstated is -- they were asked, what percentage comes

15     from Medicare; right?  Acthar sales come from either

16     government reimbursements, Medicare/Medicaid or private

17     insurer reimbursements.  So by saying, how much comes from

18     Medicare, and even if you want to take in Medicaid, the

19     lower that number, the higher the private insurer.  We just

20     had a long discussion about how --

21             THE COURT:  The private -- yeah.

22             MS. SILVERBERG:  The market was very, very

23     concerned about private insurance and potential restrictions

24     from private insurers.  So the market was concerned about

25     risk; about private insurers; the market, as he alleged, was

1    concerned about risk from Medicare/Medicaid.  Let's say Mr.

2    Trudeau was off by 5 percent, 10 percent, 15 -- wherever you

3    want to peg the outer limit of the discrepancy between what

4    you assume is the number for purposes of motion to dismiss

5    and what the market understood that, that discrepancy

6    applied to about a third of the company's revenues, and it

7    doesn't go to whether or not those revenues exist.  They go

8    to, were those revenues coming from Medicare or even

9    Medicare and Medicaid or were those companies [sic] coming

10   from private insurers?  And if you read their complaint in

11   full, there's nothing in the complaint that allege --

12   that -- for -- in which they allege that there was a

13   material difference to the market that something would be

14   coming from Medicare or Medicaid reimbursement as opposed to

15   private insurer, because throughout their complaint, they

16   allege that the market had to, you know -- that there were

17   issues with private insurers and there were issues with

18   Medicare and Medicaid.  So even if you find --

19            THE COURT:  But, maybe, there were bigger issues

20   with Medicare/Medicaid.

21            MS. SILVERBERG:  They don't allege that, but --

22   certainly not with particularity.  They alleged that people

23   were concerned about government, you know, cutting back on

24   reimbursements, but they also allege that you had a --

25   really big issues with private insurers that needed to be

1    adequately disclosed.

2              THE COURT:  Okay.

3              MS. SILVERBERG:  So in order to do a material

4    misstatement, three things.  You need to find that the

5    discrepancy between what you deem the number and what Mr.

6    Trudeau signaled to the market, as applied to this

7    particular revenue stream, and then overlaid by, was it a

8    materially different risk factor, in order to find a

9    material misstatement, and then on top of all of that, you

10   have the scienter.  And if I could just --

11             THE COURT:  Okay.

12             MS. SILVERBERG:  -- very --

13             THE COURT:  But back on the statement, do you

14   disagree with what I'm saying in terms of how to read the

15   facts here?  Because I think you've got good arguments that

16   it was ambiguous.  But don't I, at this stage, basically

17   have to take the outer limit?  Not -- I hear you.  It's

18   still not material for all the reasons you said, but in your

19   brief, you go to great lengths to argue why it was really

20   closer to low 30s, and you might be right, but at this

21   stage, I don't think I can do that.  Do you, really?

22             MS. SILVERBERG:  Again, if the statement is

23   ambiguous and --

24             THE COURT:  But I have to give them --

25             MS. SILVERBERG:  -- you have a heightened standard

```
1    --
2              THE COURT:  But -- so how does that jibe?  I
3    struggle with this in a -- on a motion to dismiss.  The
4    heightened standard -- I mean, that's not a pleading
5    question.  This is just a statement that was made.
6              MS. SILVERBERG:  Well --
7              THE COURT:  So I've got to --
8              MS. SILVERBERG:  -- the PSLRA does impose
9    heightened pleading --
10             THE COURT:  Right.
11             MS. SILVERBERG:  -- requirements.
12             THE COURT:  But this is a statement that they're
13   just quoting that was made.  So they can't clean that up.
14   It is what it is --
15             MS. SILVERBERG:  It is what it is.
16             THE COURT:  -- right?  And don't I -- doesn't the
17   "is" where it's ambiguous and susceptible to multiple
18   meanings -- don't I have to give it the most favorable for
19   them?
20             MS. SILVERBERG:  If -- yes, Your Honor -- well,
21   no, Your Honor.
22             (Laughter.)
23             Well, I'm sorry.  Let me just --
24             THE COURT:  Well, I've been struggling with
25   this --
```

1           MS. SILVERBERG:  No.  So the --

2           THE COURT:  -- because I think you make good

3      arguments, but --

4           MS. SILVERBERG:  No, but, again -- okay.  So let's

5      -- thank you.  So let's just go back to what they were

6      saying.  We all agree, I think you just said, it was

7      ambiguous.  His statement was not clear.  So the question

8      is, did he mislead the market?  Did he provide false

9      information to the market?  And if the language was

10     ambiguous and imprecise and the market knew or heard that he

11     was not giving a precise answer, did he mislead the market

12     and put out false information?

13          THE COURT:  If it's ambiguous to me, it's

14     ambiguous to everybody.  So he couldn't mislead.  Okay.

15          MS. SILVERBERG:  All right.  Now, if I could just

16     go back to scienter for one more point, in addition to the

17     context of everything you would have to believe on scienter

18     that he decided on the spot; he used all those [sic]

19     language around it, look at who else was on the call.  Mr.

20     Harbaugh was on the call, the CFO.  So you would need to

21     believe that in the seconds between being asked -- the

22     seconds between Mr. Trudeau was asked the question and

23     answered it, you would have to believe that he decided to

24     defraud the market; that he decided to use the words he used

25     to accomplish that goal; and that in those same minute or

1    so, Mr. Harbaugh, who was sitting on the phone call, decided

2    to go along with the fraud and not correct him even though,

3    if you look at the transcript, it is clear from the course

4    of the transcript that they were both answering questions

5    and commenting on each others' answers.  So you would not

6    only have to believe that Mr. Trudeau decided to commit

7    fraud in that minute, but at the same time, Mr. Harbaugh

8    decided to go along with it.

9            THE COURT:  Or it could have been carefully

10   orchestrated ahead of time.

11           MS. SILVERBERG:  But who knew the -- there's no

12   allegation that anyone had ever asked that question before,

13   ever.  So you would have to have thought that these people

14   decided, Gee, if we get this question today which we've

15   never gotten before, let's have a scheme that I'm going to

16   give an answer that's not a model of clarity and you'll stay

17   silent and we'll trick the market into thinking that our

18   exposure to Medicare or Medicare/Medicaid is less which, by

19   the way, means that our exposure to the private insurers

20   that people are also looking at is higher.  That's just not

21   plausible.  And the only thing that plaintiffs have on

22   inference -- on scienter is that this was an important --

23   Acthar was an important product to the company and,

24   therefore, the executives must have had this information,

25   but just because Acthar was an important product doesn't

1    mean that this particular metric -- revenue reimbursed by

2    Medicare -- was a particular metric that was tracked by the

3    company.  And, in fact, there's no allegation that the

4    company -- which made extensive disclosures on Acthar --

5    ever disclosed Acthar by this metric, revenue from Medicare;

6    there's no allegation that anyone had ever asked for that

7    metric before; there's no allegation that anyone in the

8    market ever considered it; there's no allegation that anyone

9    ever asked for that metric about Acthar again until the

10   Citron report.  And, quite frankly, when Mr. Trudeau was

11   asked, he tried to back into the number by reference to

12   other numbers and Mr. Harbaugh, who was on the call, also

13   stayed silent and didn't say anything.  So given the

14   totality, there is just no -- there's no inference, let

15   alone a strong inference, that Mr. Trudeau intended to

16   provide inaccurate information on this and, if anything, the

17   better inference is that he made a valiant effort to provide

18   accurate information.

19           THE COURT:  Okay.  To throw out the Citron report,

20   you mentioned these other reports which they argue that I

21   shouldn't consider, but as a backup, you argue it's not

22   necessary because the CMS reports reveal the problems with

23   the Citron report.

24           MS. SILVERBERG:  Correct.

25           THE COURT:  Can you just walk me through the math

 1    on that --

 2                MS. SILVERBERG:   Sure.

 3                THE COURT:   -- the numerator and denominator and

 4    what's in each.

 5                MS. SILVERBERG:   Yes.  So Mallinckrodt sells

 6    Acthar to the government; government pays money to

 7    Mallinckrodt; however -- and it is not disputed by the

 8    plaintiffs and is publicly available -- Mallinckrodt gives

 9    rebates to the government.  So when Citron wanted to

10    calculate its number, it looked at, how much money does the

11    government pay Mallinckrodt?  So that is a big number and it

12    does not include the rebates that Mallinckrodt gives back.

13    So let's say two simple numbers.  Let's say the government

14    buys $100 worth of Acthar from Mallinckrodt.  Mallinckrodt

15    rebates them $40.  In fact, the government's only paying

16    Mallinckrodt $60.  The number that Citron used was $100, the

17    gross amount that the government pays Mallinckrodt.  When

18    Mallinckrodt discloses its total revenue, it includes

19    government revenue net of rebates.  So it's only -- it's --

20    the government part -- piece of the revenue in its revenue

21    numbers is just the $60.  So the math that Citron used by

22    using the gross number made the denominator -- made the

23    numerator -- the amount of money to Mallinckrodt -- high,

24    but because Mallinckrodt netted out the rebates, it made

25    Mallinckrodt's numbers low.  So instead of using a number

1   that did not include rebates on top and a number that did

2   not include rebates on the bottom -- so using the high

3   number for both -- they didn't do that, and they didn't use

4   the low number for both.  They used the high number for the

5   numerator and the low number for the denominator which

6   overstates the percentage.

7          THE COURT:  So I can look at these CMS reports?

8          MS. SILVERBERG:  Correct.

9          THE COURT:  There's no issue there on a motion to

10  dismiss?

11         MS. SILVERBERG:  They're --

12         THE COURT:  Because they refer to them.

13         MS. SILVERBERG:  They refer to them in the

14  complaint and they're incorporated into the complaint.

15         THE COURT:  Okay.

16         MS. SILVERBERG:  All right.

17         Your Honor, very -- so one other thing.  They

18  allege in their complaint that the projections that

19  Mallinckrodt -- just -- that -- going back to the insurers,

20  they allege projections of Mallinckrodt going forward at the

21  time that the revenue from Acthar was growing in 2017.  They

22  announced, Revenue grew and we project revenue to continue

23  growing in the single to mid digits -- to -- the single to

24  mid double digits.  At the time they were saying that,

25  revenue was, in fact, growing; then, at the end of the third

1    quarter, as we discussed, revenue didn't -- declined for the

2    first time.  Again, they have no particularized allegations

3    as to why we should have -- why the statements that were

4    made at the time the revenue was increasing were false and,

5    as we discuss in the brief, the projections were

6    forward-looking statements with adequate cautionary

7    language.

8              And I realize we're --

9              THE COURT:  Okay.

10             MS. SILVERBERG:  -- going late.  So I --

11             THE COURT:  Yeah.

12             MS. SILVERBERG:  If you have any questions, I'm

13   happy to answer on that.

14             THE COURT:  Okay.

15             MS. SILVERBERG:  Finally, Acthar efficacy --

16   which, again, I think can be done very, very briefly -- we

17   disclosed -- Mallinckrodt disclosed Acthar's efficacy is --

18   Acthar's efficacy and approved indications was strongly

19   supported by the evidence.  They claim that that was an

20   intentionally false statement because they take issue with

21   the word "strongly" supported by the evidence.  They say

22   that, in fact, the evidence was low-quality.

23             First, if you look at the actual quote, they said

24   Acthar's efficacy and approved indications is, quote,

25   Strongly supported by evidence.  The USFDA reviewed the

1    label in 2010 and determined that there, in fact, was

2    sufficient scientific and clinical evidence to support the

3    19 indications now on the label.  They don't dispute that

4    the FDA actually did that.  So it's clear from the context.

5    We said that the efficacy is strongly approved, and then we

6    gave them the support that the FDA reviewed it and approved

7    it for these 19 indications.  So in context, the statement

8    was entirely accurate.  Plaintiffs say that we should have

9    said that the trials were not controlled trials.  We did say

10   that.  Mallinckrodt disclosed it in 2015 and 2016 in their

11   10-Ks.  They said evidence of efficacy, quote, Does not

12   include clinical trials.  And, again, the total mix of

13   information, it's in our papers.  The market was adequately

14   fully informed on the status of the clinical trials or lack

15   thereof regarding Acthar.

16          Finally, loss causation, we touch on it very

17   briefly.  For several of plaintiffs' claims, there was no

18   stock drop.  When the FTC investigation was first disclosed,

19   the stock went up.  When the Synacthen manufacturer was

20   disclosed, the stock went up -- when the -- when it was

21   disclosed that the manufacturing plant in which Synacthen --

22   the manufacturer was going to be closed, the stock went up.

23   And the Acthar efficacy issue which I just discussed was not

24   disclosed until April 2018 which is long after the class

25   period.  As discussed, there is no case law and they don't

1    cite any that you don't need a stock drop.

2              So in sum, Your Honor, classic -- this is a

3    classic case of fraud by hindsight.  There are no

4    particularized allegations of material misstatements and

5    omissions.  In any event, there is no allegation --

6    certainly not a strong -- they -- their allegations do not

7    constitute a strong inference of conscious misconduct by the

8    defendants.  Particularly in light of the inferences, the

9    case should be dismissed.

10             THE COURT:  Okay.

11             MS. SILVERBERG:  Thank you, Your Honor.

12             THE COURT:  Mr. Brown, do you need to add anything

13   to that?

14             MR. BROWN:  Well, I think Ms. Silverberg did an

15   excellent job covering it --

16             THE COURT:  I'll give you a few minutes, if you

17   need it.

18             MR. BROWN:  Just a couple points that I would like

19   to cover, mainly focusing on Mr. Trudeau's statement from

20   October of 2015.  And just to reenforce what Ms. Silverberg

21   said, context matters.  The percentage of Acthar sales that

22   were reimbursed by Medicare, contrary to what the plaintiff

23   has alleged, was not a key metric to investors.  The company

24   had never previously disclosed this number.  Plaintiffs

25   don't allege otherwise.  No analyst had ever followed up or

1    asked any questions about which percentage of the revenue

2    from this particular drug is reimbursed by the government.

3    Plaintiffs don't allege otherwise.

4         You know, this was one snippet of conversation by

5    Mr. Trudeau on an analyst call in an unscripted situation.

6    He didn't repeat this number --

7         THE COURT:  Did the stock drop right then?

8         MR. BROWN:  No.  No, there was no stock -- nobody

9    asked anything about this for 13 months; then Citron comes

10   out with its report.  It's an inflammatory report accusing

11   Mr. Trudeau falsely of committing securities fraud.  And

12   this is, you know, also a report that comes out by a short

13   seller who is planning to squeeze the stock.  So the more he

14   can throw out inflammatory allegations of securities fraud,

15   the more chance there is the stock will fall and he will

16   make a profit.  That's the context by which, you know, this

17   allegation comes out and the stock drops, but at the time

18   Mr. Trudeau made his statement in October of 2015, nobody in

19   the market reacted to it; nobody asked about it again; the

20   whole issue went away until the Citron report comes out 13

21   months later in November of 2016.

22        And if you look at the plaintiffs' complaint, they

23   spend pages after pages after pages talking about everything

24   else that Mr. Trudeau said on the analyst call in question

25   in October 2015, all the statements about Acthar.  And he

1    certainly was knowledgeable about a lot of aspects of this

2    drug and that was his objective, to go on this analyst call

3    and answer questions about Acthar, but the fact that he knew

4    about many other aspects of this drug does not mean that he

5    was knowledgeable in real time on that call about the

6    precise level of Medicare reimbursement for Acthar.

7           They can't just back their way into this by

8    saying, Well, you knew about all these other things, so you

9    must have known this particular percentage, because, as the

10   case law shows, saying someone must have known is not enough

11   to establish knowledge and you need more particularized

12   allegations in a fraud case.  They would have to show --

13   they would have to make allegations about documents that Mr.

14   Trudeau was shown.  There are no allegations in this

15   complaint that when he made his statement, he had other

16   information that he deliberately chose not to provide to the

17   analysts on the call.  There's no allegation about what

18   documents he was given before the call; there's no

19   allegations about information that was orally told to him;

20   and then, you know, in this context where there's absolutely

21   no motive for someone to lie about this, you know, the more

22   obvious inference from this is that he gave his best

23   estimate at the time.  And perhaps it was a little lower

24   than the plaintiff says it should have been, but, certainly,

25   there was no, you know, attempt to mislead, because

1    directionally, he's moving in the right way; right?

2           Everybody agrees that the number was higher than

3    25 percent real time; right?  And he says, A little higher.

4    The gravamen of the plaintiffs' claim is that he should have

5    said a lot higher.  Now, perhaps, with the benefit of

6    hindsight and -- he wouldn't have given such a garbled

7    answer and he would have been a little bit more precise, but

8    he was pointing in the right direction.  And if we're

9    quibbling about, should it have been a little bit higher or

10   a lot higher, that's not a securities fraud case.  At most,

11   that may be a mistake or imprecision in language, again,

12   when you're, you know, reacting on the fly to a question

13   that comes in the unscripted Q&A portion.

14          Now, you know, Your Honor, you asked, you know,

15   what I thought were some questions that got to, you know,

16   the heart of the matter here about, you know, if we have to

17   give the plaintiff the benefit of the doubt here because

18   this is a motion to dismiss and, you know, say his

19   statement, we think, you know, a little higher than roughly

20   25 percent means somewhere in the 30s, but, you know, we'll

21   say it was about Medicare and Medicaid, maybe, that gets us

22   to the 50s.  So you know, haven't they shown something --

23   haven't they shown the statement is not correct?  I still

24   think that even if you give them all of the benefit of the

25   doubt like that, you still don't have a material

1    misstatement on this record because, as Your Honor stated --

2    I mean, the estimate that Mr. Trudeau gave here is ambiguous

3    as to what it means.  It's susceptible to multiple

4    interpretations.  And there are cases that clearly state

5    that where the alleged misstatement is too vague to be

6    subjected to --

7            THE COURT:  Well, I don't think it's a vague

8    statement here.  I think it's --

9            MR. BROWN:  Pardon?

10           THE COURT:  I don't think it's a vague statement.

11   I mean, he's clearly tying it to 25 and saying a little

12   more, but I hear what you're saying --

13           MR. BROWN:  Sure.

14           THE COURT:  -- but I don't think it falls in the

15   category of cases where things are vague.

16           MR. BROWN:  Well, I mean vague in the context of

17   imprecise, because it's imprecise exactly what the upper

18   bound of his statement is.  So I think it's fair to say that

19   although it's different from the cases involving puffery and

20   vague language in that way, it is a case where an imprecise

21   estimate was given.  I think the Ashland and the City of

22   Monroe cases are good for that and then, also, there's a

23   Second Circuit case, Furher v. Ericsson, where, in that

24   case, the CEO, during an analysts' and investors'

25   conference, said that the third-quarter results would be

1    only slightly down from second-quarter results, and the

2    allegation is that he knew the results would be disastrously

3    worse.  And, in that case, the court found that saying, you

4    know, the results would be slightly down when they would be

5    disastrously down was taking the individual statements on

6    the analysts' call out of context and that when they were

7    considered in light of the questions in the full discussion,

8    the statements were not misleading, and that's our point

9    here, too.  When you consider this statement in context; its

10   imprecision; that he's going the right way but not

11   necessarily as far as the plaintiff says he should have gone

12   that's -- a lot higher than 25 percent, that that's not

13   materially misleading because a reasonable investor looks at

14   it.  If it's an imprecise statement like that, you're not

15   going to make a decision about whether to buy or sell your

16   securities based on such an imprecise statement.  And

17   there's also, you know, we believe, a tie-in from that,

18   like, directly to scienter because, you know, where the

19   inference of falsity is tenuous at most, you need, like, a

20   higher quantum of evidence for recklessness or, like, intent

21   to mislead, and that also comes from the Furher case --

22   Furher v. Ericsson case in the Second Circuit which we cite,

23   you know?  Not only their statement's not misleading, but

24   the court found that there was no scienter for this reason.

25              And I'll just -- I don't want to repeat everything

 1    --

 2              THE COURT:  Yeah, please don't.

 3              MR. BROWN:  -- that was said here, but just to

 4    focus on scienter very briefly which, I think, Ms.

 5    Silverberg didn't go into that much for the statement

 6    because most of what we discussed was what -- was the

 7    statement, you know, accurate or inaccurate?  And things

 8    like that.

 9              It's our position that the plaintiffs' allegations

10    here for Mr. Trudeau's statement fall woefully short of

11    establishing scienter.  And, you know, to begin with, take a

12    step back, even if they could show that the statement was

13    not accurate, that does not establish scienter on its own.

14    These are two separate elements of a 10b-5 case.  The Fourth

15    Circuit case that we cited, Maguire Financial, is very

16    direct on this that falsity and scienter are two separate

17    inquiries.  And in that case, the plaintiff tried to say,

18    Because we've shown falsity, we have shown scienter, and the

19    court said, No, you can't stack inference on inference to

20    show scienter.  And, you know, as we discussed, the

21    plaintiffs pointed to no documents or information to show

22    that Mr. Trudeau knew that he should have offered a higher

23    estimate for Acthar when he made his statement in October

24    2015 and deliberately tried to underestimate that.  The only

25    thing that the plaintiff says is, Well, Mr. Trudeau must

 1    have known this because he was, like, a senior executive at

 2    the company and he sat on some committees.  There are

 3    multiple cases that say that's not enough.  They also say

 4    that he must have known because this was a key metric at the

 5    company.  Again, other than making that allegation, there's

 6    no facts to support it.  If it was a key metric, this would

 7    have been something the company had disclosed before.  They

 8    would have made reference to internal documents showing it

 9    was a key metric.  They didn't provide anything to show that

10    this is a key metric.  They didn't show anything -- they

11    didn't provide any facts to show that anybody in the market

12    regarded this as a key metric because they haven't shown

13    that anybody ever asked about this number before.

14         The only other way that the plaintiff here tries

15    to show scienter for Mr. Trudeau's statement is by saying,

16    Well, 13 months later, the day after the Citron report comes

17    out accusing Mr. Trudeau of securities fraud, two other

18    company executives, Mr. Lannum and Mr. O'Neill, who are at

19    an investors' conference in London provide estimates for the

20    Medicare and Medicaid reimbursement.  And the fact that 13

21    months later, two separate individuals were able to provide

22    rough estimates in response to the Citron report coming out

23    the day before with these inflammatory allegations, that

24    says nothing about Mr. Trudeau's state of mind 13 months

25    prior to then.  We have to focus on, what should he have

1    known in real time?  And there are no allegations in this

2    case about what he knew or even what he should have known in

3    real time.  And the Foley v. Transocean case is really

4    strong on this point.  That case says that you cannot

5    establish scienter, you know, when you refer to documents or

6    information when there's no evidence that the defendant

7    actually saw that document.  And that's even more true, I

8    think, for the Citron report because it's not a company

9    document.  There are no allegations, unless you believe in

10   time travel, that Mr. Trudeau could have seen such a

11   document before he got on this call.

12             THE COURT:  Okay.  Thank you.

13             MR. BROWN:  So thank you for your indulgence, Your

14   Honor.

15             THE COURT:  All right.

16             MR. BROWN:  I appreciate the time.

17             THE COURT:  Mr. Rosen?

18             MR. ROSEN:  Your Honor, might I suggest -- we've

19   been going about 90 minutes --

20             THE COURT:  You want a break?

21             MR. ROSEN:  -- we take a break?

22             THE COURT:  Sure.

23             MR. ROSEN:  I want to respond to their various

24   points and --

25             THE COURT:  Okay.  We'll take a seven-minute

1    break.  All right?

2              MR. ROSEN:  Seven or 10-minute break.  Thank you.

3              THE DEPUTY CLERK:  All rise.  This Court is now in

4    recess for seven minutes.

5              (Brief recess taken.)

6              THE COURT:  Mr. Rosen?

7              MR. ROSEN:  Good afternoon, Your Honor.

8              THE COURT:  Good afternoon.  I'll give you as much

9    time as you want, almost.

10             MR. ROSEN:  Almost.  Almost.  Well, almost will

11   probably be enough.

12             First of all, I want to thank you for giving me

13   that break.  It allowed me a chance to try and organize my

14   notes.  They made a number of specific comments in response

15   to Your Honor's questions.  I don't know if you'd like me to

16   address them up front or as I get to the argument.

17             THE COURT:  Whatever way you'd prefer.

18             MR. ROSEN:  Well, let me just hand up one thing.

19   There's a case that I found -- again, I only got to write

20   one -- we only got to write one brief, so we didn't submit

21   it, but there's a case dealing directly with taking judicial

22   notice of analyst reports.  I have copies for defense

23   counsel.  And the case is called -- let me just read the

24   case name into the record for Your Honor and then I'll pass

25   it up to your Deputy -- Maiman, M-A-I-M-A-N, v. Talbott,

1    2010 WL 11421950, and I have it turned over to the spot

2    where it's star 7, and it specifically addresses taking

3    judicial notice of analyst reports and it points out that a

4    number of courts don't do that and there's a reason, and

5    that's because when we began the -- right before we began

6    the argument today, I saw a gentleman in the back, a young

7    fellow, who I introduced myself to.  And I said, Who are

8    you?  What are you here for?  He said, I'm a law student at

9    GW.  Good for him.  And it brought back memories of when I

10   was a law student a long, long time ago studying civil

11   procedure when Gerald Ford was still President -- to show

12   you how long ago it was -- and you were learning the

13   fundamental distinction between motions to dismiss and

14   motions for summary judgment.  And what we have here is a

15   motion for summary judgment disguised as a motion to

16   dismiss.

17          Defendants have submitted 70 exhibits.  They've

18   gone well beyond the record on things that are not

19   appropriate for judicial notice.  And the rule on judicial

20   notice is clear that if a document is cited, quoted or

21   relied upon in a complaint, it's fair game, just as if -- if

22   I quote one sentence from a public statement or one

23   statement -- sentence from a conference call of analysts,

24   they're allowed to quote other portions of that and say,

25   Look at the entire analyst statement.  That's fair game.

1    But they're not allowed to offer them for other purposes and

2    they're not allowed to try to contest the record.  There was

3    the recent decision we cited in our brief called Orexigen,

4    O-R-E-X-I-G-E-N -- it's Khoja, K-H-O-J-A, v. Orexigen, but

5    it's easier for me to pronounce Orexigen -- where the

6    circuit court specifically warned of the danger of going

7    beyond the record, and it said when the court considers

8    material outside the record, it converts it -- it is, in

9    effect, an attempt to refute or rebut the factual

10   allegations and unless all that material is excluded, it

11   must be treated as a motion for summary judgment and, of

12   course, the prerequisite for that is we have to have

13   discovery.

14         THE COURT:  Well, what about their point that in a

15   fraud on the market case where you're alleging an efficient

16   market, that I can't look outside the record for the truth

17   of what's in the documents but just that the market is

18   generally aware?

19         MR. ROSEN:  What the courts say -- and we cite

20   this in our brief.  I can't cite it line and verse out of

21   memory, but we cite it in our brief, and it says episodic

22   statements -- episodic information is not necessarily notice

23   to the market.  You can have an efficient market, but that

24   doesn't mean every statement by every analyst is immediately

25   incorporated into the market because it --

1            THE COURT:  But your complaint is full of episodic

2      information.

3            MR. ROSEN:  It is, because --

4            THE COURT:  So you're picking certain information,

5      but --

6            MR. ROSEN:  No, we're not.  We're talking about

7      information that was out there.  When they hold a conference

8      call and we go -- and the transcript of the conference call

9      is made available promptly on Bloomberg or someone else

10      and -- it's fair game, because that's made available to

11      everyone who follows the stock; but to say, The Des Moines

12      Tribune had an article that said this, that doesn't

13      constitute notice on the market, just as Ms. Silverberg, who

14      I think is an outstanding lawyer and made an excellent

15      argument generally -- and I like her a lot, by the way --

16      she speaks about, Well, gee, there's an analyst report that

17      says this, or, There's a report that says that.  That

18      doesn't mean the market is on notice of that.  The market is

19      -- and we cite the cases for that in our brief.  So I won't

20      repeat them.  I know you're a very hot bench.  You're very

21      -- even though you're young at this, you obviously have

22      taken this responsibility very seriously.  You dove in and

23      understand the issues.  But you don't go into that.  And the

24      reason you don't go into that is it becomes, in effect,

25      disputing what's in the record.  And Your Honor is

1    absolutely correct.  On a motion to dismiss, unlike a motion

2    for summary judgment, the benefit goes to the plaintiff.

3    They are correct, of course, that under the '95 statute

4    which they often refer to -- and I'll only use it once,

5    because it's hard for the court reporters -- the PSLRA,

6    there are certain heightened pleading standards, but that

7    doesn't mean it changes the basic fact.  And, as the Supreme

8    Court said in Tellabs -- the decision that said -- talking

9    about how you address some of these issues -- it said you

10   look at the inferences and you balance them.  And unless --

11   and you don't need a smoking gun inference.  It doesn't even

12   need to be the most likely.  It needs to be equally likely.

13   And there was a case I did not cite but I personally

14   experienced called PainCare where the District Court said in

15   the Middle District of Florida, I find the inference of

16   scienter and the inference of non-scienter equally balanced;

17   therefore, I sustain the complaint, or as they say in

18   baseball, the tie goes to the runner, and that's the

19   situation here on a lot of this stuff.

20            The defendants asked you -- or you asked the

21   defendants about motive and there was a lot of talk about

22   motive.  One of the motives was to effectuate the merger.

23   They were merging between Mallinckrodt and Questcor a merger

24   that was valued at $5.6 billion.  And the record is clear

25   that -- and they made a reference to it -- they did due

1    diligence prior to the transaction, as all do.  And Ms.

2    Silverberg's firm is an expert at that.  They do some of the

3    most significant mergers and acquisitions in the world

4    within countries -- with -- between companies in the U.S.;

5    between companies in foreign companies [sic] and they go

6    through a whole process of diligence.  They specifically

7    mentioned in the proxy that was issued jointly by both

8    companies -- that is, Mallinckrodt and Questcor -- that they

9    had conducted the due diligence; they had looked at various

10   issues, including legal, including compliance; and they made

11   no disclosure about the FTC investigation.  None.  There's

12   no doubt they were aware of it and they made absolutely no

13   disclosure about that --

14           THE COURT:  Well, does the reference to

15   Retrophin's Sherman Act lawsuit help them at all?  The

16   incorporation --

17           MR. ROSEN:  No.  No, there's a fundamental

18   distinction, Your Honor.  You can have law professors saying

19   this is -- there's an issue here.  You can have retired

20   government officials saying there's an antitrust issue here.

21   It is a fundamentally different fact when the government

22   says there's an issue here and says, Here's a subpoena and

23   here's a civil investigative demand.  That fundamentally

24   changes it.  To know the government considers this worthy of

25   attention is fundamentally different from some newspaper

1    article saying, Well, there may be an issue.

2              THE COURT:  But there's a whole line of cases that

3    say, just when you receive a subpoena, a company does not

4    have to disclose it at that time.  You don't have to do

5    that.  Is there something special about the merger that

6    makes that line of cases not applicable here?

7              MR. ROSEN:  What I think Your Honor is talking

8    about is not a line of cases that say you don't disclose a

9    subpoena.  The issue is --

10             THE COURT:  Well, just early investigation,

11   whether a subpoena or just early on in the investigation

12   which this was; right?  This investigation was relatively --

13             MR. ROSEN:  It was --

14             THE COURT:  -- early.

15             MR. ROSEN:  -- at the beginning, but this is

16   something that was -- involved the single biggest product

17   for Questcor.  It accounted for 95 percent of their revenue.

18   And after the merger, it accounted for the largest share of

19   revenue of any product of Mallinckrodt.  The term that we

20   quoted at one point in the complaint was 31 percent.  There

21   is no other drug that came close to that.  There is no other

22   drug that was 28 percent or 27 percent.  So this was highly

23   material.

24             THE COURT:  Can you give me a case -- what's the

25   best case you can give me that is analogous to this on that

1    point?

2            MR. ROSEN:  I can't do it off the top of my head,

3    but I'll be glad to submit it to Your Honor.

4            THE COURT:  Okay.  Well, I assume it's in the

5    briefs.

6            MR. ROSEN:  I'll -- I will look when I get back to

7    my office.

8            THE COURT:  Okay.

9            MR. ROSEN:  But more importantly, when Your Honor

10   asked about this and they said, Well, gee, what was

11   disclosed?  There are three periods we're talking about as

12   it relates to the FTC.  And I really want to focus on other

13   things first, but since Your Honor asked, there are three

14   things on the FTC.  There's the period from the date of the

15   proxy to November 2014 when they disclosed the existence of

16   the subpoena.  Ms. Silverberg gave you a very careful and, I

17   would respectfully suggest, misleading response when she

18   said there were no other scheduled filings or -- I don't

19   remember her -- the adjective, but the implication is there

20   were no other filings.  There were other filings.  Under the

21   SEC, there are three types of filings that relate to this,

22   the annual reports which are called 10-Ks; the quarterly

23   reports that are called 10-Qs; and the interim reports where

24   something is material and should be disclosed to the market

25   and that's called an 8-K.  Between July when they issued the

1    proxy and November 2014 when they issued the 10-K disclosing

2    the investigation, they issued 8-Ks on other topics.  They

3    had an opportunity to inform the market then and they

4    elected not to.  That, I respectfully submit, is

5    significant.

6              Then you have the period between November 2014 and

7    November 2016.  They disclosed the existence to the market.

8    We're not attacking that.  What we're saying is, as it

9    relates to the FTC -- and then I want to move quickly past

10   that to talk about the other issues which I consider much

11   more important -- on November 29, 2016, they filed their

12   10-K report and they say, We're not aware of any existing or

13   pending matters or litigation.  There's a case we cited in

14   our brief called Richman, and Richman is interpreting the

15   regulations applying the disclosure obligations.  What

16   Richman says -- and they quote it, too.  They say there's no

17   obligation to disclose an investigation until you've been

18   advised that they intend to bring litigation.  And what we

19   alleged in detail in our complaint based on the FTC's own

20   internal operating manual and the procedures and the steps

21   they are required to go through before they file a complaint

22   with a consent decree that they -- it was only 50 days

23   between November 29th, 2016, and January 17th, 20 -- between

24   November 29th -- November 29, '16, and January, I believe it

25   was, 17th -- it might be 18th, but I think it was 17th --

1    2017, where the FTC procedure is laid out.  And under all

2    the FTC procedures, they had to be notified, and so they had

3    to be notified of three things:  The FTC intends to file a

4    complaint; the FTC intends to seek a nine-figure penalty or

5    payment; and the FTC is going to require the mandatory

6    licensing of Synacthen, the one drug that could be the magic

7    competitor to Acthar for two of the possible uses, including

8    infantile paralysis which is a very high-demand issue

9    because up to then, it -- Acthar was the only drug approved

10   in the U.S. for treating infantile paralysis --

11            THE COURT:  And your complaint alleges that they

12   knew those three things that that case -- that FTC was going

13   to conclude that?

14            MR. ROSEN:  They knew -- I -- we infer that they

15   knew based on the all the steps and all the timetables

16   spelled out --

17            THE COURT:  But is that enough for the highly

18   particularized --

19            MR. ROSEN:  Short of a confession, I don't know

20   of -- how you could get anything else.

21            THE COURT:  If you had someone on the inside say,

22   Yeah, they knew.

23            MR. ROSEN:  Your Honor, I'm ethically bound not to

24   talk to any of their employees.

25            THE COURT:  Well, if someone --

```
 1              MR. ROSEN:  I'm not allowed to --

 2              THE COURT:  -- came to you.  I'm just saying,

 3     there are ways you might know --

 4              MR. ROSEN:  There --

 5              THE COURT:  -- not that you can go --

 6              MR. ROSEN:  We did two things, Your Honor.  We

 7     made a request to the law firm that represented them, Cleary

 8     Gottlieb, and got their commitment to preserve their

 9     documents because under the PSLRA, I'm not allowed to

10     initiate any discovery until I get past the motion to

11     dismiss.  So we got a commitment from them to preserve their

12     documents which is highly relevant precisely because they

13     would have the communications that went back and forth not

14     between them and Mallinckrodt but between them and the FTC

15     where the FTC would have transmitted -- they're required to

16     show them a draft complaint; they're required to show them

17     the final complaint; there, obviously, must have been

18     negotiations over its terms; over what the drug Synovac

19     [sic] -- Synthroid [sic] would be licensed for -- excuse me,

20     Synacthen; there probably were negotiations over the amount

21     of the payment -- the $100 million payment.  All that would

22     have existed.  We also tried doing a FOIA request to the FTC

23     and the FTC said -- and this is very interesting --

24     Mallinckrodt has asserted confidentiality of all its

25     submissions to the FTC; therefore, we're not allowed to show
```

1    it to you.  So we couldn't get it through the FTC that we

2    tried; we got Cleary Gottlieb which represented them and to

3    agree to preserve its documents; and we infer --

4             THE COURT:  Did you file a FOIA case?

5             MR. ROSEN:  We did.  We didn't file a case, but we

6    got their objection.  And we infer from the FTC's operating

7    manual, with all the steps that are required and all the

8    time period built into those steps, that they had to have

9    had notice by then, and then when the FTC complaint is filed

10   in January 2017, the stock drops 5.85 percent which is

11   material even by the 5 percent threshold Ms. Silverberg was

12   referring to.

13            THE COURT:  Okay.  But why is that the critical

14   date that I look at as opposed to either the November 2014

15   date at which the investigation was disclosed -- you say too

16   late, but nonetheless, it was disclosed -- why don't I look

17   at that or at the 2015 when it was disclosed with the

18   heightened disclosure?  Why do we get all the way to the end

19   when the complaint's filed?

20            MR. ROSEN:  Well, first of all, there are two

21   separate claims, in effect.  There's the claim that they

22   should have disclosed the existence of the FTC investigation

23   and didn't.  That claim arises from the date of the proxy.

24   And they, in effect, addressed that when they made the

25   disclosure in November 2014.  We alleged they should have

1     done it sooner, but they didn't; then there's the claim --

2               THE COURT:  But no stock drop for that; right?

3     No --

4               MR. ROSEN:  That's correct.

5               THE COURT:  Can you give me a case --

6               MR. ROSEN:  -- but --

7               THE COURT:  -- in which there's been --

8               MR. ROSEN:  -- Gilead --

9               THE COURT:  -- no stock drop and a court's looked

10    -- I understand you've got this broader argument, but as to

11    --

12              MR. ROSEN:  Gilead says -- Gilead is a decision

13    from the Ninth Circuit, and it says courts should be

14    incredibly reluctant to grant a motion to dismiss based on

15    lack of loss causation at the -- at that stage because you

16    need to see a factual record; you need to have

17    investigation; you need to look at the evidence as to what

18    else may have been going on that could have inflated the

19    stock that would have balanced that out.  We don't know at

20    this point.  But that is totally distinct from the claim

21    that says they made a representation on November 29, 2016,

22    concerning, We are not aware of any threatened or pending

23    litigation, when we conclude, based on circumstantial

24    evidence, there is an awful lot of indication that they

25    were.  And the proof of its relevance and the loss causation

1     for that is the -- is when they disclosed that, the stock

2     fell 5.85 percent.

3               THE COURT:  And the statement is, "No threatened

4     or pending litigation"?

5               MR. ROSEN:  Correct.  And we quote that in detail

6     in our complaint.  That is the exact language.

7               Let me just address a couple of their separate --

8     Ms. Silverberg's separate comments and I want to -- really

9     want to get to the focus of my outline.

10              THE COURT:  Okay.

11              MR. ROSEN:  Defendants quote Paragraph 90 --

12    Paragraph 84 of our complaint.  And I would respectfully

13    suggest they misread Paragraph 84 of the complaint.  They

14    say Paragraph 84 of the complaint is an admission or

15    notification that they notified the market in June of 2016

16    that they weren't going to develop Synacthen for anything

17    else that would compete with Acthar.  I'm prone to read too

18    quickly.  So I'll try really hard not to, but here's what

19    Paragraph 84 says in its entirety:

20              From the time of its acquisition of Questcor in

21    August 2014 to the present, Mallinckrodt has not sought

22    approval -- FDA approval for any of the uses for which

23    Synacthen was approved in these and other countries outside

24    the U.S.  Rather, on or about June 14, 2016, nearly two

25    years after Mallinckrodt completed its acquisition of

1    Questcor, Mallinckrodt submitted an investigational new drug

2    application for Synacthen Depot to the FDA seeking to pursue

3    licensure of Synacthen solely for the treatment of DMD.

4         Nowhere in that paragraph do we allege that they

5    stated to the market in words or in any other way that, We

6    had determined that we were not going to do that.  And, in

7    fact, the claim is that they didn't.  And here's why it's

8    relevant to the market and here's why the market was fooled.

9    In 2013 when Questcor acquired the rights to Synacthen, the

10   chief scientific officer of Questcor specifically said, We

11   intend to develop Synacthen not only for uses that don't

12   compete with Acthar, but also, for uses where it may be --

13   have a competitive advantage over Acthar.  In effect, that's

14   telling the market the opposite of, You should be worried

15   about it.  Now, some people were skeptical of that and

16   thinking that they acquired it to do that, but Questcor told

17   the market the opposite and Mallinckrodt did not correct

18   that impression.

19        THE COURT:  And they had a duty to correct -- I

20   mean, you're saying they --

21        MR. ROSEN:  Well --

22        THE COURT:  -- there's an admission there and they

23   had a duty to correct --

24        MR. ROSEN:  Well --

25        THE COURT:  -- based on the prior

1    misrepresentation by Questcor, essentially?

2          MR. ROSEN:  Well, I suspect the statement in 2013

3    by Questcor was not correct, but they certainly can't point

4    to Paragraph 84 as telling the market something they didn't

5    say.

6          Ms. Silverberg also talks about monopolization and

7    saying, Where's the evidence of monopolization?  The

8    monopolization is acquiring Synacthen with the intent or

9    with the goal of preventing it from being developed for

10   competitive purposes by -- there were four companies that

11   had an interest in acquiring the rights to -- the U.S.

12   rights to Synacthen.  Questcor outbid them all because to

13   Questcor, Synacthen had a value nothing -- no other company

14   had a value to which is they had this incredibly valuable

15   franchise of Acthar.  When Questcor acquired Acthar in 2000

16   or 2001, it was selling for $40 a vial.  By 2017, it was

17   selling for $34,000 a vial.  And at the time of its

18   acquisition in 2013, it was easily over $20,000 a vial.  So

19   Questcor acquired Synacthen for the purpose and with the

20   intent of preventing competition and then lied about it.

21   And defendants can't say, Well, the market knew about it,

22   based on the fact that in 2016, they filed an NDA for a

23   different purpose of it because there was no statement

24   stating, And we are not going to let it develop as a

25   competition for Acthar.

1          THE COURT:  But why isn't the threat of monopoly

2     present right when Mallinckrodt assumes -- merges with

3     Questcor?

4          MR. ROSEN:  It is, and that's why the failure to

5     disclose the FDA -- the FTC subpoena was so important.  It's

6     not simply musings by a reporter.  It's not the musings of

7     an analyst.

8          THE COURT:  But what I'm getting at, in your

9     complaint, you suggest that Mallinckrodt's failure to pursue

10    FDA approval for the drug to be used in these various ways

11    that would compete with Acthar, that's anticompetitive.  But

12    why --

13         MR. ROSEN:  Monopolization.

14         THE COURT:  -- is not the mere acquisition of it

15    anticompetitive?  What -- how does the anticompetitive

16    effect get any worse?  It's -- they're holding both drugs.

17    They can increase the price of the synthetic drug and the

18    other drug.

19         MR. ROSEN:  They have no need to do anything with

20    the synthetic drug.  And the only reason, I respectfully

21    submit, that they submitted any license or application for

22    Synacthen was under the terms of the licensing agreement

23    with Novartis, they had to get it approved for something by

24    a certain deadline or they would risk having Novartis take

25    the drug back.  That would be the ultimate danger to them

1    because if Novartis says, You're not developing it --

2    remember, as we alleged in the complaint, Questcor paid two

3    things for the right to Synacthen:  First, they paid

4    $100,000, and they agreed to a royalty provision.  If they

5    never develop it; if they never sell any, there will be no

6    royalties, and so Questcor and then Mallinckrodt had to do

7    something to at least go through the motions of some sort of

8    licensure or Novartis could say, We're taking it back.

9            THE COURT:  But putting aside the FTC

10   investigation, was the market not generally aware at the

11   time the merger happened that these are potentially

12   competing drugs and now you've got Mallinckrodt getting them

13   both -- I mean, I'm just trying to figure out, from the time

14   of the merger -- yeah, you've got, yet again, another

15   company -- first, it was Questcor; now it's Mallinckrodt --

16   have --

17           MR. ROSEN:  Correct.

18           THE COURT:  -- two drugs that could be competing

19   against each other.

20           MR. ROSEN:  Correct.

21           THE COURT:  That's a problem in the market,

22   potentially.

23           MR. ROSEN:  But it all depends on the intent to

24   develop it.

25           THE COURT:  But --

 1              MR. ROSEN:  If you --

 2              THE COURT:  But why?

 3              MR. ROSEN:  If -- the market has to assume that

 4      executives are speaking truthfully, and so the executive --

 5      the chief scientific --

 6              THE COURT:  Well, Mallinckrodt hadn't said

 7      anything at this point.  They've just acquired the drug and

 8      these are potentially competing drugs.

 9              MR. ROSEN:  Right.

10              THE COURT:  And I mean, the market, right -- I

11      mean, does the market know, then, that these are competing

12      drugs?

13              MR. ROSEN:  First of all, the market doesn't even

14      know that Synacthen -- first of all, the market knows

15      Synacthen is not licensed for anything at that moment.

16      There were -- the -- there's no FDA licensure for Synacthen

17      for any purpose whatsoever.  Now, it could be competitive.

18      It's competitive in other countries where Synacthen --

19              THE COURT:  Does the market know that?  That it

20      could be competitive.

21              MR. ROSEN:  Sure, but -- and here's your critical

22      thing -- the last word to the market prior to the merger was

23      the chief scientific officer of Questcor saying, We intend

24      to develop it for uses that would compete with Acthar.

25              THE COURT:  But how can Mallinckrodt be held

1     responsible for what Questcor said?

2          MR. ROSEN:  First of all, Questcor becomes a

3     subsidiary of Mallinckrodt.  The -- Questcor is now called

4     Mallinckrodt ARD.  Questcor -- the stockholders of Questcor,

5     I believe, ended up owning 49 percent of the stock in the

6     merged company.  This is not a case where they acquired the

7     company and purged all the executives and said, We're

8     redirecting it.

9          But I'd really like, if I could, to turn to the

10    Medicare and Medicaid issue, because I think that's probably

11    the clearest case of misrepresentation.

12          In 2014, the joint proxy specifically warns, and

13    I'll quote, An increase in the proportion of Questcor's

14    Acthar unit sales comprised of Medicaid-eligible patients

15    and government entities, closed quote, constitutes a

16    potential risk factor.  So the market is told, an increase

17    in the Medicare/Medicaid is a risk factor for the company.

18    So that's what the market's told; then on October 6th, 2014,

19    the company -- 2015, the company holds an analysts call.

20    There are four executives from Mallinckrodt present, the

21    CEO, Mr. Trudeau; the CFO, Mr. Harbaugh; the chief medical

22    officer, Mr. Romano; and the Vice President for investor

23    relations, a man named Coleman Lannum, L-A-N-N-U-M.  And

24    as part -- at the beginning of it, Mr. Trudeau, as CEO,

25    speaks about the company and speaks about Acthar.  And, in

1    fact, Mr. Trudeau is the only executive to speak about

2    anything on Acthar other than a technical or -- a scientific

3    or medical question because he's not an M.D.; he's not a

4    scientist.  Your Honor pointed -- someone pointed out -- I

5    believe it was -- I don't know if it was defense counsel for

6    the individuals or defense counsel for the company -- Mr.

7    Harbaugh didn't correct Mr. Trudeau.  Well, I don't know if

8    you can take judicial notice of it, but it's my experience,

9    in 39 years of litigating, it is not an infrequent

10   experience when a head of an organization speaks that his

11   subordinates don't criticize him and disagree with him in

12   public.  It's not a career-enhancing move.  It -- you don't

13   need to have a conspiracy.  You need to say, The boss said

14   something.  I'm just going to remain silent.  Why do I need

15   to go out there?

16           Now, at that point, Acthar accounted for $1

17   billion worth of revenue to the company in the last prior

18   four quarters and Mr. Trudeau spends more time measured by

19   paragraphs of the -- of that conference call speaking about

20   Acthar than anything else.  He speaks more than a third of

21   his time about Acthar.  And he's asked the question, quote,

22   What is your Acthar exposure to Medicare?  I'd like to read

23   into the record the precise response, because it's

24   important.  Quote, With regard to your question on Medicare

25   exposure to Acthar, a couple of things.  One, if we look at

1    our combined -- if we look at our overall business, the --

2    one, this is the first time he says it -- combined

3    proportion of our business that goes through Medicare and

4    Medicare -- two, he says "combined" again -- combined, it's

5    about a quarter of our business, roughly.  Acthar may be a

6    little higher than that, but in general, our business is

7    about a quarter.  So not once but twice, he refers to

8    Medicare and Medicaid together.  He uses the term

9    "combined".

10              THE COURT:  I've already suggested, I think, I

11   would read it to be "combined" --

12              MR. ROSEN:  Yes.

13              THE COURT:  -- and the outer limit of that.

14              MR. ROSEN:  Right.

15              THE COURT:  It's still -- you've still got the

16   materiality hurdle --

17              MR. ROSEN:  Right.

18              THE COURT:  -- and the scienter.

19              MR. ROSEN:  Yeah.  You've had a lot of

20   explanations for why he said what he did, but there were

21   four things he could have said that would have solved the

22   problem and created no liability when he's asked the

23   question.  Number one, I'll have someone else handle that

24   question -- remember, he had the CFO on the call; he had the

25   chief medical officer on the call; and he had the investor

```
 1    relations person -- two, We'll have to get that figure and
 2    get back to you; three, It's not important to understanding
 3    the company's performance, so we are not going to give you
 4    that information; or, four, I don't know the answer to your
 5    question, so I won't guess.  There isn't a fifth option that
 6    says, I'm going to guess or I'm going to lie.  And when a
 7    company executive makes a statement, there's an implied
 8    representation that he knows what he's talking about.  If a
 9    company executive was asked, What do you think of how the
10    Redskins did, at the analyst call, no obligation if he got
11    it wrong, but if a company executive is talking about the
12    product that's the single biggest source of revenue for his
13    company and the company had already flagged the issue of the
14    size of the government reimbursement -- the size of the
15    government share of their market was a risk factor and then
16    the company executive gives an answer that's 100 percent
17    wrong, now --
18            THE COURT:  Wait, wait.  Let me -- back up there.
19    Let me ask you, your complaint talks a lot about the risk
20    factors in the private market --
21            MR. ROSEN:  Right.
22            THE COURT:  -- right?  So we've got risk factors
23    in the government and the private.  So --
24            MR. ROSEN:  But --
25            THE COURT:  -- help me understand why this is --
```

```
 1              MR. ROSEN:  Sure.

 2              THE COURT:  -- so critically important --

 3              MR. ROSEN:  Sure.

 4              THE COURT:  -- at the time.

 5              MR. ROSEN:  If you have a larger share of sales of

 6    Acthar to government-funded insurance -- Medicare/Medicaid

 7    -- that implies you're not penetrating the private insurance

 8    market as much.  And the proof of the relevance of that was,

 9    fast-forward a year later, October 14, 2016.  CMS, the

10    Centers For Medicare and Medicaid Services, the division of

11    Health and Human Services, discloses information on the 10

12    or 20 most prescribed drugs.  It's on their website.  They

13    call it -- the dashboard, is the phrase; first time they do

14    it.  And based upon this information, Mr. Left, who is a

15    short seller -- but there's nothing sinful about that.  It's

16    an ordinary part of the efficiency of the market.  Mr. Left

17    is the same one who called the fraud in Valeant which was

18    proven to be absolutely right.  Short sellers frequently do

19    that.  But Mr. Left goes through the calculation and

20    determines that this was about 61 percent of the market --

21    61 percent -- that Acthar was about 61 percent to government

22    and not 25 percent or thereabouts.

23              THE COURT:  Do you argue with their discrediting

24    of that report?

25              MR. ROSEN:  There's an easy answer.  It doesn't
```

1    matter.

2              THE COURT:  Why didn't --

3              MR. ROSEN:  And here's why --

4              THE COURT:  -- it matter?

5              MR. ROSEN:  Here's why it doesn't matter.  When

6    Mr. Left says that, on that day, the stock drops $8 or falls

7    a little more than 12 percent.  The next day, after the

8    analysts criticize it, Coleman Lannum, the investor

9    relations person who was present 13 months earlier when they

10   had the --

11             THE COURT:  Well, wait.  It does matter, in

12   looking at Trudeau's statement, though, how far off it was.

13             MR. ROSEN:  Well, let me show you -- it's off

14   enough, and let me show you why.

15             THE COURT:  Well, yeah, but it doesn't matter for

16   that purpose.  It might matter in terms of how the market

17   reacted, but it doesn't matter in terms of whether what

18   Trudeau said was grossly false as opposed to --

19             MR. ROSEN:  I would respectfully disagree, and

20   here's why.  Mr. Lannum goes and speaks and he says the

21   following thing.  He's obviously expected to ask this

22   question based on Mr. Left's comment the day before and this

23   is his comment.  So if you take a -- quote, So if you take a

24   look at our core exposure of Acthar for Medicare, it's

25   somewhere in the mid-40s percent range.  If you take it to

 1   Medicaid, it's probably in mid single digits.  Here's the

 2   magic sentence.  Similar numbers last year.  So -- and then

 3   he says, If you go back two years, it was lower.

 4            THE COURT:  Which this --

 5            MR. ROSEN:  So --

 6            THE COURT:  Wasn't this two years or no?

 7            MR. ROSEN:  This was one year later.

 8            THE COURT:  Okay.  One -- exactly one or --

 9            MR. ROSEN:  Yeah.

10            THE COURT:  -- in between one and two?

11            MR. ROSEN:  It was 13 months later.

12            THE COURT:  Okay.  But that gets you --

13            MR. ROSEN:  He's talking about --

14            THE COURT:  -- in the low 50s at the outer limit.

15   Do you agree with that?

16            MR. ROSEN:  I -- yeah, he says the low 50s,

17   because he's saying mid-40s for Medicare --

18            THE COURT:  Plus single digits --

19            MR. ROSEN:  -- mid single digits.  So --

20            THE COURT:  Right.

21            MR. ROSEN:  -- low 50s.

22            THE COURT:  So low 50s.

23            MR. ROSEN:  Here's why it doesn't matter whether

24   Mr. Left was right or Mr. Left was wrong.  Stock -- the --

25   all they -- all the favorable analysts that trashed Mr.

1    Left; all the company response, including Mr. Lannum's

2    specific quotation on that, if they were correcting Mr. Left

3    and showing that he was wrong, the stock should have bounced

4    up.  So after having fallen $8 on the day Mr. Left made his

5    statement, it falls $4 further the next day.  So between the

6    two days, it's fallen over 18 percent from $67.80 to $59.65

7    on the 16th down to $55.32.

8              THE COURT:  And this is how many months after the

9    statement was made?

10             MR. ROSEN:  Thirteen months.  And they're talking

11   about the prior year because they're in a September fiscal

12   year.  So what he's saying is that year, they were at

13   roughly 50 percent, and the prior year, the year about which

14   Mr. Trudeau was speaking, they were about 50 percent.  So

15   you don't have to agree with Mr. Left at all.  You can say,

16   You know what?  Mr. Left miscalculated.  I don't have to

17   accuse him of having bad motives, but he miscalculated.  It

18   wasn't 61 percent.  It was 50 percent.  And I would

19   respectfully submit that if I, as a CEO, say a number is

20   roughly 25 percent and the number is roughly 50 percent,

21   that is material.  Ms. Silverberg said, Well, gee, it's 31

22   percent.  It's not that much.  It doesn't get to the 5

23   percent threshold, but here's how you do the math.  It's a

24   25 percent difference.  So if you multiply --

25             THE COURT:  But he -- didn't he say, "A little

1    over"?  So we shouldn't start at 25.  Not quite 25.

2         MR. ROSEN:  He said, Perhaps.  He didn't say,

3    Definitely.  He said, Perhaps a little higher.  He said, A

4    quarter; perhaps a little higher.  But if you have an

5    additional 25 percent of a company -- of a product that is

6    Acthar that accounts for 70 -- 31 percent of the revenue,

7    that corresponds to 7.75 percent, well above any 5 percent

8    threshold.  So you don't need to accept Mr. Left's

9    arguments.  You don't need to accept Mr. Left's credibility.

10   The fact is, over a two-day period following the disclosure

11   from CMS about this -- about the Acthar sales, the stock

12   falls over 18 percent.  That is material by any measure.

13   And I would respectfully submit that you don't need a

14   conspiracy.  If Mr. Trudeau gave the answer either knowing

15   it was false or not knowing what the answer is and just

16   winging it, that's securities fraud.  This is not like

17   taking the SAT where if you get a question you don't get --

18   don't know the answer, you say, Well, I have a one in four

19   chance.  I might as well guess and say B.  Executives are

20   not allowed to guess.

21        And that brings me up to their reference to

22   Omnicare which I would respectfully submit is also

23   misleading.  Here's the quotation.  Omnicare was talking

24   about statements of opinion and liability for statements of

25   opinion.  And I'm quoting from 135 Supreme Court Reporter at

1    1330, first paragraph:

2          Moreover, whether an omission makes an expression

3    of opinion misleading always depends on context.

4    Registration statements as a class are formal documents

5    filed with the SEC as a legal prerequisite for selling

6    securities to the public.

7          And here's where they're -- the off-the-cuff

8    statement comes in.  It's truly misconstrued by them.

9          Investors do not and are right not to expect

10   opinions contained in those statements to reflect baseless,

11   off-the-cuff judgments -- here's the key phrase -- of the

12   kind that an individual might communicate in daily life.

13          The Supreme Court in no way in Omnicare was saying

14   there's an off-the-cuff exception.  Defendants cite one case

15   from the Seventh Circuit that suggests there is.  The only

16   case that has ever cited that was a case called SEC v. --

17   and now I'm blanking on the name, but it's a 200-page

18   opinion that we cited in our brief which specifically

19   considers and rejects that.  And defendants concede in their

20   reply brief that there is no off-the-cuff exception,

21   although immediately turn around and talk about all the

22   reasons why it's a surprise and he didn't know it and wasn't

23   expecting it and all that, but there were four choices,

24   again, that he had:  Have someone else answer the question;

25   say, I don't know the answer.  We'll get back to you; say,

1    We don't consider it relevant to the company's performance,

2    so we're not going to disclose this; or, I don't know, so

3    I'm not going to guess.

4              THE COURT:  So you're saying, at best, it was a

5    reckless statement?

6              MR. ROSEN:  Absolutely.  Absolutely.  And that is

7    sufficient under the law on the D.C. Circuit under Harman

8    and under the law of every other jurisdiction that has

9    addressed this.  So we think that's highly significant.

10             I want to talk now about the statements in 2017,

11   the ones that Ms. Silverberg was about to address with her

12   chart that I -- and, by the way, one last point on Acthar

13   before we go on about the representation.  The percentage of

14   earnings was even greater because of the high price for

15   Acthar.  Acthar, when there's -- you're charging 30,000,

16   34,000, whatever it was at that time -- in 2017, it was

17   34,000.  It was certainly in the high 20s, if not in the 30s

18   at the time of CEO Trudeau's statement.  Because of that

19   high price, it accounted for an even larger part of earnings

20   for the company because it was such a profitable product.

21             Now, let me talk about statements about acceptance

22   of the product and their progress in dealing with private

23   insurers.  With private insurers, they were talking about

24   the formularies.  And formularies simply -- and I'm sure

25   Your Honor has dealt with this.  If you're like anyone else

1    in America today, you deal with your insurance company and

2    say, Is this current drug approved for payment?  Am I

3    allowed to get this hypertension drug or I have to take that

4    hypertension drug?  Or whatever the drug may be.  And they

5    have formularies that say, These are the drugs that are

6    approved, and then they have approved indications which is,

7    These are the conditions for which we will approve the drug.

8    Acthar was the gold standard for infantile -- I believe it

9    was -- paralysis because it was the only known treatment for

10   that, but the management strategy at Mallinckrodt was to try

11   and broaden the number of things that it could be prescribed

12   for and they were constantly promoting it, and so they made

13   a series of statements about the progress the company was --

14   made in getting them to ease those restrictions both in

15   terms of getting on formularies and easing the conditions

16   for which they could be prescribed.  At the same time, they

17   made statements that there was extensive data and clinical

18   support for the efficacy of Acthar, and then based upon

19   their growing acceptance of Acthar by private insurers and

20   based upon the -- their assertion that it was being used --

21   approved more and more by doctors who were recognizing its

22   efficacy, they were saying, We are seeing mid digit -- mid

23   single-digit to low double-digit growth.  So those three are

24   all tied together, the formulary issue and the conditions

25   for which it's approved; the medical acceptance issue; and

1        the other issue.

2                So let's talk about the formulary issue.  We have

3        alleged line and verse in the complaint that they made

4        misrepresentations in the year 2017 about where they stood

5        on the formularies and where they stood on the conditions

6        for which they were approved.  Ms. Silverberg is absolutely

7        correct.  We went to the websites of various insurers and

8        tried to infer, Well, gee, this one doesn't approve it for

9        this, or, This one doesn't approve it for that.  That's not

10       enough to disclose it to the market.  Certainly, there's no

11       perspective because you don't know which conditions account

12       for which part of the sales.  They were trying to sell it

13       for nephrology; they were trying to sell it for neurology;

14       they were trying to sell it for rheumatology.  If you don't

15       know the percent of the sales or the intended sales for

16       which each of those conditions make up, then knowing that,

17       for example, UnitedHealthcare will approve it for

18       rheumatology but not neurology or a particular rheumatology

19       condition but not the others, you can't put it all together.

20       Defendants knew.  Defendants absolutely knew.  And we

21       alleged they made a series of statements through August of

22       2017 misrepresenting where they stood with the formularies

23       and where they stood with the private insurers in terms of

24       the conditions.

25                We also allege that they made misrepresentations

1    about where they stood in terms of medical acceptance and

2    that they -- the falsity of this was proven by a couple

3    things.  One was that -- I don't know if Your Honor has

4    friends who are doctors.  I assume -- you've gone to law

5    school.  You probably did -- knew some people who went to

6    medical school.  You always hear them talk about JAMA,

7    Journal of the American Medical Association, one of the gold

8    standards of medical publications along with the New England

9    Journal of Medicine.  And one of JAMA's publications is JAMA

10   Internal Medicine for adult docs as opposed to pediatric

11   docs.  And we quote -- we cite an article from JAMA which

12   heavily criticized Acthar and said the evidence -- the

13   scientist -- science doesn't support it and the science that

14   they've done is of such poor quality that it wouldn't be

15   approved.  And, in fact, we cite in a footnote in our brief

16   or in our complaint -- I don't remember which; it may have

17   been the brief -- not only did they push -- publish an

18   article critical of Acthar, but there was an editorial

19   published on the same edition of JAMA Internal Medicine

20   saying, High prices for old medicine, or words to that

21   effect.  You'll see -- Your Honor, if you go to -- you'll

22   see it in the -- cited in the footnote.

23        We also cited -- and this came out after filing a

24   complaint -- the 60 Minutes report which quotes the fact

25   that a small number of prescribers were accounting for an

1   incredibly large portion of the sales; that for some

2   conditions, 0.2 percent of the physicians accounted for 42

3   percent of the prescriptions for certain specialties and

4   many of them had financial relations with Mallinckrodt.  It

5   smells.  It certainly is indicative that there was not broad

6   acceptance of the efficacy of Acthar, especially for these

7   new conditions for which they were trying to get approval.

8   It is absolutely true that the FDA issued a label in 2010

9   saying there are 19 conditions for which it may be

10  prescribed, and they made statements in 2017 -- 2012 --

11  there were publications in 2012 about that and about the

12  limitations on that, but in 2017, they said, We have, in

13  effect -- this is an oversimplification -- good science

14  supporting us; effective science supporting us.  And any

15  disclosure in 2012 doesn't undo the fact that five years

16  later, they're saying, The science supports us.  It's simply

17  inconsistent.  And if you have four insurers -- if you have

18  Aetna, Cigna, UnitedHealthcare and we cited a particular

19  Blue Cross fund -- I -- we cited the one from Philadelphia

20  because we're in Philadelphia.  So it's an independent Blue

21  Cross, but I -- after we submitted the brief, I checked --

22  or I believe one of my colleagues here checked the Blue

23  Cross affiliate for the Washington, D.C., area and we saw

24  the same thing, restrictions in terms of what they would

25  approve.  So that's certainly inconsistent.

1              And then you get to the situation that the -- you

2     have the big decline announced at the end of the class

3     period which is -- they give the results in November 2017

4     for the third quarter of 2017 and it shows Acthar net sales

5     are down, and not only that, but in the following four

6     quarters continuing well past the end of the class period

7     since the class period ended on that date, they continued to

8     drop.  So it wasn't a fluke.  So we're saying you can't say,

9     We're getting growing acceptance; you can't say, Physicians

10    are approving more and more treatments for this, when, in

11    fact, we allege and infer the opposite.  The scientific

12    evidence was not there; the medical acceptance was not

13    there, as proven by the fact that in some of these

14    conditions, most of the people prescribing it were people

15    who had a financial relationship with the company.

16              THE COURT:  But weren't their numbers growing?

17    Doesn't the complaint reflect that during the same period?

18              MR. ROSEN:  The complaint says they reported

19    greater acceptance, but, in fact, when they made the

20    disclosure on November 17, 2017, there was a 35 percent drop

21    in the stock price.

22              THE COURT:  Right, but during the time they're

23    making the alleged misstatements.

24              MR. ROSEN:  They're saying they're doing well, but

25    we --

1          THE COURT:  And the numbers were not at the time?

2          MR. ROSEN:  Well, we won't know it --

3          THE COURT:  Not in the future, but --

4          MR. ROSEN:  We won't --

5          THE COURT:  -- at the time, the numbers weren't

6     increasing when they were saying that they were increasing?

7          MR. ROSEN:  All we know is what they say.  We

8     haven't audited the books.  We don't know what the truth is.

9     They were saying they're making great progress, but all the

10    indications are, based on finding what the various insurers

11    were putting out, that, in fact, there wasn't acceptance;

12    based upon the fact that -- the article period in JAMA

13    criticizing it, that there was not the acceptance.  So we

14    think that's absolutely not true.

15          Let me talk for a moment about scienter.  As Your

16    Honor indicated, scienter can be based as well as on -- just

17    as on intent as on recklessness.  That's approved by -- in

18    this circuit in Harman and in other cases.  And they did due

19    diligence and learned of the FTC investigation; they had an

20    incentive to push the transaction through, going back to the

21    merger; and scienter can be founded based on that.  They

22    were trying to effectuate a $5.6 billion merger where they

23    needed shareholder approval.  If they had disclosed to the

24    shareholders of Mallinckrodt the truth that the FTC was

25    already investigating, the shareholders very well may have

1      said, We don't want to acquire this liability because this

2      represents a great liability to us, as proven out by the

3      fact that two-and-a-half years later --

4                THE COURT:  Well, no, no, no --

5                MR. ROSEN:  -- they cost them --

6                THE COURT:  -- let's back up.

7                MR. ROSEN:  -- 100 million --

8                THE COURT:  Let's back up.  But by November, it's

9      out there.

10               MR. ROSEN:  It's out there --

11               THE COURT:  Stock price does nothing.

12               MR. ROSEN:  And we have to look, after we get

13     discovery, to see what other factors were out there that may

14     have --

15               THE COURT:  But you have no --

16               MR. ROSEN:  -- influenced the stock.

17               THE COURT:  I mean, give me a case that says you

18     can do that.

19               MR. ROSEN:  Gilead says -- it's a Ninth Circuit

20     case.  It says the court should be reluctant to grant

21     summary judgment on loss causation at the motion to dismiss

22     stage.  Harman also says --

23               THE COURT:  But what about the larger point you

24     make which is where there could be something favorable?

25               MR. ROSEN:  Right.

```
 1          THE COURT:  They cite this case.  Warren Buffett
 2    comes in and --
 3          MR. ROSEN:  Right.
 4          THE COURT:  -- there's a lot of good news, and it
 5    might even have been in -- is it -- this district, I think,
 6    said, Not enough.  I don't know if it's this district for
 7    sure, but you've got to have loss.  It's pretty --
 8          MR. ROSEN:  Well --
 9          THE COURT:  -- unequivocal.  You have to have
10    loss.
11          MR. ROSEN:  The D.C. Circuit's decision in Harman
12    says you don't need to prove loss causation at the motion to
13    dismiss stage.  So I would respectfully suggest we do not
14    have to show it now.  I will freely agree that at the
15    summary judgment stage, we'll have to show loss causation
16    relating to their statements.  We don't need to show that
17    now.
18          Let me talk about a few other issues with respect
19    to that.  They said there was no duty to disclose and they
20    said -- about the investigation.  We agree.  There is no
21    general duty to disclose, but there can be duty -- the
22    existence of any government -- any governmental
23    investigation, but there were several distinguishing
24    features here.  First of all, once a company speaks on an
25    issue or topic, there's a duty to tell the whole truth.
```

1    They said in the beginning in the joint proxy in July of

2    2014, We attribute the success of Acthar, its competitive

3    position -- we talk about the reasons for its strong

4    competitive position, without saying, It's not simply

5    because it's hard to formulate.  We're -- they're not

6    disclosing that its competitive position is based upon a

7    decision not to let Synacthen be developed to compete with

8    it.

9           THE COURT:  And so the misstatement they made

10   there -- or the incomplete, rather, is the one about the

11   uniqueness of the drug?

12          MR. ROSEN:  Well, they're saying, We're well

13   positioned competitively.  It's -- I don't -- I'm garbling

14   it because I'm doing this from memory.  I don't have the

15   exact quotation in front of me.  But they're saying, We're

16   well positioned.  They're talking about its competitive

17   position.  And we cited one of the cases where -- in a

18   brief, and I can't be more specific from standing here on

19   one foot, but it says, If you talk about the reasons for

20   success and one of the principal reasons is you're doing

21   something illegal or unlawful, that's a misrepresentation,

22   and that's what they were doing here, and the FTC alleged

23   that there was a violation of the Sherman Act, Section 2.

24          Now, at one point, Ms. Silverberg --

25          THE COURT:  This is as to Questcor; right?

1          MR. ROSEN:  No, the FTC complaint and the FTC

2     consent order is against both Mallinckrodt and Questcor

3     which is -- which became Mallinckrodt ARD.

4          THE COURT:  For conduct of Questcor; correct?

5          MR. ROSEN:  For conduct of Questcor and its

6     continuation, because there was a --

7          THE COURT:  Right.  But what is the continuation?

8     That's the hard part I'm having --

9          MR. ROSEN:  Not allowing Synacthen to be developed

10     as a competition for Acthar.

11          THE COURT:  So Mallinckrodt had a duty to proceed

12     as Questcor said it would because Questcor is the

13     subsidiary --

14          MR. ROSEN:  They --

15          THE COURT:  -- and they had a duty to --

16          MR. ROSEN:  They created the impression that they

17     did not refute; they did not correct.

18          THE COURT:  And they are, therefore, responsible

19     for what --

20          MR. ROSEN:  Right.

21          THE COURT:  -- Questcor said?

22          MR. ROSEN:  Right.  The market assumes continuity.

23     The market should -- doesn't assume discontinuity.

24     Certainly, when the company that's acquired becomes a

25     subsidiary -- that's the first reason.  When you speak about

1    the reason for success, there's the duty to tell the whole

2    truth.  Second, the company, in its proxy, referred to other

3    existing or threatened -- other pending or threatened

4    litigation but didn't disclose the FTC investigation when it

5    knew of it.  There is zero doubt that when due diligence was

6    conducted by the -- by Mallinckrodt and its lawyers, that

7    they learned of this -- they learned of the existence, this

8    FTC proceeding.  If they didn't, it would have been -- you

9    would have a very unhappy client and have a great

10   malpractice claim.  And I'm not excusing [sic] --

11              THE COURT:  No, no --

12              MR. ROSEN:  -- anyone of malpractice.

13              THE COURT:  -- I think that's a fair inference to

14   draw, but --

15              MR. ROSEN:  Also --

16              THE COURT:  -- with all the cases that say you

17   don't have to disclose an early stage of an investigation

18   coupled with the fact that there is knowledge of the

19   potential of antitrust --

20              MR. ROSEN:  But that's fundamentally different,

21   Your Honor.  It is fundamentally different -- to use an

22   analogy -- and it's frequently in the news today -- it's one

23   thing to say, You may be indicted, or, You may be in

24   criminal trouble because of X, Y or Z.  It's another thing

25   to say, The Department of Justice or the FTC has contacted

 1   us and they are going to assert a claim.  That is a --

 2   fundamentally, a horse of a different color.

 3          THE COURT:  Well, it's not that.  They're

 4   investigating me.  It's not, They're going to charge me.

 5   It's --

 6          MR. ROSEN:  Well, they're considering it

 7   significant.  And, by the way, we know a little bit about

 8   that FTC investigation.  You said, what do we know?  There's

 9   a private antitrust suit against Mallinckrodt relating to

10   this, sort of, derived from or secondary to the FTC

11   investigation.  And I've checked the dockets and something

12   interesting got filed there, a discovery plan in that case

13   and in which disclosed that -- the word isn't "deposition"

14   because they use a different word for it at the FTC, but

15   there are the equivalent of about a dozen depositions

16   conducted by the FTC of Mallinckrodt officials relating to

17   that.  So this wasn't simply, Turn over some documents.

18   They were taking sworn testimony from individuals.

19          THE COURT:  And, yet, in the end, there was no

20   admitted wrongdoing of Mallinckrodt?

21          MR. ROSEN:  Your Honor, let me address that very

22   simply.  I've been at this business for -- litigation for 39

23   years.  I know you haven't been that long, but you've

24   obviously seen a lot of litigation.  My partner, Jeff Golan,

25   litigated -- was lead counsel in a case against WorldCom;

```
 1    settled for a total of $6 billion.  And the one constant is

 2    every settlement constitutes no admission of liability.

 3    Every -- and the one prediction I'll make, Your Honor, is if

 4    this case survives and if this case settles, the stipulation

 5    of settlement will say, Mallinckrodt and the individual

 6    defendants are settling solely to avoid inconvenience and

 7    disruption and all that and there is no admission of

 8    liability.  There is never an admission of liability short

 9    of a judgment, and that's part of the price of settling a

10    case rather than taking a case to judgment, but I would

11    respectfully submit that you don't pay $100 million and

12    agree to license your -- the drug that could cut the legs

13    out from under you unless you think there's a real

14    possibility that you will get hit for much worse.  And you

15    can't close your eyes.  There was a famous line -- and it

16    sounds sexist, but it's from a different era -- which a

17    judge says, We can't cannot ignore as judges what we know as

18    men.  You cannot ignore the fact that they paid $100 million

19    and they licensed the drug to a competitor.  They didn't do

20    this voluntarily.  They did it because they face real

21    exposure.  This is not a rounding error.  This was the

22    equivalent of 43 percent of their revenue -- net revenue

23    that year.  That was clearly material.  It clearly hurt.

24              THE COURT:  Okay.  What do I make of the SEC

25    investigation?
```

1          MR. ROSEN:  I'm sorry?

2          THE COURT:  The SEC investigation.

3          MR. ROSEN:  The law is clear the Court should draw

4     no -- and we cite a case called -- I believe it's --

5     UTStarcom in our brief that says the Court should draw no

6     inference from the SEC's decision not to prosecute.  The SEC

7     has limited resources; it has limited priorities; it has

8     varying priorities; and, as the Supreme Court has repeatedly

9     said -- I believe it said in Tellabs; I know it's said in

10    other cases -- private enforcement of securities laws is an

11    important adjunct to public prosecution and SEC enforcement.

12    The fact that the SEC, for whatever reason, elected not to

13    sue means nothing.  You can draw no inference from that.

14    There is no case that says you can.  It's not a clean bill

15    of health.  It's not any decision other than the SEC

16    administratively says, These are our resources.  Here's how

17    we want to spend them.  We're going to spend them on

18    something else.

19          Let me talk about a few other issues very, very

20    briefly.  On -- and this is the least important issue, but

21    it's something I don't want to forget.  Counsel from Paul,

22    Weiss was speaking about the individual defendants and we

23    have asserted a control person claim against them.

24          THE COURT:  I'm sorry?

25          MR. ROSEN:  We have asserted a control person

1    claim against them under Section 20(a).  And the D.C.

2    Circuit has said, We're not sure what the standard is for

3    control person liability, whether you need to be a culpable

4    participant or not.  I would respectfully submit that the --

5    that --

6            THE COURT:  I'm sorry.

7            MR. ROSEN:  No, not a problem.

8            THE COURT:  My pen's out of ink.

9            MR. ROSEN:  If you can't write, I can't talk.

10           THE COURT:  All right.

11           MR. ROSEN:  I would respectfully submit that Mr.

12   Trudeau is a control person, certainly, as it relates to his

13   comment; Mr. Harbaugh is a control person as it relates to

14   his comments; and, frankly, as to misstatements contained in

15   securities filings, they both signed them, so they're both

16   control persons.  I think that's sufficient.

17           Let me talk about a few other issues because I

18   think -- and this will, again, start to sound scattershot,

19   but I don't want to leave them unsaid.

20           Counsel spoke at the beginning about the

21   standards.  They are correct.  We must plead fraud with

22   particularity.  We believe we've done that.  And we must

23   specify each challenged statement.  We believe we've done

24   that.  The inquiry on scienter, as Tellabs instructs us, is

25   a holistic one.  You don't look at each statement; each fact

1    separately.  You look at them where they're -- taken

2    collectively, they give rise to strong inference.  And,

3    again, they said it does not need to be smoking-gun level of

4    proof; doesn't even need to be the most likely level of

5    proof, just as likely as the other.  And Tellabs also

6    specifically rejected -- and the citation for this is 551

7    U.S. at 324, Note 5; I'll repeat that, 551 U.S. at 324, Note

8    5 -- specifically rejected the suggestion that the test for

9    summary judgment should be applied to the state of mind on a

10   motion to dismiss in a securities case.  And as the D.C.

11   Circuit said in Harman, the Court doesn't have to accept the

12   complaint's legal conclusions, but it must assume the truth

13   of well-pled allegations and draw all reasonable inferences

14   in favor of the plaintiff.  We are not required to plead

15   evidence.  And, by the way, the case earlier when we talked

16   about the SEC, it's UTStarcom, 617 F. Supp. 2d 964, 975,

17   Note 15.  We cited that in our brief, but in case you needed

18   that.

19          Also -- and this is in response to their comment,

20   Well, gee, this was an off-the-cuff.  He was surprised,

21   whatever.  There is no off-the-cuff exception for statements

22   by executives in an organized forum.  I mean, if I ran into

23   Mr. Trudeau at the golf course and I said, How's the company

24   doing?  What percentage are you selling to Medicare and

25   Medicaid?  And he says, Oh, about 25 percent, and, you know,

1    he's got one eye on his golf bag and one eye on how he's --

2    who his partners are that day, he's not liable for that, but

3    in a public forum where you're expected to comment; where

4    the whole purpose of it is to comment; analysts are there to

5    ask questions and you answer that, that's different, and

6    there's no off-the-cuff exception for that and Omnicare

7    certainly doesn't support that.

8            Let me talk about a few other points.

9            Your Honor asked about analyst reports and whether

10   that constitutes notice on the market.  And the defendants

11   cite a Third Circuit case called Merck, M-E-R-C-K, but the

12   fact -- the court reasoned that it was, quote, Too much for

13   us to say that every analyst following Merck, one of the

14   largest companies in the world, was in the dark.  Here,

15   we've shown both the analysts and the market was deceived

16   about the true state of acceptance of Acthar by private

17   insurers and practitioners, and the proof of that is the 35

18   percent market drop when the truth came out revealing that

19   the insurers and practitioners were not embracing the

20   expansion of access to Acthar.

21           They also -- we cited a case called United

22   Paperworkers -- 985 F.2d 1190 at 1199 -- which talks about

23   sporadic public news reports don't constitute sufficient

24   notice.  And they say in their brief, Well, that was a 14(a)

25   case -- that is, Section 14(a) -- not a 10(b) case, but they

1    failed to tell the Court that the D.C. Circuit expressly

2    quoted and followed that standard in one of the cases they

3    do cite which is Dolphin & Bradbury, 512 F.3d 634 at 641,

4    and Dolphin & Bradbury rejected the argument they had no

5    duty to disclose the information that was, quote,

6    Technically in the public domain, closed quote.

7            They also cite a non-precedential Second Circuit

8    case called Garber v. Legg Mason to distinguish United

9    Paperhangers -- Paperworkers without telling the Court that

10   a later precedential case --

11           THE COURT REPORTER:  Can you slow down, please.

12           MR. ROSEN:  I'm sorry -- without telling the Court

13   that a later precedential Second Circuit case, after noting

14   Garber, declared, quote, Case law does -- after noting

15   Garber decision, declared, quote, Case law does not support

16   the sweeping proposition that an issue of securities is

17   never required to disclose publicly-available information.

18   That is a case we did not cite previously.  I can hand it

19   up.  It's Litwin v. Blackstone, 634 F.3d 706 at 718, and

20   that's another Second Circuit case, and my partner Jeff

21   Golan is pulling that out to share with Your Honor and

22   defense counsel.

23           (Brief pause.)

24           If I can hand this to your Deputy, (indicating.)

25   That's a case that was --

```
 1                THE COURT:  Thank you.
 2                MR. ROSEN:  On loss causation, we've talked about
 3      it sporadically, but let me just point out a few things.
 4      Following the disclosure of the FTC complaint, there's a
 5      drop of 5.85 percent; following the disclosure of the true
 6      percentage of Medicare and Medicaid sales in Acthar, the
 7      stock dropped over 18 percent; and following the disclosure
 8      at the end of November 17 that ended the class period, the
 9      stock fell 35 percent.  That should eliminate any issue as
10      to loss causation on those.
11                THE COURT:  But, again, don't I have to look at
12      where the misrepresentation or the omission was corrected?
13                MR. ROSEN:  That's correct.  And for the 2017
14      statements, it was corrected on the last day of the class
15      period when they disclosed that information.
16                THE COURT:  All right.  But for the earlier ones,
17      the proxy and --
18                MR. ROSEN:  For --
19                THE COURT:  I need to look earlier.  You agree
20      with that?
21                MR. ROSEN:  For each statement, you need to look
22      at the response.  For the statement, you know, on October --
23      November 29th, 2016, that says, We're not aware of any
24      existing or threatened or existing or pending, whatever --
25                THE COURT:  Right.
```

1              MR. ROSEN:  -- litigation --

2              THE COURT:  You look at the --

3              MR. ROSEN:  -- you look at what happened on

4     January 17, 2017 --

5              THE COURT:  Understood.

6              MR. ROSEN:  -- where the stock drops 5.85 percent.

7              THE COURT:  Understood.  Do you -- Mr. Rosen, do

8     you argue with the way they've broken down -- I think it's

9     their Exhibit -- is it 66 or 63?  They have this chart.  And

10    they say, in four areas, there's no loss causation.  Do you

11    disagree with those or do you simply say on a motion to

12    dismiss I shouldn't be hung up on loss causation?

13             MR. ROSEN:  Well, I think that's certainly what

14    the decisions in both Harman and Gilead suggested; that you

15    should not get hung up on that issue --

16             THE COURT:  Okay.

17             MR. ROSEN:  -- at this time.

18             THE COURT:  But do you -- understood.  But do you,

19    as a factual matter, disagree with the way in which they've

20    characterized certain alleged misstatements or omissions?

21             MR. ROSEN:  I've got to pull out my copy of

22    Exhibit-63, Your Honor.  Let me just find that for a second.

23             THE COURT:  And I can give you time later.

24             MR. ROSEN:  Here's my answer as to Exhibit-63.

25    It's not accurate.  For example, if you look at Page 3 of

```
 1    their document -- it's actually -- excuse me, it's labeled
 2    Page 4 of 4, but it's actually the third page.  I guess the
 3    first page is the exhibit indication.  The first indication
 4    is on the alleged misstatement:  Alleged misstatement that
 5    Acthar sales would experience mid single-digit to low
 6    double-digit growth.  And they say, Conceded.  It's not
 7    conceded.
 8                THE COURT:  Yeah.  No, I'm not focused on the
 9    conceded points.  I'm just -- on that page, there's three
10    examples of no loss causation:  Paragraph 159, Paragraph
11    148, Paragraph 115.  Similarly, on Page 1, Paragraphs 101
12    through 102, they also say, No loss causation.  I'm just --
13                MR. ROSEN:  Your Honor, I don't want to do this
14    standing on one foot.  So if I can --
15                THE COURT:  Okay.
16                MR. ROSEN:  -- get back --
17                THE COURT:  No, no, no, you can, and I'm going to
18    hear briefly from them, and I'll give you a chance to answer
19    that later.  So go ahead and make your remaining --
20                MR. ROSEN:  Yeah.  Thank you --
21                THE COURT:  -- points.
22                MR. ROSEN:  -- Your Honor.  I can just make a
23    couple of other points.  And, again, I'm flipping back and
24    forth here.
25                (Brief pause.)
```

1          Your Honor, subject to having a sudden occurrence

2    as soon as I sit down of something that I was going to say

3    but didn't --

4          THE COURT:  Okay.  I'll give you a few minutes.  I

5    know this has been a long argument and it's hard to keep all

6    your thoughts together.  So I'll hear from the defendants

7    again and then give you a very brief chance.

8          MR. ROSEN:  Thank you, Your Honor.

9          THE COURT:  All right.  Ms. Silverberg?

10          (Brief pause.)

11          Okay.  If you can just rebut the points that you'd

12    like to rebut.

13          MS. SILVERBERG:  I'm going to tick off -- I really

14    appreciate --

15          THE COURT:  All right.

16          MS. SILVERBERG:  -- Your Honor's time today.  I'm

17    going to tick off a very few points.

18          Number one, they handed up to the Court -- I think

19    it was -- the last case they handed up to the Court was a

20    Second Circuit case, Litwin v. Blackstone Group, which they

21    said supported their position that the Court should not

22    consider the total mix of information.  On very quick read,

23    it appears that that case is a Section 11 case, not a

24    Section 10b-5 case.  So again, it would confirm that they do

25    not have a 10b-5 case on the subject.

1          Number two, they passed up another case to the

2     Court earlier, Maiman v. Talbott, 2010, from the Central

3     District of California.  They passed it up for the point of

4     judicial notice of analyst reports which I'll get to, but I

5     did want to note that there is a section in that case called

6     loss causation in which the court says, To sufficiently

7     allege loss causation, a complaint must allege that the

8     defendant share price fell significantly after the truth

9     became known, quoting Dura.  So again, that supports us on

10    loss causation and, again, just briefly refer the Court to

11    both the Ninth Circuit case and the Fourth Circuit case that

12    we cite at Page 42 of our reply brief, again, citing cases

13    saying that a stock must fall -- stock price must fall in

14    order to establish loss causation.

15          Next, very, very briefly, on judicial notice,

16    again, they just handed up this case from the Central

17    District of California.  We quote in our brief -- the

18    opening brief, Page 4, Note 4 -- a number of cases,

19    including a case from this court, Stevens v. InPhonic, in

20    which the court says that it is appropriate to consider

21    various documents, including analyst reports, to view the

22    total mix of information on a 10(b) case.  We would also

23    note that in the event that there are documents that may not

24    be considered on a motion to dismiss -- and, again, we do

25    not believe that the public statements being used for the

```
1    total mix fall into that category -- the remedy is not to

2    convert this into summary judgment but to ignore the

3    statements.  And, again, that's the Khoja case -- K-A-J-A

4    [sic] -- from the Ninth Circuit which we quote in our brief.

5              THE COURT:  Wait.  Say that again.  I'm sorry.  I

6    was --

7              MS. SILVERBERG:  Khoja, K-H --

8              THE COURT:  No, before that.  The basic point you

9    want to make about it.

10             MS. SILVERBERG:  Oh, that in the event the Court

11   determines that there are documents included in our motion

12   that are not appropriately considered on a motion to

13   dismiss, plaintiffs suggested that the answer was to convert

14   this into a motion for summary judgment.  To the contrary,

15   the correct remedy is to ignore the documents that you think

16   are not properly before the Court, and that was the Khoja

17   case, K-H-O-J-A, Ninth Circuit.

18             In Richman -- the plaintiff says that in Richman,

19   the court said -- actually, I left my -- I believe I left my

20   case on the table.  Thank you.

21             They described the Richman v. Goldman Sachs case

22   that we mentioned as saying that you need to disclose a

23   potential litigation once you've been advised of litigation.

24   The actual language from Richman -- and it's on star -- Page

25   star 275 -- is, When regulatory investigation matures to the
```

```
 1    point where litigation is apparent and substantially certain

 2    to occur, then 10(b) disclosure is mandated.  Here, they're

 3    only -- they have -- they seek to draw an inference that --

 4    well, let me start back.  They have no particularized facts

 5    that litigation was substantially certain to occur.  What

 6    they rely on is the fact that under the guidelines, it

 7    should take no more than 65 days.  It does not say what the

 8    lower bounds are.  And they have absolutely no

 9    particularized facts as to why anyone thought that the

10    litigation was certain at that time.

11            THE COURT:  But you agree that at the point at

12    which it's substantially certain to occur, that Mallinckrodt

13    would have an obligation to disclose under the --

14            MS. SILVERBERG:  Under the --

15            THE COURT:  -- case law?

16            MS. SILVERBERG:  -- Richman case --

17            THE COURT:  Okay.

18            MS. SILVERBERG:  -- if it was going to be material

19    to the company and substantially likely to occur.

20            THE COURT:  Okay.

21            MS. SILVERBERG:  And, again, let me just see --

22    I'm sorry.  This is a 103 case.  So again, Item 103 contains

23    that language, but there's an exemption under Item 103 which

24    we discuss in our briefing which is, in the event that the

25    relief sought is predominantly monetary and is less than a
```

1    certain -- I believe it's 10 percent of the company's

2    assets, you don't have -- Item 103 is not triggered --

3            THE COURT:  But why is this -- can we say that

4    this is predominantly monetary when they had to give up the

5    license for certain things?  Is that a fair conclusion for

6    me to draw?

7            MS. SILVERBERG:  So as of now, Synacthen is not on

8    the market anywhere in the U.S.  It's not approved for

9    anything in the U.S.  At the time that Questcor was

10   acquired, I think it accounted for about $10 million in

11   revenues.  As of now, yes, there is injunctive relief, but

12   it has not imposed any practical implication --

13           THE COURT:  But I can't look at that, can I, at

14   this stage?  Can -- I mean --

15           MS. SILVERBERG:  There was injunctive relief, but

16   as of now, it has imposed no value.

17           THE COURT:  I know.  But don't I have to look at

18   what was imposed, injunctive relief, not actually what's

19   happened?

20           MS. SILVERBERG:  Well, if you look at the actual

21   relief imposed, there was a $100 million --

22           THE COURT:  Right --

23           MS. SILVERBERG:  -- fine.

24           THE COURT:  -- and injunctive relief.

25           MS. SILVERBERG:  And injunctive relief.

1          THE COURT:  So can I say it's predominantly

2     damages?

3          MS. SILVERBERG:  In terms of the actual effect on

4     the company, there has been no actual effect as of now

5     because there's no --

6          THE COURT:  But I can't look at that, can I?

7          MS. SILVERBERG:  Well, if you --

8          THE COURT:  I mean, don't I have to look at the

9     judgment and decide, is this predominantly damages?

10         MS. SILVERBERG:  In terms of the impact on the

11    company --

12         THE COURT:  Yeah.  Well, I mean, in terms of that

13    -- what -- that standard you just cited to me --

14         MS. SILVERBERG:  So if you look at Richman,

15    Richman says that if there is injunctive relief, it must be

16    material, and plaintiff has the burden of proving that the

17    injunctive relief is material.  And, again, given the

18    injunctive relief that was imposed here, they have not met

19    that burden.

20         A number of times, incidentally, they said that

21    Mallinckrodt disclosed that there was no threatened or

22    existing litigation.  The actual language used in the

23    disclosures was, No pending --

24         THE COURT:  That's what --

25         MS. SILVERBERG:  -- or existing --

1            THE COURT:  -- I thought --

2            MS. SILVERBERG:  -- litigation.

3            THE COURT:  -- that "threatened" was not used --

4            MS. SILVERBERG:  "Threatened" was not used.

5     Correct.

6            A number of times, they argued that the stock

7     dropped and, therefore, the disclosures must have been

8     material.  If all plaintiffs have is the fact that the stock

9     dropped, they have not met -- they have not satisfied the

10    requirements under the PSLRA.  The heightened pleading

11    requirements were imposed in large part because plaintiffs

12    were bringing lawsuits when the stock fell and the court --

13    and Congress determined that is no longer -- that is not

14    enough and that you actually need to show particularized

15    allegations of material misstatement, scienter -- strong

16    inference of scienter and loss causation.

17           THE COURT:  Okay.  On the -- this is another

18    point, but it just triggered this question in my mind which

19    is the alleged misstatements, misleading remarks that

20    Mallinckrodt made about the private insurance market and

21    that you're making inroads and it's growing; is there

22    anything that I can consider in the complaint that

23    demonstrates that it, in fact, was growing?

24           MS. SILVERBERG:  Well, yes.  For example, there is

25    a paragraph -- and I left my binder on the table -- but

1     there is a paragraph in the complaint which contains the

2     facts where they said that when Mallinckrodt acquired

3     Questcor, they had 0 commercial lives under contract, and

4     then over time, that increased to -- I think it's 20 or 30

5     percent, and it's now 60 percent.  They have no

6     particularized allegations that that was not, in fact, the

7     case that they were increasing --

8                MR. BROWN:  (Indicating.)

9                MS. SILVERBERG:  Thank you, Your Honor.  [sic]

10               Paragraph 158 and 159 and Footnote 27.

11               Thank you.

12               THE COURT:  This is of the complaint?

13               MR. BROWN:  Yes.

14               MS. SILVERBERG:  Yes.

15               THE COURT:  Okay.  All right.

16               MS. SILVERBERG:  Here.  So if you look at the

17    footnote, the -- Footnote 27 on Page 75, it says, During the

18    earnings call of August 2nd, 2016, Trudeau, again, addressed

19    this long-term objective and stated, quote, Over the course

20    of the last two years or so, we have moved that portion of

21    covered lives under contract for Acthar from 0 to now

22    greater than 50 percent, and that was as of August 2nd, and

23    then later, they quote language from a subsequent call a few

24    months later where they said Trudeau represented that the

25    company was still achieving 60 percent commercial lives

1    under contract, and so -- and they have not alleged anything

2    to suggest that that progress was not being made as

3    disclosed.  We also disclosed that one formulary has added

4    Acthar.  And, again, they had no particularized allegation

5    that that was not the case.

6              Next -- sorry, trying to read my handwritten

7    notes.

8              (Brief pause.)

9              Yes.  They note that the stock drop fell

10   significantly after the day that Citron issued its report on

11   the Medicare number -- Medicare/Medicaid numbers, and then

12   it fell again the following day after the executives

13   noted -- number one, on the day the Citron report fell, you

14   had somebody accusing the CEO of a major pharmaceutical

15   company of fraud.  That gets somebody's attention.  And they

16   put a number that had a very wide discrepancy on that.  As

17   for the executives, we were talking about total mix of

18   information.  I'll just note that there was a pharmaceutical

19   conference at which executives for Mallinckrodt spoke on a

20   number of issues.  So again, there -- this is not in the

21   record.  So I won't go into details, but this was not the

22   only piece of information that was disclosed that day.  So

23   the Court should not draw any inferences solely from the

24   fact that the stock fell on a particular day.

25             Next, they say that if you look at the -- taking

1    the highest -- again, still on the Medicare statement,

2    looking at the highest differential that they want to grow

3    between Mr. -- what they say was Mr. Trudeau's number and

4    the later numbers, they say that that gets you to 7.75

5    percent of Mallinckrodt's revenues which they say is more

6    than 5.  I would just add that, again, we are -- unlike the

7    cases that are just 5 percent, these are not revenues that

8    disappeared or didn't exist or were overstated.  Again, all

9    we're saying about these revenues is that they are saying

10   that the risk profile was different, and our position is

11   they have not even alleged in their complaint why the risk

12   profile of government -- of revenues coming in from the

13   government versus revenues coming in from the private sector

14   would be different.  So at most, it's a 7.5 -- 7.75 number

15   on where the revenue is coming from, not on the existence of

16   the revenue, and they don't even have particularized

17   allegations on why the risk profile from that revenue would

18   be different.

19           Almost done.

20           They referenced JAMA.  Number one, that came in

21   April 2018.  That supposes corrective disclosure was outside

22   of the class period and there's no alleged stock drop.  The

23   CVS [sic] report that they mentioned is not in their

24   complaint and is also outside of the class period.

25           On -- still on the medical efficacy, in 2016 10-K,

1    the company did disclose no clinical studies.  So that was

2    in the market on the subject of efficacy.

3              And I think, finally, you had asked about the Form

4    4s.

5              THE COURT:  The Form 4s.  Yep.

6              MS. SILVERBERG:  The Form 4s.

7              THE COURT:  Yep.

8              MS. SILVERBERG:  Okay.  If you look at Exhibit-56

9    -- actually -- yes, Exhibit-56 is the Form 4 at the

10   beginning of the class period which shows -- and I'm looking

11   at Mr. Trudeau -- total securities owned, 135,892.  And if

12   you look at Exhibit-7, total securities owned by Mr.

13   Trudeau, 264,053 shares.  And if you look at the case laws

14   we -- case law we cite, it talks about net increases in

15   share ownership during the class period.  So his shares went

16   from 135,000-and-change to 264,000-and-change which is a

17   little under a doubling.

18             And, very briefly, on the Questcor statements, the

19   statements that Questcor made about its intent with respect

20   to the development of Synacthen, number one, they were made

21   outside of the class period; number two, they were made by

22   Questcor, not Mallinckrodt; number three, they applied to a

23   company, Questcor, that looked very different than

24   Mallinckrodt in terms of the nature of the business; number

25   four, Mr. -- this is not in the record, but Mr. Rosen made a

1    statement that the former Questcor executives continued with

2    Mallinckrodt.  They did not continue with Mallinckrodt.  I

3    just wanted to correct that statement.

4           THE COURT:  What about -- is Questcor a

5    subsidiary?

6           MS. SILVERBERG:  Questcor has, I believe, merged

7    into a subsidiary of Mallinckrodt, but going to the FTC

8    complaint, there are absolutely no allegations against

9    Mallinckrodt with respect to any conduct of Mallinckrodt.

10   If you read the complaint --

11          THE COURT:  Going to the FTC complaint?

12          MS. SILVERBERG:  The FTC complaint.  Apologies.

13   There is nothing in the FTC complaint that accuses

14   Mallinckrodt of doing -- of engaging in any anticompetitive

15   conduct.  Mallinckrodt is named in the complaint because

16   they are the successor of Questcor and, therefore, inherited

17   Questcor's liability and they were a necessary party, in

18   effect, to the extent that the FTC was seeking to have

19   Synacthen licensed to a third party, but there is no part of

20   that complaint which claims that separate from the

21   acquisition of Synacthen in 2013, Mallinckrodt -- there's no

22   allegation that Mallinckrodt -- called Mallinckrodt --

23   continued to violate the antitrust laws by not developing

24   Synacthen for other uses.  The gravamen of the antitrust

25   violation in the FTC complaint is Questcor's acquisition of

1     Synacthen in 2013.  Mallinckrodt, under corporate law, as

2     successor to Questcor, inherited that liability and was a

3     necessary party to the relief that the FTC sought, but there

4     is nothing in that complaint that says, apart from the

5     acquisition of Synacthen, Mallinckrodt, on its own,

6     separately violated the antitrust laws by not developing

7     Synacthen for other uses --

8                    THE COURT:  Okay.

9                    MS. SILVERBERG:  -- to compete with Acthar.

10                   THE COURT:  Well, on the allegation of

11    misstatement -- or omission, rather, this argument that

12    Mallinckrodt had a duty in light of Questcor's earlier

13    representations about developing the synthetic drug with the

14    FDA, what about that?  It is a subsidiary.  That doesn't

15    give -- put a legal duty on Mallinckrodt to dispel the

16    market of that because Questcor's been subsumed?

17                   MS. SILVERBERG:  There's no duty to correct a

18    comment -- well, step back.  Questcor made a statement about

19    the intent of Questcor as it existed then at the time and

20    what it stated its intent was.  Mallinckrodt acquired the

21    company.  All of a sudden, the company became a different

22    entity.  Questcor became part of a broader pharmaceutical

23    company.  There are probably many statements that Questcor

24    said about what it planned to do in the future.  Most of

25    those things were no longer true, because they didn't exist

1    as a standalone, independent company.  They existed as part

2    of Mallinckrodt.  Mallinckrodt never said they were going to

3    continue to develop this drug or that they planned to

4    develop this drug.  There's no allegation they were ever

5    asked what they planned to do with the drug.  And they made

6    it publicly known through the public FDA filing that they

7    had submitted an application to develop it solely for this

8    muscular dystrophy condition.

9            THE COURT:  You suggested earlier that that was a

10   representation that it's -- did they say solely for this and

11   no others?

12           MS. SILVERBERG:  The application was solely, and

13   the word "solely" is in plaintiffs' complaint.  So they said

14   that they were submitting this application and it was only

15   being submitted for this one indication.

16           THE COURT:  But is it a stretch to take that to,

17   then, say, in the future, they would do no others?

18           MS. SILVERBERG:  So nobody -- to the extent that

19   the market understood that the acquisition of Synacthen was

20   a net positive for Questcor because it was eliminating

21   competition, I don't know why the market would have

22   necessarily thought that now that Mallinckrodt owned this

23   and they had put in their FDA investigational application

24   and it said, This is was what we are developing it for -- no

25   reason to believe that the market would have assumed that

1     would -- it would have been developing it for any other

2     indications.  And, again, there was no stock market reaction

3     when that was -- that application was filed.  There was no

4     inquiry about, Gee, what about all these other applications

5     that we thought you were going to be developing the drug

6     for?

7               THE COURT:  Okay.

8               MS. SILVERBERG:  Finally, one last thing on

9     scienter.  There's a lot of case law.  There's been a lot of

10    talk about scienter.  And we would just say, compare the

11    scienter here to the scienter in the other cases that are

12    discussed by the court where the court found scienter.

13    There is a very wide gap.

14              THE COURT:  And one last question.

15              MS. SILVERBERG:  Yes.

16              THE COURT:  On the formulations and it was -- the

17    plaintiffs say it wasn't enough for Mallinckrodt to disclose

18    to the market, because if you don't know the percentage of

19    the sales that make up the various -- I'm trying to think of

20    the examples he gave -- it's getting late.  I'll get there.

21              MR. ROSEN:  Can I help, Your Honor?

22              THE COURT:  Sure.

23              MS. SILVERBERG:  Formularies --

24              THE COURT:  Yeah, yeah, yeah, yeah.  So if no one

25    on the outside knew -- go ahead.  Say it, Mr. Rosen.

1          MR. ROSEN:  If no one on the outside knew what

2    percentage of their sales were neurology; what percentage of

3    their sales were nephrology; what percentage of their sales

4    were -- pick your poison -- the next condition, then that --

5    the information that we could pull off the various websites

6    wouldn't tell you how significant and material that fact

7    was.

8          MS. SILVERBERG:  So I would --

9          MR. ROSEN:  There was not enough information to --

10          MS. SILVERBERG:  I would say a couple of things.

11          Mr. Rosen is suggesting that the market could not

12    understand the information that we were putting out unless

13    they also understood what percentage of prescriptions, I

14    guess, were for each indication.  Number one, there's no

15    allegation that anybody ever asked for that information.

16    Their complaint contains allegations regarding what was or

17    wasn't said on various analyst calls.  Our exhibits include

18    what was and wasn't said under other analyst calls.  Their

19    position is you could not understand information that we

20    publicly disclosed without additional information which

21    there's no allegation that anybody ever actually asked for

22    that information.  And it shouldn't matter why it was being

23    prescribed.  If sales are growing; we're saying that lives

24    under contract had increased from 0 to 60 percent; when

25    we've added a formulary, there -- plaintiff has not provided

1    any particularized allegations as to whether -- why it would

2    matter to an investor whether the new lives under contract

3    were predominantly using it for rheumatology or neurology or

4    whether or not the new formulary was for muscular dystrophy

5    or for some other use, so long as we disclosed, Right now,

6    revenues are growing; right now, we've increased commercial

7    lives; right now, we've added a formulary; right now, we've

8    had increased -- improved relaxation of restrictions, at the

9    same time, warning of all of these other risk factors.

10   They've provided no reason why anyone would care whether

11   it's nephrology, rheumatology, muscular dystrophy, neurology

12   or other conditions.

13          THE COURT:  Okay.  Thank you.

14          MS. SILVERBERG:  Thank you, Your Honor.

15          THE COURT:  Anything, briefly?

16          MR. BROWN:  Very briefly, Your Honor.  Thank you.

17   I know we've been here a long time.  So I'll try to be as

18   brief as possible and not cover what has already been

19   covered before by Ms. Silverberg.

20          But just with regard to this point about neurology

21   and nephrology and rheumatology, I'm a little confused as to

22   what Mr. Rosen is saying about the company not disclosing

23   sufficient information about that, because that's right

24   there in his complaint.  If you look at Paragraphs 148 and

25   149, there are allegations about my client, Mr. Trudeau,

1    explaining the company's historical penetration levels for

2    those, you know, different conditions, saying that the

3    company was predominantly a neurology business and it was

4    starting to evolve to much more pulmonology and

5    rheumatology.  Paragraph 149 has a block quote where he's

6    saying, historically, the business was 30 percent neurology;

7    30 percent rheumatology; 30 percent nephrology; and going

8    into great detail about this.

9         And, you know, just to step back for a second;

10   kind of, explain how I see this case and, you know, when I

11   was reading through the complaint; when I was listening to

12   Mr. Rosen earlier today -- I mean, this is a company that

13   had excellent risk disclosures both in oral statements to

14   investors; provided a tremendous amount of information in

15   the written securities filings.  This was not like the

16   Harman case where you only had boilerplate risk disclosures.

17   They were very detailed risk disclosures about so many of

18   the things that we're talking about today.  Like, for

19   example, with reimbursements for the drug, the company

20   repeatedly discussed orally and in writing -- and this is

21   going to be in the chart that we provide to you afterward,

22   and I think we're going to be able to agree with the

23   plaintiff about what that chart is going to include, but

24   that chart is going to show you, Your Honor, that there were

25   oral and written statements over the course of the entire

1    class period where the company is disclosing the risks that

2    government programs like Medicare and Medicaid and private

3    payers might push back and not want to reimburse patients

4    for the use of the drug in certain situations, but at the

5    same time as the company was disclosing these risks, during

6    the class period, the company was making good progress with

7    private insurers.  Sales were going up.  Market penetration

8    was going up.  That's that 0 to 50 percent and then 60

9    percent of covered lives under contract that Ms. Silverberg

10   discussed.  Sales went up both on a percentage basis and an

11   absolute basis.  If you look at the chart on Page 32 of the

12   complaint, it shows that the sales are going up.  And so the

13   -- this is exactly the type of case that the PSLRA was meant

14   to have dismissed on a motion where, you know, the company's

15   providing accurate information; the company's disclosing

16   risks; sales are going up; and then you, you know, hit a

17   point where your sales drop and then somebody comes in and

18   files a securities class action and says, You must have been

19   lying the whole time.  The company was making adequate

20   disclosures the whole time.

21           THE COURT:  So for the projections of future

22   growth and the safe harbor provision, they claim that the

23   cautionary instructions weren't tailored enough.  You

24   disagree?

25           MR. BROWN:  Yes, we absolutely disagree.  And if

1    you look at the specific language that the company used

2    which is, in fact, I believe, cited in the complaint --

3    actually, I can show that to you.  Like, if you go back to

4    Page 53 and Page 54 of the complaint, Paragraph 110, they

5    list, from the 2014 10-K, a lot of different risk factors.

6    One, two, three, four, five, six, seven, eight, nine, ten

7    specific bullet points that have risk factors.  And the last

8    one is specifically relevant here.  One of the risk factors

9    is our ability to achieve hospital formulary acceptance and

10   maintain reimbursement levels by third-party payers.  And

11   that's exactly, you know, what we're talking about here.

12   That was a cautionary statement in the 10-K that provided,

13   you know, meaningful disclosure to investors about risks,

14   but also, you know, Mr. Trudeau, when he made oral

15   statements to the market, said very similar things about the

16   difficult situation the company was facing getting

17   reimbursement from private payers, and it's, like, two

18   things can be true at the same time.  He can be making the

19   progress -- the company can be making progress with these

20   payers while, you know, at the same time, it's a difficult

21   situation to get the reimbursement, and both were true and

22   the company disclosed both that it's making progress and

23   both that it's getting pushed back and, at some point, the

24   pushback from insurers became so great that sales fell, but

25   that doesn't mean that Mr. Trudeau was lying when he said,

1    We're making progress and sales are going up.  That's the

2    point we're trying to make.

3         And then just to step a little bit further back,

4    you know, when we're talking about the information that's

5    available about Acthar in the public domain -- I mean, in

6    addition to the company's oral disclosures; written

7    disclosures about risk which we think were robust, there are

8    the civil lawsuits; the Retrophin lawsuit; there's all this

9    media coverage; there are medical industry publications;

10   there are analyst reports; there's information that's

11   released by the private insurance companies.  So this is not

12   a case where the information about the drug and its risk

13   factors are hidden.  Like, all of this is in plain sight.

14   The market knows about it.  And that's why, if you look at

15   the complaint, there's so many public sources cited, you

16   know?  The -- there are multiple articles from the Journal

17   of the American Medical Association cited.  And I know one

18   of them is outside the class period, but I think some of

19   them are from within the class period.  If all this

20   information is available from the AMA itself, how can we say

21   that anything was hidden, you know, from investors?  And if

22   you look at Paragraph 75 of the complaint, that's where

23   there are multiple articles referred to from the Journal of

24   American -- of the American Medical Association.

25        So against this backdrop of so much publicly

1    available information, we think it's hard to say that

2    material information was hidden from investors where, when

3    people like Mr. Trudeau spoke on behalf of the company, they

4    used qualifying language and, you know, showed investors

5    what the risk factors were.

6              Now --

7              THE COURT:  Okay.  I'm going to give you two more

8    minutes.

9              MR. BROWN:  -- the specific --

10             THE COURT:  I'm going to lose my staff here.

11             MR. BROWN:  Okay.  The -- yes.  The only discrete

12   issue that I wanted to focus on here at this time was Mr.

13   Trudeau's statement and whether it was reckless, because Mr.

14   Rosen said, you know, that Mr. Trudeau had four choices and

15   he could have had someone else answer; he could have said, I

16   don't know, things like that, and he said -- and I wrote it

17   down.  I may be paraphrasing a little bit, but he said,

18   Whether he knew it was false or he was winging it, it's

19   still securities fraud, and we strongly disagree with that.

20             First, I don't think that even Mr. Rosen would say

21   this is a case where Mr. Trudeau knew that what he was

22   saying was false.  There are no allegations in the complaint

23   that he, sitting there in real time, October 6th, 2015,

24   knows what he's saying is wrong.  His case, I think, at

25   best, is a recklessness case.  But what does "recklessness"

1    mean?  If we look at the Fannie Mae case out of this

2    court -- District Court, District of Columbia -- from 2007,

3    it says, In our circuit, the required state of mind that

4    must be pled is that of at least extreme recklessness;

5    meaning, an extreme departure from the standards of ordinary

6    care which presents a danger of misleading buyers or sellers

7    that is either known to the defendant or so obvious that the

8    actor must have been aware of it.  And the court went on to

9    quote a standard that has been used by other courts,

10   including in the Southern District of New York and the

11   Second Circuit, that, In order for reckless conduct to give

12   rise to a strong inference of scienter, it must not -- it

13   must be not merely simple or even inexcusable negligence but

14   an extreme departure from the standards of ordinary care

15   which presents a danger of misleading buyers or sellers.

16   It's either known to the defendant or so obvious that the

17   actor must have been aware of it.

18              THE COURT:  Is the standard any different at

19   summary judgment versus motion to dismiss?

20              MR. BROWN:  I believe that is the standard that we

21   use for a motion to dismiss.

22              THE COURT:  And was that case summary judgment or

23   motion to dismiss?

24              MR. BROWN:  I believe this case was a -- this case

25   was a motion to dismiss.

1            THE COURT:   Okay.   All right.   Anything else?

2   Twenty seconds.

3            MR. BROWN:   Okay.   Yes.

4            This was one statement; never repeated again.   The

5   plaintiff has not cited a single case where there was just

6   one -- a one-off statement that was made that was a guess

7   that was held to be, you know, securities fraud.   The cases

8   that the plaintiff cites are all cases where there were

9   multiple statements made over a long period of time both

10  orally and in writing where the defendants knew what they

11  were saying was wrong because someone had told them

12  internally or they'd seen it in a document and where there

13  were also other motives present like suspicious stock sales

14  or insider trading.

15           And, finally, the cases also say that where there

16  is -- where you're arguing extreme recklessness, that where

17  -- that the strength of those recklessness allegations have

18  to be higher when there are no adequate allegations of

19  motive.   And here, there's simply no allegations of motive.

20  So we submit that the corresponding allegations of

21  recklessness would have to be higher.

22           THE COURT:   Thank you.

23           MR. BROWN:   Thank you.   Sorry.

24           THE COURT:   That's all right.

25           Okay.   Mr. Rosen?

```
 1                    MR. ROSEN:  I will speak even faster than I

 2         normally speak.

 3                    THE COURT:  Okay.

 4                    MR. ROSEN:  First of all --

 5                    THE COURT:  No, please don't do that.

 6                    MR. ROSEN:  Okay.

 7                    (Laughter.)

 8                    THE COURT:  I've got a tired staff here.

 9                    MR. ROSEN:  That last -- the last point he made,

10         let me address that first.  Answering a question by a CEO in

11         a public forum where you're expected to discuss the

12         company's status --

13                    THE COURT:  No, I've got it.

14                    MR. ROSEN:  -- there's an implied representation

15         you know what you're talking about.  And if you don't know

16         what you're talking about, you don't have the liberty of

17         just --

18                    THE COURT:  Okay.

19                    MR. ROSEN:  -- shooting at the side of the barn.

20         That's the first point.

21                    Ms. Silverberg talked about a couple cases talking

22         about recognizing -- taking judicial notice.  Stevens v.

23         InPhonic which they cite on Page 8 of their brief, in that

24         case, the Court said those analyst reports were integral to

25         the complaint.  They are not here.  They are not integral.
```

1    Likewise, in XM, the court said the plaintiffs didn't object

2    to the consideration of those materials.  That's different.

3    Same with Form 4s, the forms that report their trades.

4    Until we take discovery, we don't know if they filed

5    truthful or untruthful statements with the SEC or for their

6    sales.  There's no way of knowing.

7         Second of all -- or maybe, I'm past second -- on

8    the issue of, what's the condition -- or the licensure of

9    Synacthen, if you're going to seek licensure for a

10   particular condition, you have to do testing for that

11   condition.  The fact that you're seeking licensure for

12   treatment for Duchenne -- D-U-C-H-E-N-E [sic] -- muscular

13   dystrophy, sometimes called DMD, doesn't mean you've done

14   the testing for other purposes.  And, certainly, nothing in

15   Paragraph 84 suggests they told the market they weren't

16   going to develop it or weren't in the process of trying to

17   develop it for something else.

18        The question about Questcor's comment and whether

19   it impacted the market, it certainly conditioned the

20   market's expectation.  When Questcor's chief scientific

21   officer said, We expected to develop it for competitive

22   purposes that are competitive to Acthar, the market had to

23   be influenced by that, and they never corrected that.

24        They cite to Paragraph 110 of our complaint where

25   the last bullet point says, and I quote, Our ability to

1    achieve hospital formulary acceptance and maintain

2    reimbursement levels by third-party payers.  We contend,

3    obviously, that they did not; that there was something -- a

4    misrepresentation.  And the proof of that is, at the end of

5    the process, you know, there is the -- if you look at

6    Paragraph 169 on Page 82 which is talking about the

7    disclosures that closed the class period on November 7th,

8    2017, it quotes, Trudeau was attributing the volume decline

9    to the fact that, quote, As the third quarter progressed, we

10   saw an increasing number of prescriptions going unfilled

11   beyond the level we had seen previously.  The implication

12   is, you're not getting -- they're not getting unfilled

13   because people aren't driving to the CVS to pick up their

14   scripts.  They're getting unfilled because the insurer is

15   rejecting them.  The insurer says, It was prescribed for X.

16   We don't think you're eligible for that.  We don't think

17   that condition -- that medicine is appropriate for that.

18   That's an indication that all their assurances that they

19   were making throughout 2017 -- We're getting greater

20   acceptance -- were collectively inaccurate and misleading.

21          Do you have anything?

22          If I could just have Mr. Golan stand up for one

23   second, he had a point he was going to make.  Rather than

24   pass me a note --

25          THE COURT:  Very quickly.

1          MR. ROSEN:  -- I thought I'd let him do it

2     directly.

3          MR. GOLAN:  Your Honor, I -- if Your Honor had

4     questions about the chart and loss causation, I'd be happy

5     to answer them.

6          THE COURT:  Oh, yeah.  Just yes or no, do you

7     dispute their claim that four of these misstatements --

8     alleged misstatements don't show loss causation?

9          MR. GOLAN:  We don't dispute that when they

10    identified the FTC investigation, that there was no stock

11    drop.  We don't dispute that.  We think the statement is

12    still relevant to motive, and we think that there were other

13    information that may have been in the market that led to the

14    price not dropping.

15          Same answer, Your Honor, with respect to the --

16    when the Synacthen manufacturer closing of its factory came

17    out.  We don't dispute that there was no loss causation.  In

18    our brief, we tried to explain that with the company not

19    having developed Synacthen, it's not surprising that the

20    market, at that point, would not have reacted.

21          THE COURT:  What about the other two?

22          MR. GOLAN:  I'm not sure I know what --

23          THE COURT:  159 and 148, just above the Synacthen.

24          MR. GOLAN:  Oh, yes, Your Honor.  We -- 159, the

25    -- in their chart at least, they have alleged

1    misrepresentations that Acthar's efficacy and its approved

2    indications were strongly supported by evidence.  And they

3    say -- first of all, they say that we conceded scienter.

4    That's not right.  We've said that --

5              THE COURT:  Yeah, okay.

6              MR. GOLAN:  -- the entire group of statements

7    during 2017 were stated with scienter.  And with respect to

8    loss causation, what we say is that on November 7th, 2017,

9    when the market goes down 35 percent because of all of the

10   disclosures that Mallinckrodt and Mr. Trudeau make, that is

11   a bottom line indication to the market that, We're not going

12   to meet our guidance of Acthar growth; that the insurer

13   restrictions were not being --

14             THE COURT:  Okay.  So --

15             MR. GOLAN:  -- relaxed; and that there wasn't

16   medical acceptance --

17             THE COURT:  And same for Paragraph 148?  You --

18   same argument there?

19             MR. GOLAN:  148, Your Honor, we -- that's in the

20   complaint.  We're not alleging any claims based on that.

21   That's the percentage of Acthar business in 2014.

22             THE COURT:  Mm-hmm.  Okay.

23             MR. GOLAN:  We're not pressing -- we, in fact, put

24   that in our answering brief.

25             THE COURT:  Okay.  All right.  Thank you.

```
1              MR. GOLAN:  Okay.

2              THE COURT:  Is that it for everybody?  I hope so.

3              MR. GOLAN:  Thank you, Your Honor.

4              MR. ROSEN:  You've been very patient.  So I'm sure

5     --

6              THE COURT:  Yeah, this has been very helpful.

7              MR. ROSEN:  I'm sure we all join -- Ms. Silverberg

8     and Mr. Brown join me in thanking you for Your Honor's

9     attention and patience today.

10             THE COURT:  Oh, of course.  Of course.  Thank you

11    for your hard work on this.

12             So let me ask you, I don't want to interfere with

13    Thanksgiving holiday, but how quickly can you all confer and

14    file something on this chart that you had proposed that Mr.

15    Rosen wants a chance to correct and rebut, if necessary?

16             MS. SILVERBERG:  I'm happy to confer with Mr.

17    Rosen right after this hearing in the hope that we could --

18    he could send us, by tomorrow morning, anything he would

19    like us to incorporate.

20             THE COURT:  Okay.  Will this put too much of a

21    burden on you all just to say by Monday or Tuesday of next

22    week -- if you can get it done --

23             MR. ROSEN:  If we could shoot for Tuesday.

24             THE COURT:  Okay.  Tuesday.

25             MR. ROSEN:  Unlike Ms. Silverberg, I don't have
```

1    big support staff.

2              THE COURT:  Okay.

3              MR. ROSEN:  I don't have a --

4              THE COURT:  All right.  So no later than Tuesday,

5    the 27th, you'll file something.  If you can file it

6    earlier, great, but --

7              MR. ROSEN:  That would be --

8              THE COURT:  -- I won't expect it.

9              MR. ROSEN:  That would be great.

10             THE COURT:  Okay.  All right.

11             MR. ROSEN:  Thank you, Your Honor --

12             THE COURT:  Thank you.

13             MR. ROSEN:  -- and have a happy holiday.

14             MS. SILVERBERG:  Happy Thanksgiving.

15             THE DEPUTY CLERK:  All rise.

16             THE COURT:  Thank you.

17             MR. GOLAN:  Thank you, Your Honor.

18             THE DEPUTY CLERK:  This Court is now adjourned.

19             (Proceedings concluded at 5:27 p.m.)

20                   *  *  *  *  *  *  *  *  *  *  *

21             **CERTIFICATE OF OFFICIAL COURT REPORTER**

22   **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

23   **that the above and foregoing constitutes a true and accurate**

24   **transcript of my stenographic notes and is a full, true and**

25   **complete transcript of the proceedings to the best of my**

1    ability, dated this 24th day of November 2018.

2                            /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                             Official Court Reporter
3                            United States Courthouse
                             Room 6722
4                            333 Constitution Avenue, NW
                             Washington, DC 20001
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25